Kenneth M. Ferguson
NAME
K-11229
PRISON NUMBER

CSP-Solano, P.O. Box 4000, 2-119-L
PLACE OF CONFINEMENT

Vacaville, Ca. 95696-4000
ADDRESS

2254 ✓ 1983
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ___ No ✓
COPIES SENT TO
Court ✓ ProSe

FILED
MAY 29 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# United States District Court
## Southern District Of California

KENNETH MICHAEL FERGUSON,
(FULL NAME OF PETITIONER)

**Petitioner**

v.

D.K. SISTO, Warden,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER)

**Respondent**

and

The Attorney General of the State of California, Additional Respondent.

Civil No. '08 CV 0955 JLS WMc
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of court which entered the judgment of conviction under attack
Superior Court of California, San Diego, California
2. Date of judgment of conviction April 17, 1996.
3. Length of sentence 7 Years-to-life.



CR

4. Nature of offense involved (all counts) Torture w/Use of Deadly Weapon; Assault w/DW; Corporal Injury to Spouse. (Calif. Penal Code §§ 206/12022(b); 245(a)(1)/ 12502.7(d); 273.5/12022(b)/12022.7.).

5. What was your plea? (CHECK ONE)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contenders ☐
   It you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: N/A

6. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?
   ☒ Yes ☐ No

8. Did you appeal from the judgment of conviction?
   ☒ Yes ☐ No

9. If you did appeal, answer the following:

   (a) Name of court California Court of Appeal, Fourth District.

   (b) Result Judgment Affirmed.

   (c) Date of result and citation, if known 12-18-97. D026454

   (d) Grounds raised Improper Jury Inst. for Torture; Sufficiency of Evidence for Torture; Denial of Mot. for New Trial; Improper Character Evidence.

   (e) If you sought further review or the decision on appeal by a higher state court, please answer the following:

      (1) Name of court California State Supreme Court.

      (2) Result Review Denied.

      (3) Date of result and citation, if known 3-11-98. S067424.

      (4) Grounds raised Instruction Error; Self-Defense Question; New Evidence.

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court N/A

(2) Result N/A

(3) Date of result and citation, if known N/A

(4) Grounds raised N/A

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
☒ Yes ☐ No

11. If your answer to 10 was "Yes," give the following information:

(a)(1) Name of court San Diego State Superior Court.

(2) Nature of proceeding Habeas Corpus Application.

(3) Grounds raised Same as in instant petition.

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes ☒ No

(5) Result Denied.

(6) Date of result November 29, 2005.

(b) As to any second petition, application or motion give the same information:

(1) Name of court Cal. Court of Appeal, 4th District.

(2) Nature of proceeding Habeas Corpus Application.

(3) Grounds raised Same as in the instant petition.

(4) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes ☒ No

(5) Result Denied.

(6) Date of result May 24, 2007.

(c) Did you appeal, to the highest state court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc. ☒ Yes ☐ No
(2) Second petition, etc. ☒ Yes ☐ No

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not: N/A

12. **State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground.** If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. Moreover, if you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these **grounds for relief**, you must allege facts. The Court will return the petition to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

**A. Ground one:** PLEASE SEE ATTACHED ARGUMENTS #1-7.

**Supporting FACTS** (state *briefly* without citing cases or law)

PLEASE SEE ATTACHED ARGUMENTS #1-7.

**B. Ground two:** PLEASE SEE ATTACHED ARGUMENTS #1-7.

**Supporting FACTS** (state *briefly* without citing cases or law):

PLEASE SEE ATTACHED ARGUMENTS #1-7.

**C. Ground three:** PLEASE SEE ATTACHED ARGUMENTS #1-7.

**Supporting FACTS** (state *briefly* without citing cases or law):
PLEASE SEE ATTACHED ARGUMENTS #1-7.

**D. Ground four:** PLEASE SEE ATTACHED ARGUMENTS #1-7.

**Supporting FACTS** (state *briefly* without citing cases or law):
PLEASE SEE ATTACHED ARGUMENTS #1-7.

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them: N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
☐ Yes ☒ No

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing C. Bradley Patton, 2777 Jefferson Street, Ste. 200, Carlsbad, Ca. 92018.

(b) At arraignment and plea Same as above.

(c) At trial Same as above.

(d) At sentencing Same as above.

(e) On appeal Same as above.

(f) In any post-conviction proceeding N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding
N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes ☐ No

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes ☒ No

(a) If so, give name and location of court which imposed sentence to be served in the future:
N/A

(b) Give date and length of the above sentence: N/A

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
☐ Yes ☒ No

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

May 26, 2008 (DATE) Kenneth M. Ferguson SIGNATURE OF PETITIONER

# INDEX OF GROUNDS FOR RELIEF


Page

Ground I
THE BOARD'S FAILURE TO FIND PETITIONER SUITABLE FOR PAROLE RELEASE IS SUBJECT TO HABEAS REVIEW AS CONTRARY TO STATE LAW AND AS A VIOLATION OF THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED STATES CONSTITUTION 1

Ground II
PETITIONER'S CLEAR RIGHT TO SUBSTANTIVE DUE PROCESS OF LAW UNDER THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE READILY APPARENT DENIAL OF AN IMPARTIAL BOARD OF PAROLE HEARINGS PANEL 6

Ground III
THE BOARD UNLAWFULLY DENIED PETITIONER PAROLE RELEASE ON THE BASIS OF VAGUE AND CONCLUSORY STATEMENTS THAT IN FACT CONTRADICTED THE RECORD, THEREBY DEMONSTRATING THE ABSENCE OF IMPARTIALITY 17

Ground IV
THE BOARD'S ASSERTION THAT PETITIONER HAS NOT YET BEEN ADQQUATELY REHABILITATED VIOLATES STATE LAW ESTABLISHING THE PURPOSE OF INCARCERATION 30

Ground V
THE DECISION BY THE BOARD OF PRISON TERMS THAT PETITIONER WAS NOT SUITABLE FOR PAROLE RELEASE DID NOT COMPLY WOTH DUE PROCESS CRITERIA SET FORTH BY MANDATORY STATE LAW SERVING TO ENFORCE THE UNITED STATES CONSTITUTION 35

Ground VI
PETITIONER'S STATE AND FEDERAL RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY THE BOARD'S REFUSAL TO CONSIDER SUBSTANTIAL AND LAUDATORY REPORTS AUTHORED BY PRISON STAFF 43

Ground VII
THE BOARD FAILED TO SET A PRIMARY TERM -- A DUTY EXPRESSLY MANDATED BY STATE LAW THAT IS ENTIRELY SEPARATE AND DISTINCT FROM ITS TASK OF DETERMINING HIS CURRENT SUITABILITY 45

PRAYER FOR RELIEF 55

VERIFICATION 56

INDEX OF EXHIBITS

A) Transcript of January 12, 2005 Parole Board Hearing

B) Statement By Defense Counsel

C) Statement By District Attorney

D) Psychosocial Evaluation of 2004

E) BPT Form 1005(b) Parole Denial

F) Psychosocial Evaluation of 2002

G) Excerpt From Reporter's Transcript
Dated June 13, 1996

H) Letters to Petitioner From His Son, Kyle

I) Ten Assorted Laudatory Chronos Issued
By Department of Corrections Staff

J) Superior Court Denial of Habeas Corpus Petition,
Case No. HCN 814/HCN 0719, Dated 11/09/05

K) Documents Concerning Department of Corrections
Investigation of Petitioner's Laudatory Chronos
As Requested At The January 12, 2005 Board Hearing

L) California Court of Appeal and State Supreme Court
Denials of Habeas Corpus Petition

M) Psychosocial Evaluation of December 2006

N) BPT Form 1001 "Life Prisoner Hearing Decision Face Sheet"
And Board of Parole Hearing Transcripts Denial From 2/27/07

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT


| | |
|---|---|
| Board of Prisons v Allen 482 U.S. 360 (1987) | 6 |
| Brecht v Abrahamson 503 U.S. 691 (1993) | 3 |
| Connecticut Board of Pardons v Dumschat 452 U.S. 458 (1981) | 47 |
| Edwards v Balisok 520 U.S. 641 (1997) | 18 |
| Hicks v Oklahoma 447 U.S.343 (1980) | 51 |
| Houston v Lack 487 U.S. 266 (1988) | 2 |
| Kotteakos v U.S. 328 U.S. 750 (1946) | 3 |
| McGinnis v Royster 410 U.S. 263 (1973) | 8 |
| Mitchell v Esparza 540 U.S. 12 (2003) | 1 |
| Morrisey v Brewer 408 U.S. 471 (1972) | 15 |
| Peters v Kiff 407 U.S. 493 (1972) | 6 |
| Rogers v Richmond 64 U.S. 45 (1961) | 28 |
| Stansbury v California 511 U.S. 318 (1994) | 29 |
| Superintendent v Hill 472 U.S. 445 (1985) | 19 |
| Weaver v Graham 450 U.S. 24 (1981) | 52 |
| Woodford v Visciotti 537 U.S. 19 (2002) | 29 |


## NINTH U.S. CIRCUIT COURT OF APPEALS


| | |
|---|---|
| Ballard v Estelle 937 F.2d 453 (1991) | 2 |
| Beno v Shalala 30 F.3d 1057 (1994 | 24 |
| Biggs v Terhune 334 F.3d 910 (2003) | 20 |
| Caliendo v Warden 365 F.3d 691 (2004) | 28 |
| Clark v Murphy 331 F.3d 1062 (2003) | 3, 29 |
| Coopersmith v Palmateer 397 F.3d 1236 (2005) | 28 |
| Cooperwood v Cambra 245 F.3d 1042 (2001) | 28 |
| Fernandez v Roe 286 F.3d 1073 (2002) | 28 |
| Hines v Gomez 018 F.3d 265 (1997) | 19, 36 |
| Jancsek v Oregon Board of Pardons 833 F.2d 1389 (1987) | 36 |
| McQuillion v Duncan 306 F.3d 895 (2002) | 1, 17, 20, 36 |
| McQuillion v Schwarzennegger 369 F.3d 1091 (2004) | 7 |
| Platex v Mossinghoff 758 F.2d 594 | 32 |
| Sass v California 461 F.3d 1123 (2006) | 1 |
| Sellers v Procunier 641 F.2d 1295 (1981) | 6 |
| Torres v Prunty 223 F.3d 1103 (2000) | 29 |
| Wasko v Vasquez 820 F.2d 1090 (1987) | 2 |


## FEDERAL DISTRICT COURT OF CALIFORNIA


| | |
|---|---|
| Brown v Terhune 158 F.Supp.2d 1050 (N.D. Cal. 2001) | 29 |


## CALIFORNIA STATE SUPREME COURT


| | |
|---|---|
| Cal. Ass'n. of Psych. Providers v Rank 51 Cal.3d 1 (1990) | 33 |
| Hunick v U.S. Fidelity 47 Cal.3d 456 (1988) | 32 |
| In re Cudjo 20 Cal.4th 673 (1999) | 16, 29, 34, 42, 44 |
| In re Dannenberg 34 Cal.4th 1061 (2005 | 14, 17, 54 |
| In re Jeanice D 28 Cal.3d 210 | 47 |
| In re Lynch 8 Cal.3d 410 (1972) | 46, 47 |
| In re Powell 45 Cal.3d 894 (1988) | 17, 18, 19 |
| In re Rodriguez 14 Cal.3d 639 (1975) | 45, 46, 47, 49 |

| | |
|---|---|
| In re Rosenkrantz 29 Cal.4th 616 (2002) | 8, 14, 17, 24, 33, 43 |
| In re Stanworth 33 Cal.3d 176 (1982) | 50, 51, 52 |
| In re Sterling 63 Cal.2d 486 (1965) | 29 |
| In re Visciotti 14 Cal.4th 325 (1996) | 56 |
| Mejia v Reed 31 Cal.4th 657 (2003) | 31 |
| People v Allen 42 Cal.3d 1222 (1986) | 54 |
| People v Barnum 29 Cal.4th 1210 (2003) | 46 |
| People v Duvall 9 Cal.4th 464 (1995) | 16, 29, 34, 42, 44, 55 |
| People v Felix 22 Cal.4th 651 (2000) | 46, 53 |
| People v Jefferson 21 Cal.4th 89 (1999) | 54 |
| People v Robles 23 Cal.4th 1106 (2000) | 31 |
| People v Wingo 14 Cal.3d 169 (1975) | 45, 46, 47 |
| Powers v City of Richmond 10 Cal.4th 84 (1995) | 16 |


CALIFORNIA COURTS OF APPEAL


| | |
|---|---|
| Catchpole v Brannon 36 Cal.App.4th 237 (1995) | 6 |
| Hall v Harker 69 Cal.App.4th 836 (1999) | 7 |
| In re BPT v S.Ct. (Bragg, 2005 #H028569)___Cal.App.4th___ | 27 |
| In re Bray 97 Cal.App.3d 510 (1979) | 47 |
| In re Carr 38 Cal.App.4th 209 (1995) | 15 |
| In re Caswell 92 Cal.App.4th 1017 (2002) | 18, 36 |
| In re DeLuna 126 Cal.App.4th 585 (2005) | 4, 15, 28, 36, 37 |
| In re Fain 139 Cal.App.3d 295 (1983) | 6, 47, 50 |
| In re Johnson 35 Cal.App.4th 160 (1995) | 18 |
| In re Marriage of Iverson 11 Cal.App.4th 1495 (1992) | 7 |
| In re Neal 114 Cal.App.3d 141 (1980) | 47 |
| In re Ramirez 94 Cal.App.4th 549 (2001) | 18, 24, 43 |
| In re Scott 119 Cal.App.4th 871 (2004) | 8, 15, 22, 24, 36, 43 |
| In re Scott 133 Cal.App.4th 573 (2005) | 35 |
| In re Seabock 140 Cal.App.3d 29 (1983) | 19, 50, 51 |
| In re Smith 109 Cal.App.4th 489 (2003) | 15, 28, 55 |
| In re Smith 114 Cal.App.4th 343 (2003) | 28 |
| In re Stanley 54 Cal.App.3d 1030 (1976) | 48, 52, 53 |
| In re Wen Lee 143 Cal.App.4th 1400 (2006) | 4 |
| Moore v Twomey 120 Cal.App.4th 910 (2004) | 2 |
| People v Bryan 10 Cal.App.4th 1584 (1992) | 32 |
| People v Cluff 87 Cal.App.4th 991 (2001) | 36 |
| People v Duran 140 Cal.App.3d 485 (1983) | 48 |
| People v Phelps 41 Cal.App.4th 946 (1996) | 32 |
| People v Scott 150 Cal.App.3d 221 (1985) | 48, 49 |
| Scott v Ciba Vision Corp. 38 Cal.App.4th 307 (1995) | 32 |
| Sommerfield v Helmick 57 Cal.App.4th 315 (1997) | 6, 28 |
| Terhune v S.Ct. 65 Cal.App.4th 864 (1998) | 13, 33, 50 |
| In re Duarte | 50, 51, 52 |

## GROUND I

THE BOARD'S FAILURE TO FIND PETITIONER SUITABLE FOR PAROLE RELEASE IS SUBJECT TO HABEAS REVIEW AS CONTRARY TO STATE LAW AND AS A VIOLATION OF THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED STATES CONSTITUTION

### INTRODUCTION

It is settled that California Penal Code § 3041(a) creates a due process liberty interest in parole, thus rendering state findings of unsuitability for parole subject to federal judicial review (Sass v California 461 F.3d 1123 (9th Cir. 2006); McQuillion v Duncan 306 F.3d 895, 902 (9th Cir. 2002).). Petitioner contends that the Equal Protection Clause of the U.S. Constitution provides an alternate source of jurisdiction by which a federal district court may review such findings of unsuitability, and thus a separate basis for state remedy, founded on a violation of the Equal Protection Clause. In addition, that alternate source of federal authority and distinct basis for state remedy is likewise settled in the law, within the meaning of Mitchell v Esparza 540 U.S. 12, 16-17 (2003).

In other words, insofar as California parole applicants similarly situated with petitioner as to parole suitability have been released on parole, the state's failure to find petitioner suitable for parole release has violated his right secured by the Equal Protection Clause of the U.S. Constitution.

The Board of Parole Hearings (hereinafter "BPH") erroneously concluded that petitioner would "pose an unreasonable risk of danger to society or a threat to the public safety" culminated in the violation of the Equal Protection Clause of the U.S. Constitution. This Clause also renders those aspects subject to review by both the state and federal courts.

STATEMENT OF THE LAW

It is well established that the Equal Protection Clause of the Fifth Amendment to the United States Constitution creates a basis for federal judicial review of state misconduct that is separate and distinct from federal jurisdiction founded on the Due Process Clause In Wasko v Vasquez 820 F.2d 1090, 1091 fn.2 (9th Cir. 1987), the reviewing court emphasized the separate and distinct jurisdiction conferred where a state habeas petitioner alleges unequal, as opposed to unfair or incorrect, application of a state regulation or process:

> our jurisdiction to review this [] habeas petition is based on Wasko's allegations that his federal constitutional rights to due process and equal protection were violated. (emphasis added)

As the reviewing court acknowledged in Ballard v Estelle 937 F.2d 453, 456 (9th Cir. 1991), addressing a claim that California Penal Code § 12022.5 had been applied unequally to that petitioner:

> Mr. Ballard's claim that his sentence violated the California sentencing laws because a different definition of "personal use" of a firearm was used than California has adopted in other cases sets forth a cognizable federal habeas corpus claim...

For example, as a state reviewing court noted in Moore v Twomey 120 Cal.App.4th 910 (2004), in the context of the "mail-box rule" established by Houston v Lack 487 U.S. 266 (1988):

> The [California] Attorney General's brief acknowledges that "equal protection guarantees are implicated when equal access to the courts is unreasonably denied by state officials in the handling of the prison plaintiff's mail...

As with Mr. Moore in the context of state prison actions concerning legal mail, so also with petitioner in the context of state parole Board actions concerning suitability for parole, unequal application of state regulations violates the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution — especially where, as with court access and parole suitability,

the state actions enforce rights acknowledged by United States Supreme Court precedent.

In sum, the right to Equal Protection of Law secured by the Fifth Amendment, and the right to Due Process of Law secured by the Fourteenth Amendment, may provide two separate and distinct bases for federal judicial review of state misconduct. Also, in the present matter, on habeas corpus the state courts should address and resolve both constitutional violations arising from a single act of state misconduct.

Holdings of the United States Supreme Court are the only definitive source of clearly established authority interpreting rights secured by the U.S. Constitution. However, federal and state reviewing courts may rely on precedent from the Ninth Circuit Court of Appeal as persuasive authority for determining whether a state's decision unreasonably applied U.S. Supreme Court law, or was objectively unreasonable in light of the record (Clark v Murphy 331 F.3d 1062, 1069 (9th Cir. 2003) - cert. den. 540 U.S. 968). By way of Example, since the Brecht v Abrahamson (503 U.S. 691 (1993)) standard was founded on 28 U.S.C. § 2111 — which codified the holding of Kotteakos v U.S. 328 U.S. 750 (1946), existing Circuit Court precedent applying 28 U.S.C. § 2111 is likewise compelling precedent where a state prisoner invokes federal habeas corpus review of his criminal conviction.

Accordingly, the decisions of the Ninth Circuit Court of Appeals in Wasko, supra and Ballard, supra, illustrate the alternate source of federal jurisdiction arising from a state's unequal application to petitioner of the state regulations governing parole suitability, as will be explained next.

STATEMENT OF FACTS

Numerous recent published decisions of the California Courts of review on

habeas corpus have vacated BPH findings of unsuitability for parole on the basis that the record in those cases could not support the Board's purported findings. For example, in In re DeLuna 126 Cal.App.4th 585, 598 (2005), the court concluded that:

> This review of all of the Board's stated reasons for denying defendant a parole release date reveals that the majority of them lack any evidentiary support.

Accordingly, the matter was remanded to the Superior Court, and subsequently remanded to the BPH for "reconsideration" of Mr. DeLuna's suitability for parole. Likewise, in In re Wen Lee 143 Cal.App.4th 1400 (2006), the court concluded that:

> The record establishes that Mr. Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record allows only one conclusion about Lee's lack of dangerousness to the public, it serves no purpose to remand this matter...
> Accordingly, the petition for writ of habeas corpus is granted.

Deluna and Wen Lee had been convicted of murder, and petitioner of torture, in violation of Cal.P.C. § 209, which is, in reality, aggravated assault with great bodily injury redefined as "torture" in order to grant the prosecutor the ability to seek the life sentence they were otherwise denied through the jury's acquittal of the charge of attempted murder. However, petitioner is similarly situated with DeLuna and Lee in that they share a sentence of life, and therefore the same statutory criteria for parole suitability, as set forth by the California Code of Regulations, Title 15 (hereinafter CCR) §§ 2402 et seq.

CONCLUSION

The Board's decision that petitioner is unsuitable for parole, and the Superior Court's order to that same effect violates the Equal Protection Clause of the United States Constitution, as well as state laws enforcing that Clause,

because he is similarly situated with habeas Petition's likewise suitable for parole who have been ordered released by the state reviewing courts.

Therefore, the federal constitutional Due Process violations hereafter addressed within this petition are separately and distinctly subject to review and remedy as violations of the right to Equal Protection of Law as secured by the Fifth Amendment to the U.S. Constitution. 1/

Habeas corpus should issue here as a matter of law.

1/ Petitioner attended a subsequent parole hearing in February 2007, at which the Panel discussed various reasons for another denial, this one for two years. The Transcripts for that decision are attached hereto as Exhibit N, and the pro-forma nature of the reasons given should reflect on each claim within this application for habeas corpus relief. The Panel's reasons discuss static circumstances, misstate the record, require the petitioner to complete book reports, and attack his reasons for seeking a grant of parole. The nature of this opinion of the Board is unduly onerous and hostile, and each claim within this petition should relate to the latest denial of parole.

GROUND II

PETITIONER'S CLEAR RIGHT TO SUBSTANTIVE DUE PROCESS OF LAW UNDER THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE READILY APPARENT DENIAL OF AN IMPARTIAL BOARD OF PAROLE HEARINGS PANEL

INTRODUCTION

The right to an impartial and unbiased decision maker, in the context of parole suitability determinations, is founded on the Fourteenth Amendment right to due process of law (Sellers v Procunier 641 F.2d 1295, 1303 (9th Cir. 1981)), and when using its authority, the Board acts in a quasi-judicial role requiring impartial and unbiased decisions (Sommerfield v Helmick 57 Cal.App.4th 315 (1997)). That right is mirrored by the public's expectation that such decisions will be based on the merits, and not arbitrary and capricious (Board of Prisons v Allen 482 U.S. 360 (1987): In re Fain 139 Cal.App.3d 295, 305 (1983)). In addition, the right to an impartial and unbiased decision maker arises from the Equal Protection Clause of the United States Constitution and of the California Constitution, which requires that similarly situated applicants for parole receive similar consideration under similar criteria and, conversely, that a qualified applicant not receive the same denial as an unqualified applicant.

Under the California statutory authority of the Code of Civil Procedure § 170.2, such bias is evaluated by an objective, rather than subjective, standard of whether a reasonable person would doubt the impartiality of the decision maker (Catchpole v Brannon 36 Cal.App.4th 237, 245 (1995)). Accordingly, the federal constitutional right to such impartiality in the context of Due Process of Law and Equal Protection of Law is violated when the circumstances demonstrate a reasonable likelihood or probability of bias; a clear showing of actual bias is unnecessary (Peters v Kiff 407 U.S. 493, 502 (1972)). It should also be noted that the U.S. Supreme Court has emphasized, in the comparable context of prison disciplinary hearings - where a lesser degree of due process

may suffice - that the "some evidence" standard of review is only one limited aspect of judicial review for compliance with minimal due process requirements. It does not apply to the review of a denial of impartiality.

While it is not necessarily a settled point, it is a matter of common perception among local federal district courts that the Board unofficially does have a blanket policy of issuing unwarranted, pretextual, and thus unlawful parole denials, and it is much more firmly established that any such policy would violate state law and federal constitutional standards (McQuillion v Schwarzenegger 369 F.3d 1091, 1097 (2004)). For the purposes of the instant matter, petitioner here does assert that the Board does, in fact, follow just such a policy, and the Board did so in finding him unsuitable for release on parole; an assertion separate and distinct from the specific bias of the Board against him at the January 12, 2005 hearing. Also, while bias against an individual is a denial of due process, bias against a cognizable class of persons is especially egregious because it systematically "taints the decision making process itself." (Hall v Harker 69 Cal.App.4th 836, 842 (1999)), and is thus more likely to warrant remedy (In re Marriage of Iverson 11 Cal.App.4th 1495, 1501 fn.6 (1992)).

In sum, petitioner will demonstrate that the transcript of his parole consideration hearing on January 12, 2005 affirmatively and objectively demonstrates the partisan bias of the Board members. The separate and distinct ground for relief arising from the Board's reliance on vague and conclusory statements, as a basis for the finding of unsuitability, will be addressed later in the petition, and will also explain why the "some evidence" standard of California law does not satisfy the federal constitutional requirements.

STATEMENT OF FACTS

A parole release denial based on pretextual reasons unsupported or contradicted by the record is, by definition, a decision reached by a biased and partisan finder of fact. In its zeal to find petitioner unsuitable for parole release, the Board overreached its statutory discretion, misstating the record and even relying on allegations disproven by the states own records. As the reviewing court emphasized in In re Scott 119 Cal.App.4th 871 (2004) (citing In re Rosenkrantz 29 Cal.4th 616, 655, 677 (2002) as authority):

> The exceedingly differential nature of the "some evidence" standard of judicial review...does not convert a court reviewing the denial of parole into a potted plant...
> Not only must the denial of parole be based on "some evidence" but, additionally, such evidence "must have some indicia of reliability..."
> The graveman of our analysis is not that the evidence Scott is suitable for parole outweighs that showing him suitable, but that there is no evidence he is unsuitable, not even the modicum required by Rosenkrantz...
> (Emphasis in the original

As with Scott, so also with petitioner, the factors relied upon by the Board have no support in the record. Ground Three will explain why the California "some evidence" standard does not comport with the U.S. Constitution, but for now the point is that the hearing transcript and other state documents do more than simply demonstrate petitioner's suitability for parole -- they affirmatively show the Board's partisan bias, rendering the January 12, 2005 parole suitability hearing a sham and a farce with a foreordained outcome.

Thus, whether the Board's finding of unsuitability flowed from an illicit blanket policy of denial, in violation of the principles of due process of law, or from a partisan bias against petitioner, thus violating his right to equal protection of the law by having no rational relation to any legitimate penal interest (McGinnis v Royster 410 U.S. 263, 270 (1973)), the denial of parole release contravened the United States Constitution.

The Board's partisan bias in the present matter is evident from the

transcript, from which the petitioner will provide three examples:

1. LAUDATORY CHRONOS

The Board's reaction to the Laudatory Chronos maintained and regulated by the Department of Corrections and Rehabilitation concerning petitioner's institutional history demonstrate the degree of partisan bias that underlay the purported "findings" of his reasons for unsuitability for setting a parole release date. Confronted with about 150 extremely favorable Chronos prepared by many prison staff members who, having observed petitioner on virtually a daily basis for extended periods of time - in some cases several years - had concluded on the basis of their training and experience that petitioner is entirely suitable for parole, the Board simply attempted to discredit the prison guards who had taken the time and care to submit the Chronos for addition into his C-File, and accused petitioner of having somehow "coerced" those personnel into following petitioner's orders:

> The Board is additionally ordering an investigation...coordinated with the Board's investigation Unit and the Department of Corrections' classification parole representatives, of the numerous laudatory chronos that appear in the file. At issue would be a request that the writers of those chronos, the authors, signify to what degree the inmate brought to their attention and requested these chronos and/or produced the written verbiage of those chronos.
>
> There is an apparent pattern to the Panel today of some coercion and some attempts and even possible forgery of signatures on these chronos over a long period of time.
>
> The bottom line is we'd like to determine the veracity of the chronos that appear in the file, if they were voluntarily put in that file by the officers or the counselors.
>
> (Hearing Transcripts of January 12, 2005, pp. 90-91)

It would be difficult to conceive of clearer evidence of partisan bias than the preposterous allegation that petitioner must have somehow "coerced" literally dozens of prison guards or, for that matter, even a single one, into submitting <u>any</u> laudatory chronos, notwithstanding the evasion of disciplinary action for having supposedly "forged signatures" on those chronos. Petitioner

is informed and believes, and on the basis of that belief and information herein asserts, that the investigation solicited by the Board was, in fact, conducted and did exonerate him of the ridiculous allegations against him regarding the laudatory chronos.

Of course, the Board had no such reservations concerning the 59 letters in opposition to his being granted a parole release date -- 14 of which were photo-copied duplicates, generated by victim's rights groups and certainly by various persons entirely unfamiliar with petitioner or the facts surrounding his commitment offense or institutional history (Id. at pp. 30-31). Those generic letters were given far more credence by the Board than the comments of dozens of prison staff who currently knew petitioner and were ready to opine that petitioner was ready for parole release. These are comments from Department employees who had some current interaction with the petitioner of one sort or another and, who could by virtue of that contact, be qualified as character witnesses on behalf of petitioner. Such disparate treatment by the Board, accepting the relevance and veracity of the letters in opposition to parole release while damning the information and origin of the laudatory chronos with unsound, unfounded, baseless, and ultimately disproven accusations, likewise demonstrates the Board's partisan bias.

Finally, it should be noted that petitioner's attorney of record at that hearing explained why their (the Board's) attitude toward the laudatory chronos was inappropriate and unwarranted, however his explanation was rebuffed:

> [Commissioner:] The Chair just acknowledged from the Board Report: "Writer has observed inmate Ferguson has solicited laudatory chronos from staff on numerous occasions...I think the point...would be that...they are solicited which tended to detract from them a little bit...
> [Attorney Stringer:] But we could agree that the author [of each chrono] has a choice of whether or not to issue the chrono?..Of course, in preparation for the hearing, though, it's incumbent upon the inmate to obtain letters of support from whatever source the

> inmate can, [and] that entails solicitation...
> [Commissioner:] Well, I'm not going to...discuss it any further.
> (Exhibit A, pp. 34-36)

## 2. MISSTATING THE RECORD

The Board also displayed an impermissible partisan bias, invoking California Code of Regulations, Title 15, § 2402(c)(3), by claiming that petitioner "does have a history of tumultuous relationships, primarily with his spouse, having quite a few arguments" (Exhibit A, pp. 87-88). However, the Board's implicit assertion that petitioner had "tumultuous relationships" with people other than his wife bears no support whatsoever in the record, and is nothing more than the Board's attempt to exaggerate the significance of the marital problems which culminated in the commitment offense which, by definition, would not have occurred absent the "tumultuous relationship" with his wife.

In addition, the Board's specious and vitriolic conclusion that "quite a few arguments" over a 23 year period of marriage (Id. at p. 17) renders a prisoner presumptively unsuitable for parole release, nine years after the marriage ended, shows the partisan bias that so permeated the January 2005 Board hearing. In fact, as the defense counsel at petitioner's jury trial emphasized:

> When interviewed by Carlsbad Police Department, Mrs. Ferguson admitted that there had been no previous threats or physical assaults between she and her husband.
> The notion that a man who has lived a legally blameless life in excess of fifty years, and who becomes involved in an explosive assault related to a highly charged divorce situation should never be allowed to walk the streets again is a notion which lacks insight and integrity.
> (Exhibit B, pp. 1 & 3)

## 3. RELITIGATING THE CRIME

Petitioner was acquitted of attempted first degree murder by the jury's verdict, which convicted him instead of the lesser-included offense of "battery," but the Board denied parole release by deeming the crime an attempted first degree murder, the very charge which the jury rejected at trial. The statement by the Deputy District Attorney (Exhibit C) submitted to the Department of Corrections and thus readily available to the Board, states in part that:

> ...KENNETH MICHAEL FERGUSON was convicted by a jury of the following offenses: Count One — Penal Code Section 242, battery on a person (LIO [Lesser Included Offense] of attempted murder)...
> Count One was charged as Penal Code §§ 664/187/189 attempted murder in the first degree. The jury convicted KENNETH MICHAEL FERGUSON of the lesser included offense of Penal Code § 242, battery...
> (Id. pp. 1 & 4)

It should be first noted that the prosecution version of the circumstances comprising the commitment offense of "torture" as set forth by the Statement was largely inconsistent with the physical evidence and expert testimony (Exhibit B, Statement of Defense Counsel), and in fact:

> ...the jury reported her [the victim] lack of believability after trial. The conviction resulted primarily from a comparison of injuries between the two people.
> (Id. at p. 2)

The bias of the Board is evident from their decision to, for all practical purposes, veto the jury's verdict by first asking petitioner, "You're trying to tell me you weren't attempting to kill her?" (Exhibit A, p. 49) and then encouraging the deputy district attorney to relitigate the state's case before the Board in order to obtain a verdict the state could not prove before a jury:

> ...what really obviously happened here was [that] as she was standing in the laundry room with her back to him, he made the decision at that point that he was going to kill her, that his rage and his anger had went to such a degree that he decided he was going to attack her and kill her at that point...

> These are the actions of a man who is enraged at her and wants to kill her, that's the objective interpretation of the evidence.
> (Id. pp. 60-61)

At the hearing, petitioner's attorney vehemently objected to the relitigation conducted by a prosecutor unhappy with the jury's finding of fact, but the Board wholeheartedly embraced the deputy district attorney's version of "what really obviously happened," the version expressly rejected by the jury in their rejection of the attempted murder charge at trial. As petitioner's attorney futiley explained:

> And the case law...is clear [the question] of whether or not the inmate poses a risk to society as he sits before the Board now. It is not the state's responsibility to go back and re-fight the committing offense. That has been decided by the courts.
> (Id. at p. 66)

Mandatory statutory regulations govern the form and substance of State parole suitability hearings. Those regulations deny the Board any unlawful authority to find applicants unsuitable for parole release by the simple expedient of deeming them guilty of a different and more serious offense than that for which a jury had rendered an acquittal. The Board likewise lacks any lawful authority to deny such applicants parole release on a pretextual basis that, having supposedly committed that more serious offense, they are thus a "grave threat to the public safety." Such action by the Board therefore exceeds the scope of the authority conferred upon it by the enabling statutes (Terhune v S.Ct., 65 Cal.App.4th 864, 873 (1998)).

Here, the Board found petitioner unsuitable for parole release not only due to the circumstances of the commitment offense, but also by vetoing the jury's acquittal of attempted murder in the first or second degree, and then concluding that he was "a grave threat to public safety" for having supposedly committed the offense of attempted murder. As the reviewing court noted in In re Ramirez 94 Cal.App.4th 549, fn.8 (2001):

> The Board's broad discretion over parole suitability determinations is not a license to recharacterize the commitment offense as crimes carrying a more severe penalty.

Since the life-sentence commitment offense before the Board (Cal.P.C. § 206, "Torture") is defined as nothing more than inflicting injury with an intent to cause pain, and carries the same penalty (7 years-to-life) as attempted murder, the State was allowed to impose the exact same sentence the petitioner would have received had he not been acquitted of the attempted murder. Since the State's case as to the torture charge proved nothing more than an aggravated assault with the intentional infliction of pain, the Board's partisan bias is apparent from their decision to deny him parole release by deeming him guilty of the far more serious and heinous offense of first degree attempted murder, despite the jury's acquittal of that offense.

This unlawful tactic of the Board was, in general terms, condemned by the California State Supreme Court in In re Dannenberg 34 Cal.4th 1061 (2005):

> Our discussion [in Rosenkrantz], including our use of the phrase "particularly egregious," conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined.
>
> Here, as in Rosenkrantz, the parole authority pointed to the circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder...He struck multiple blows to his wife's head with a pipe wrench...
>
> Thus, there clearly was "some evidence" (Rosenkrantz, supra, 29 Cal.4th 616, 658) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial provocation."

In Dannenberg, the inmate could have been convicted by the jury if his wife's murder had resulted from a single injury, so the multiple injuries could properly allow the Board to deem the commitment offense "especially vicious." In the present matter, however, the multiple injuries underlay the jury verdict of "torture" and the acquittal of the attempted murder charge bars the inference of malice or premeditation, so the offense cannot be deemed "especially vicious"

by reference to the multiple injuries which comprise a minimum element of the offense, the absence of which the crime would not have been "torture" as that offense is defined by law.

Here, the Board demonstrated its partisan bias by purporting to find petitioner guilty of an offense for which he had been acquitted, since the actual offense was unable to exceed the minimum requisite elements of the commitment offense.

By way of these three examples, the Transcript affirmatively demonstrates the partisan bias of the Board at the 2005 hearing, from which a reasonable person would doubt that the finding of unsuitability had been made by a "neutral and detached" decision maker. The findings must therefore be vacated as violative of State law and the United States Constitution. (Morrisey v Brewer 408 U.S. 471, 489 (1972))

In addition to these three examples of partisan bias, the Board also questioned petitioner's ability to support himself financially if paroled, ignoring the fact that, due to his advanced age, he would receive 100% Social Security Retirement Benefits

The suitable remedy by way of habeas corpus would be a new hearing before a different panel in order to provide the process petitioner was due but denied at his 2005 hearing (In re Scott 119 Cal.App.4th 871 (2004); In re Carr 38 Cal.App.4th 209, 218 (1995)). However, since the record in this matter also provides no substantial and reliable support for the decision denying parole release, the appropriate remedy is an order from this court directing the Board to set a parole release date in accordance with law (In re DeLuna 126 Cal.App.4th 585, 598 (2005); In re Smith 109 Cal.App.4th 489 (2003)).

As the State Supreme Court acknowledged in Powers v City of Richmond 10 Cal.4th 84, 144 (1995), discussing the process that is due by way of habeas

corpus:

> Its issuance is not necessarily a matter of right, but lies rather in the discretion of the court, but where one has a substantial right to protect or enforce [such as release on parole of a qualified applicant], and this may be accomplished by such a writ, and there is no other plain, speedy, and adequate remedy in the ordinary course of law, he is entitled as a matter of right to the writ, or perhaps more correctly, it would be an abuse of discretion to deny it.

At this time, an Order to Show Cause should issue to the Respondent because the foregoing factual assertions, taken as true, comprise a prima face showing of entitlement of relief, as a matter of law (In re Cudjo 20 Cal.4th 673, 687 (1999); People v Duvall 9 Cal.4th 464, 474 (1995)).

GROUND III

THE BOARD UNLAWFULLY DENIED PETITIONER PAROLE RELEASE ON THE BASIS OF VAGUE AND CONCLUSORY STATEMENTS THAT IN FACT CONTRADICTED THE RECORD THEREBY DEMONSTRATING THE ABSENCE OF IMPARTIALITY

The Board's denial of parole release is a violation of petitioner's right to due process because their purported "findings" were based upon speculation and conjecture which did not meet even the minimal requisite standards of materiality, reliability, and support in the record.

The United States Constitution calls for a more stringent standard of review for the Board's denial than the "some evidence" standard of California law, although the conclusory statements relied upon by the Board do not even constitute "some evidence" of unsuitability.

STATEMENT OF THE LAW

The standard of review applied by the California State Supreme Court in In re Dannenberg (34 Cal.4th 1061, 1095 (2005)) to evaluate the Board's denial of parole release suitability was the "some evidence" standard noted by the court in In re Powell (45 Cal.3d 894, 903 (1988), as in In re Rosenkrantz 29 Cal.4th 616, 652 (2002)). However, that standard was applied only because the question of whether the United States Constitution compels a more stringent standard was not raised in either case. As the court noted in Rosenkrantz, (supra, at 696 fn.12, conc. opn. of J. Kennard):

> Because we conclude as a matter of California law that the "some evidence" standard of review is applicable to judicial review of a Board's decision denying parole, we have no occasion to determine whether the same standard is also mandated under federal constitutional principles...
> We note that petitioner does not contend that the federal Constitution imposes a more stringent standard of review than the "some evidence" standard.

The reviewing court in McQuillion v Duncan 306 F.3d 895, 901 (9th Cir. 2002) likewise assumed without analysis that the "some evidence -- having some

indicia of reliability" standard, as generally applied in judicial review of administrative disciplinary decisions was appropriate for evaluating parole denials or rescissions.

In the present matter, petitioner does contend that federal constitutional due process and equal protection standards mandate a more stringent standard of review, that the State must show by a preponderance of the evidence that the Board's finding of unsuitability was correct. In fact, the State courts of review have consistently noted that this question is far from settled, and that the general reliance upon In re Powell might be misplaced. For example, the reviewing court noted in In re Caswell (92 Cal.App.4th 1017, 1029 (2002)):

> ...[In re] Johnson (35 Cal.App.4th 160 (1995) could be read incorrectly - to uphold the rescission of a parole release date merely because...there had been "some evidence" before the granting panel that could have reasonably justified a finding of unsuitability...
> We find this interpretation of the standard untenable, and not in line with what our Supreme Court had in mind [in]...In re Powell...
> Indeed, "some evidence" of unsuitability for parole would exist in virtually every parole hearing, exposing every grant of parole to a Board's subsequent change of heart or political whim. (Emphasis in the original)

It is settled that a finding of unsuitability for parole is subject to the same standard of review as the rescission of a parole date, so the point made by the Caswell court likewise applies equally to parole hearings, where a pretextual finding of "unsuitable for parole" can be attributed to "some evidence" in the record though actually the result of bias of a blanket policy of parole denial. As the reviewing court emphasized in In re Ramirez 94 Cal.App.4th 549, 564 (2001), citing Edwards v Balisok 520 U.S. 641, 647 (1997):

> Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying "some evidence" in the record to support each result.
> Nor could the Board routinely deny parole for a certain class of prisoners under a blanket policy of the kind condemned in Minnis, supra, and shield itself with a case-by-case invocation of the "some

evidence" standard.

The State's consistent invocation of the "some evidence" standard of review is, as noted, founded in In re Powell, supra, which was, in turn, founded on the new rule of law announced in Superintendent v Hill (472 U.S. 445 (1985)), and intended to replace the "preponderance of the evidence" standard previously applied in judicial reviews of parole denials, as noted in In re Seabock (140 Cal.App.3d 29 (1983)). Thus, Superintendent v Hill, supra discussed the process that is due at prison disciplinary hearings to provide fundamental fairness as required by the federal Due Process Clause of the Constitution, but had no reason to address the issue of which standard of review should apply where a stronger due process liberty interest is present. Since the mandatory language of California statutory authority governing parole suitability decisions creates such an interest, while the administrative regulations governing prison disciplinary hearings do not, the "some evidence" standard is clearly inadequate to safeguard the right to actual liberty of a prisoner suitable for parole release (e.g., Hines v Gomez 108 F.3d 265, 268 (9th Cir. 1997)).

The right to an unbiased and impartial parole panel is founded on the Fourteenth Amendment right to due process of law, and the State has, in fact, adopted and followed in the present matter a policy of denial of parole to almost all life term prisoners who are in fact quite suitable for parole release.

However, aside from the effect on this petitioner of that unlawful blanket policy, the State's denial of parole in this matter is separately and distinctly invalid because it relied solely on conclusory statements lacking any support in the record from evidence having any indicia of reliability, whether reviewed under the "preponderance of the evidence" standard mandated by the United States Constitution, or even under the minimal "some evidence" standard inappropriately

applied by the State of California in parole suitability hearings.

In sum, it is settled that life term prisoners in California have a protected liberty interest in parole that "creates a presumption that parole release will be granted unless the statutorily defined determinations [i.e., of unsuitability] are made" (Sass v California 461 F.3d 1123, 1127-28 (9th Cir. 2006); McQuillion v Duncan 306 F.3d 895, 903 (9th Cir. 2002)), an interest which is borne from the fact of incarceration, not upon the granting of a parole date (Biggs v Terhune 334 F.3d 910, 915 (9th Cir. 2003)).

STATEMENT OF THE FACTS

Under California's parole scheme, circumstances tending to show unsuitability for parole are that the prisoner: 1.) committed the offense in an especially heinous, atrocious or cruel manner; 2.) possess a previous record of violence; 3.) has an unstable social history; 4.) previously has assaulted another individual in a sadistic manner; 5.) has a lengthy history of severe mental problems related to the offense; 6.) has engaged in serious misconduct while in prison. Factors in support of a finding that the prisoner committed the offense in an especially heinous, atrocious or cruel manner include: A.) multiple victims were attacked, injured or killed in the same or separate incidents; B.) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; C.) the victim was abused, defiled or mutilated during or after the offense; D.) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; E.) the motive for the crime is inexplicable or very trivial in relation to the offense (California Code of Regulations, Title 15, Division 2 §§ 2402(c) & 2281(c) et seq.).

In the present matter, the Board's decision to find petitioner unsuitable

for parole was based on arbitrary and capricious conclusory statements parroting the regulatory language, though unsupported by substantial and reliable evidence.

Conversely, the circumstances tending to show suitability for parole release include: 1.) no juvenile record; 2.) stable social history; 3.) signs of remorse; 4.) motivation for the crime - the inmate committed his crime as the result of significant stress in his life, especially if the stress has built up over a period of time; 5.) Battered Women's Syndrome; 6.) lack of adult criminal history; 7.) age -- the prisoner's present age reduces the probability of recidivism; 8.) understanding and plans for the future; 9.) correct institutional behavior (CCR, Title 15, Div. 2000, §§ 2402(d)(1) through (9)).

At the 2005 and 2007 Board hearings, petitioner was able to show that he met <u>all</u> the suitability criteria, thus demonstrating his suitability for parole release, and the Board exhibited its bias by ignoring its statutory obligations to consider those factors:

1. No Juvenile Record

In fact, the commitment offense was the only arrest in petitioner's entire lifetime, and the State has never attempted to claim otherwise. In fact, as Dr. Van Couvering acknowledged in the Psychosocial Evaluation (Exhibit D, p. 2):

He had no prior history of violence and no other criminal history.

2. Stable Social History

The Board claimed otherwise, stating that, "[he] does have a history of tumultuous relationships, primarily with his spouse, having quite a few arguments" (Exhibit A, pp. 87-88). However, as noted in GROUND II, the implicit claim of conflicts with people <u>other than</u> his spouse has absolutely no support in the record, and the arguments with his spouse during their 23 years of

marriage are absolutely irrelevant to his parole suitability.

As the court explained in In re George Scott (119 Cal.App.4th 871 at fn.14 (2004)):

> The fact that Scott previously had altercations with his wife...is entirely unrelated to the manner in which he carried out the commitment offense; the Board relied on that factor to show Scott had an unstable social history, which Justice Haerle agrees is unsustainable.

3. Signs of Remorse

This factor was entirely ignored by the Board, but the transcript reflects his complete acceptance of responsibility for his crime and his sincere expressions of remorse, indicating his understanding of the nature and magnitude of the crime.

The Psychosocial Evaluation of 2004 (Exhibit D, pp. 4-5) by Dr. Van Couvering also noted petitioner's signs of remorse.

4. Motivation For The Crime - the inmate committed his crime as the result of significant stress in his life, especially if the stress built up over a period of time.

This factor is evident from the record reviewed by the Board, and the State has never claimed that the commitment offense was anything other than the result of long term marital problems culminating in a bitter argument concerning an impending divorce. It should also be noted, although ignored by the Board, that petitioner has in fact successfully completed every stress management and personal improvement program offered by the Department of Corrections.

5. Battered Woman Syndrome

Not relevant to this matter.

6. Lack of Adult Criminal History

As noted above, and as stated by Dr. Van Couvering in her Psychosocial Evaluation for the Board (Exhibit D, p. 2):

"He had no prior history of violence and no other criminal history."

7. Age - The Prisoner's present age reduces the possibility of recidivism.

Petitioner was 52 years old when he was arrested for the current commitment offense, and is now 65 years old; he clearly meets the criteria for this category.

8. Understanding and Plans For The Future

The Board implicitly conceded that petitioner had established complete and realistic parole plans, for living in a supervised setting with on-site counseling and other assistence (Exhibit A, pp. 24 & 28).

9. Correct Institutional Behavior

The Board expressly conceded this factor, stating that:

> ...he should be commended for not having any 115's [i.e., Disciplinary Reports] during his total term of incarceration, for participation in NA and AA, for participation as a peer health educator, literacy tutor, Anger Management, (indiscernible) program, Parenting, Life Skills and [for] numerous positive chronos.
> (Exhibit A, pp. 86 & 87)

In sum, the record before the Board affirmatively established that petitioner had been a model prisoner, demonstrating an enhanced ability to function within the law upon release on parole. Nevertheless, despite the fact that by any objective standard, petitioner had demonstrated his suitability for parole release by meeting the criteria of Title 15 CCR §§ 2402(d)(1) thru (9); with the sole exception of factor (9), the Board ignored his compliance with the

eight other suitability factors.

It is settled that the Board is statutorily required to consider all such factors in making its determination as to suitability, as the reviewing court emphasized in In re George Scott, supra, at 871:

> The Board's failure to undertake the "individualized consideration of all relevant factors" required by Rosenkrantz, supra, 29 Cal. 4th at page 655, also offends the Board's own regulations, which require that "all relevant, reliable information available to the panel shall be considered in determining suitability for parole." (2402, (b)...
>
> While the Board need not recite every factor it considers in a parole hearing, particularly those it finds unpersuasive, its failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application is yet another indication of an arbitrary and capricious determination. ([Ramirez], id. at pp. 571-572.)
>
> The Board's treatment of Scott is, if anything, more unfair than that condemned in Ramirez, because more evidence of circumstances tending to show suitability for release was ignored here than in that case.

As with Scott, so also with petitioner; the Board rendered an arbitrary and capricious finding of unsuitability, and likewise demonstrated its partisan bias by ignoring petitioner's compliance with every relevant criteria set forth by Title 15 CCR, §§ 2402(d)(1) or (9). As the reviewing court noted in Beno v Shalala 30 F.3d 1057, 1063 (9th Cir. 1994):

> A decision may be found to be arbitrary and capricious if the agency has...entirely failed to consider an important aspect...
>
> Aside from the fact that a clear showing was made of statutory criteria indicating suitability for parole, the Board's denial relied on vague and conclusory allegations

Whether viewed under the "preponderance of the evidence" standard mandated by the United States Constitution - as clearly explained in part above - or even under the less stringent "some evidence" standard of California law, the record cannot adequately support the Board's unwarranted and illicit finding of unsuitability in this matter.

By its written decision of January 12, 2005 (Exhibit E), the Board provided an explanation for its finding of unsuitability by means of a BPT 1005(b) Form

with the following reasons checked:

> 1. The crime was very cruel or mean...
> 2. The victim was abused or treated very badly during / after the crime...
> 3. The reason for the crime was small compared to the hurt it caused...
> 4. Clinic reports say the inmate's thinking is dangerous.
>
> [the following was handwritten in]
> Moderate dangerousness to wife.
> New psyche report requested.

Since any crime or torture, and in fact almost every crime of violence, would inherently and by definition fit the first three statements, those statements are intrinsically meaningless as a basis for denying parole release or for providing a credible explanation for judicial review. As for the fourth statement, it mis-states the record because no psychosocial evaluation ever said petitioner's thinking was (or even might be) dangerous.

Dr. Van Couvering's comment in her 2004 Report (Exhibit D, p. 5) that, "At this time, estimated risk to his wife is moderate and to the community is low" is a clinical assessment only as to the second point; her report emphasized that the first point was based upon nothing more than the opinion of petitioner's ex-wife — the victim — stating, "However, his victim has expressed concerns that he would seek revenge if released." (Id.)

Dr. Van Couvering's comment was not based on her interview with petitioner; she did not say that the victim's concern had any foundation or plausibility, and she did not say that the shared that concern to any degree. Her statement, thus, cannot properly be construed as intending to indicate anything more than a passing mention of the victim's possible concerns. In other words, if the victim's concerns are genuine and in any way prophetic, then the risk to the victim would be no more than moderate.

Nevertheless, the Board's lack of impartiality is apparent from their

illicit ploy of first pretending that the ex-wife's personal opinion, the result of a decade old attack and the accompanying bitterness, was somehow the expert professional opinion of a doctor, and then even going further to falsely claim that the doctor had iterated that "petitioner's thinking was dangerous." This alters the subjective statement of concern of the victim and places it wholly in the realm of the objective analysis of the doctor. Such a juxtaposition of facts here is a clear indication of the Board's lack of impartiality.

Aside from the absence of impartiality, the point here is that this reason for denial has no actual support in the record. In fact, the doctor's conclusion that petitioner's risk to the community was low and that, even if his ex-wife's concerns were valid, whatever risk to her would be no more than moderate, thus supporting his suitability for parole release. The doctor's conclusion assumes even greater significance and validity in light of the similar finding by Dr. Charles Taylor whose Psychosocial Evaluation for the Board hearing of 2002 stated his expert opinion that:

> No particular mental health issues appear present, nor do adverse personality, attitude, impulse, or emotional dyscontrol factors appear to be at play. He is being successfully treated for mild depressive symptoms which are not considered to bear on his risk of dangerousness.
>
> There is little to suggest that he would be dangerous if released.
>
> (Exhibit F, pp. 4-5)

After failing to consider the factors indicative of suitability for parole release, and ignoring and juxtaposing the expert conclusions of the two Psychosocial Evaluations which were likewise supportive of parole release, the Board then based its decision of unsuitability on nothing more than vague and conclusory statements:

> The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human life and human suffering.
>
> (Exhibit A, p. 84)

However, these positive aspects of his behavior do not outweigh the factors of unsuitability...The prisoner committed the offense in an exceptionally cruel, violent and brutal manner...

The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(Id. at p. 87)

Petitioner is informed and thus believes that 1) in a recent case, entitled In re BPT v S.Ct. (Bragg, 2005, case no. H028569), ___ Cal.App.4th ___, the Board stipulated that its hearing panels use the commitment offense as a basis for findings of unsuitability in "nearly all" parole denials; 2) the stipulation was entered to avoid discovery proceedings which would have revealed the Board's practice of deeming virtually all life sentence offenses "especially heinous and callous" compared to all other such offenses, and that; 3) such said practice constitutes an unlawful blanket policy of pretextual parole denials.

Thus, the Board's compliance with that practice and policy in the present matter denied petitioner the impartial hearing to which he was entitled under both state law and the United States Constitution.

SUMMARY

The United States Constitution mandates a stricter standard of review than the "some evidence" standard of California law, although here the record cannot adequately support the Board's denial of parole release, even under the minimal state standard. Further, the Board's partisan bias is apparent from the records and rendered the decision to deny the setting of a parole release date arbitrary and capricious.

Therefore, judicial review by way of habeas corpus is appropriate, and the suitable remedy would be a new hearing conducted in accordance with law, or an Order directing the Board to establish a parole release date for petitioner, as required by California Penal Code law, thus avoiding the pretextual boilerplate

denial compelled by the illegal use of regulatory schemes widely recognized as illegal and illicit. A new hearing is proper where the Board findings on some factors lack support from anywhere, and other factors might not necessarily justify the denial of parole release (In re Smith 114 Cal.App.4th, 343, 373 (2003)), or where the Board lacked impartiality (Sommerfield v Helmick 57 Cal.App.4th 15 (1997)). However, an Order directing the Board to set a release date is appropriate if, as here, there is no substantial and credible evidentiary support for the challenged finding of unsuitability (In re DeLuna 126 Cal.App.4th 585, 598 (2005); In re Smith 109 Cal.App.4th 489 (2003)).

In either situation, judicial review is limited to consideration of the factors addressed by the Board; as the reviewing court noted in DeLuna, supra, at 593-94:

> We must confine our review to the stated factors found by the Board, and all the evidence presented at the parole hearing which is relevant to those findings that the Attorney General now suggests the Board might have made.

It is settled that questions concerning whether a state court applied the correct legal standard in resolving asserted federal constitutional violations are especially significant upon federal habeas corpus review of the matter (Caliendo v Warden 365 F.3d 691, 695 (9th Cir. 2004); Fernandez v Roe 286 F.3d 1073, 1077 (9th Cir. 2002)). Here, the state's inappropriate reliance on the "some evidence" standard of review, by the Board and the implicitly on habeas corpus, had denied petitioner the release on parole to which he is entitled as a matter of law. Therefore, the purported factual findings by the Board, implicitly reiterated on habeas corpus review, are not entitled to any degree of deference within the meaning of Coopersmith v Palmateer 397 F.3d 1236, 1243 (9th Cir. 2005) and Cooperwood v Cambra 245 F.3d 1042, 1046 (9th Cir. 2001).

As the United States Supreme Court noted in Rogers v Richmond 65 U.S. 54,

46-47 (1961):

> It would be manifestly unfair, and afford niggardly protection for federal constitutional rights, were we to sustain a state conviction [or, as here, a parole denial] in which the judge...passes upon that claim an erroneous standard of constitutional law [i.e., the "some evidence" standard]...
>
> Nor, in a case where specific findings of fact are made concerning the alleged [error]...can those findings be fairly looked to for the 'facts,' since findings of fact may often be...influenced by what the finder is looking for.
>
> Historical 'facts' found in the perspective framed by an erroneous legal standard cannot plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them.

Thus, the erroneous finding of unsuitability by the Board (Exhibit A), and the state court on habeas corpus review (Exhibit L), were founded upon an incorrect standard of law within the meaning of Stansbury v California 511 U.S. 318, 323-26 (1994) (see also Clark v Murphy 331 F.3d 1062, 1067 (9th Cir. 2003)). Accordingly, that finding and consequent denial of parole release was objectively unreasonable in light of the record within the meaning of Woodford v Visciotti 537 U.S. 19 (2002) (see also Torres v Prunty 223 F.3d 1103, 1106 fn.6 (9th Cir. 2000); Brown v Terhune 158 F.Sup.2d 1050, 1057 (N.D. Cal. 2001)).

CONCLUSION

At this time, an Order to Show Cause should issue to the Office of the Attorney General because the foregoing factual assertions, taken as true, comprise a prima face showing of entitlement to relief (In re Cudjo 20 Cal.4th 673, 687 (1999); People v Duvall 9 Cal.4th 464, 474 (1995).

As the State Supreme Court noted in In re Sterling 63 Cal.2d 486, 489 (1965):

> Preservation of a defendant's constitutional rights lies not in multiple state remedies that will ordinarily produce the same results, but in one effective state remedy plus awareness on the part of all state officials that, ultimately, federal review is available.

GROUND IV

THE BOARD'S ASSERTION THAT PETITIONER HAS NOT YET BEEN ADEQUATELY REHABILITATED VIOLATES STATE LAW ESTABLISHING THE PURPOSE OF INCARCERATION

PREFACE

The Board found that further rehabilitation was necessary in order for petitioner to realize the setting of a parole release date. As the Board members stated at the 2005 hearing:

> ...the inmate needs additional time in order to fully understand and deal with the consequences of his acts.
> (Exhibit A, p. 86)
>
> In addition, the prisoner has not completed the necessary programming which is essential to his adjustment. He needs additional time in order to gain such programming (inaudible) to adequately participate in therapy programming.
> (Id. at p. 88)
>
> ...it is my opinion that you really have not yet even begun your rehabilitation yet.
> (Id. at p. 89)
>
> I would suggest that you read Penal Code Section 206 to begin your rehabilitation.
> (Id. at p. 89)

Petitioner contends that whatever agency-created regulations, policies, or interpretations of statutory authority have been applied by the Board in deeming him unsuitable for parole release — for the purported lack of rehabilitative program or technique — are invalid because they violate the legislative intent underlying the Determinate Sentencing Act of 1977 (Hereafter "DSL").

More particularly, it can be shown that by enactment of the DSL, the California Legislature codified its conclusion after careful study that the concept of "rehabilitation" was invalid, and its intent that sentences for all felony offenses should reflect culpability and uniformity of punishment. By demanding that petitioner undergo further therapy — or, indeed, any therapy or other rehabilitation at all — absent a showing that such programs even exist

in the first place, not to mention proof that whether or not such phantom programs were effectively "rehabilitative" as applied by the Department of Corrections — the Board acted as though the Legislature did not state in California Penal Code § 1170(a)(1) that, "the purpose of imprisonment for crime is punishment, not rehabilitation." (Emphasis added)

INTRODUCTION

Since the Legislature expressly intended that incarceration suit the crime and not the archaic and disproven concept of "rehabilitation," the Board violated petitioner's state and federal right to due process of law in continuing his custody by deeming him insufficiently rehabilitated. Although the Board invoked equally baseless vague and conclusory boilerplate focusing on the commitment of the instant offense, which is likewise unlawful, its demand for additional — or any at all for that matter — "rehabilitation" or other "therapy" is constitutionally infirm because it is exactly what the state Legislature deemed to be pointless and archaic, and thus, forbidden as a matter of law. The analogy would be that, if the state disallowed one from possessing marbles for any purpose, it could not also demand that an applicant produce said marbles — in any amount — in order to secure the state's favor and thereby hasten that applicant's approval process, without violating the basic tenets of inherent constitutional protections.

STATEMENT OF LAW

It is settled that Legislative intent is the final authority governing the interpretation, application, and judicial enforcement of statutory enactments such as the DSL (Mejia v Reed 31 Cal.4th 657, 663 (2003); People v Robles 23 Cal.4th 1106, 1111 (2000).). A uniquely accurate, insightful, and persuasive

indicator of Legislative intent is the reports, notes, or other writings of those who had part in drafting a new law. (Hunick v U.S. Fidelity 47 Cal.3d 456, 465 fn.7 (1988)). Also, in avoiding a result inconsistent with such intent, the rule of lenity requires the court to provide an accused or a prisoner litigant with the benefit of every reasonable doubt when construing the intent underlying enactment of Penal Code statute (People v Phelps 41 Cal.App.4th 946, 951 (1996); People v Bryan 10 Cal.App.4th 1584, 1599 (1992)).

Statutory interpretation is a fundamental judicial function involving plain questions of law inherently subject to scrutiny (Scott v Ciba Vision Corp. 38 Cal.App.4th 307 (1995)), and such questions are likewise subject to federal judicial review if, as here, a violation of State Legislative intent is violative of the United States Constitution (Platex v Mossinghoff 758 F.2d 594 (9th Cir. 1985)).

Through its enactment of the DSL in 1977, the California State Legislature expressly made clear it intended those incarcerated for any felony criminal offense would be paroled after the serving of a proportionate term of imprisonment, commensurate with other likewise situated offenders; not after proving "rehabilitation" through the completion of some function not authorized by law, and not imposed on every class of like offenders.

Petitioner is informed and believes, and on the basis of that information and belief asserts that the DSL of 1977 was drafted by Raymond I. Parnas, Professor of Law at the University of California at Davis, and Michael B. Salerno, a regent of the Universities of California, as consultants for the Senate Select Committee on Penal Institutions.

Petitioner therefore requests that judicial notice be taken of a paper authored by Doctors Parnas and Salerno, and published in the U.C. Davis Law Review (Volume 11) in May of 1978, entitled, "The Influence Behind, Substance,

and Impact of the New Determinate Sentencing Law in California." As that paper states in pertinent part (emphasis added):

> In fact, widespread recognition of the failure and abuses of the rehabilitative ideal was the primary factor in the dismantling of a system grounded in a diagnostic, sickness, casualty — capability and curative, predictive change [in a prisoner] (Ibid. at p. 29)
>
> The [State and/or federal] Constitution provides for a criminal justice system which includes not only police powers, but also notice, speed, due process and equal protection. Experience and research, together with interviews with those involved in this system, revealed that the indeterminate sentence, while appearing to accomplish some of these legal requirements, did not, in fact, accomplish any...
>
> Most importantly, after sixty years of operation in California, the "sick-patient-model" basis of indeterminancy, developed at the turn of the [twentieth] century, had been totally invalidated. There was no evidence that the state of the sciences enabled anyone to diagnose a criminal's crime-causing problem, treat it, cure it, or predict nonrepitition. (p. 30)
>
> The switch from a "rehabilitation" to a "punishment" model with respect to the dominant purpose behind incarceration in state prisons raises a number of extremely important questions concerning related purposes in the administration of justice. Most directly, what impact will there be on resources provided for institutional rehabilitation programs and the motivation of inmates to participate in such programs?
>
> ...in addition, in never opposing these features of the new [DSL] law, the Department of Corrections acknowledged their own studies which indicate an increase, rather than a decrease, in participation after inmates received parole dates. (p. 40)

SUMMARY

It is settled that administrative policy or regulations inconsistent with authorizing statutes and legislative intent cannot stand (Terhune v S.Ct. 65 Cal.App.4th 864, 873 (1998); Cal. Ass'n. of Psych. Providers v Rank 51 Cal.3d 1, 11 (1990)), and in In re Rosenkrantz 29 Cal.4th 616, 658, 683 (2002), the court did not address whether Rosenkrantz had been "sufficiently rehabilitated;" rather, the court affirmed rescission solely by reference to the Governor's authority to reweigh factors addressed by the Board in granting a parole date.

Therefore, the question of whether in denying parole for an alleged

"inadequate degree of rehabilitation," as here, the Board exceeds the Legislative intent, and authority has not been squarely resolved in the decisional authority.

Petitioner here asserts that the pretextual finding of unsuitability for parole release is void as a matter of law, insofar as he was deemed to be "insufficiently rehabilitated" — or, as in the earlier analogy, offered no marbles for the decision makers to be persuaded in his favor. In other words, the Board's demand for additional rehabilitative programming far exceeds its lawful authority.

CONCLUSION

Based upon the foregoing factual conclusions, an Order to Show Cause should hereby issue to the Office of the Attorney General because these assertions and facts, if taken as true, comprise a prima face showing that petitioner is entitled to relief (In re Cudjo 20 Cal.4th 673, 687 (1999); People v Duvall 9 Cal.4th 464, 474 (1995).).

## GROUND V

THE DECISION OF THE BOARD OF PRISON TERMS THAT PETITIONER WAS NOT SUITABLE FOR PAROLE RELEASE DID NOT COMPLY WITH DUE PROCESS CRITERIA SET FORTH BY MANDATORY STATE LAW SERVING TO ENFORCE THE UNITED STATES CONSTITUTION

### INTRODUCTION

In contrast to claims that "some evidence" was not presented at a parole suitability hearing, resulting in a parole denial lacking evidentiary support (GROUND III, supra), a claim that the evidence of unsuitability before the hearing panel was manifestly unreliable and devoid of credibility invokes a related though distinct aspect of due process violation. Here, the testimony of petitioner's ex-wife, the victim of an assault which comprised his commitment offense, was inexplicably given great credence by the Board.

Of course, the victim's lingering hatred and bitter invective is entirely understandable and, in this context, beyond reproach; however, petitioner was nonetheless entitled to a fundamentally fair hearing based upon facts of the case, not invectives. The Transcript affirmatively reflects the victim's lack of credibility — and thus the Board's reliance on her testimony as a basis for finding petitioner unsuitable for parole release was unwarranted (In re Scott 133 Cal.App.4th 573 fn.6 (2005)).

The Board's lack of impartiality is apparent from the fact that the record so easily and clearly shows the victim's lack of credibility, yet the Board acted as though the opposite were true. Further, the Board's reliance on the victim's testimony as a sole basis for the denial of parole release is as preposterous as making the applicant pay marbles to be excused from further service of his prison term, as discussed in GROUND IV. It should be noted that, although the victim's attitude and opinions concerning the petitioner are beyond criticism for their inherent value, the Board's partisan and credulous

acceptance of her testimony and its elevation of that testimony to such a stalwart position as to be the sole determinative for denying parole release is not beyond that same level of criticism.

STATEMENT OF LAW

It is settled that even under the minimal and indulgent "some evidence" standard of California law, the evidence underlying a Board's finding must nevertheless be substantial, authentic, and credible. In other words, the quantity of evidence at an administrative hearing may be slight, but must be reliable (Hines v Gomez 108 F.3d 265, 268 (9th Cir. 1997); Jancsek v Oregon Board of Pardons 833 F.2d 1389, 1390 (9th Cir. 1987)). As the reviewing court acknowledged in People v Cluff 87 Cal.App.4th 991, 1002 (2001), in the context of prosecutions founded on federal authority:

> To be sufficient, evidence must be 'substantial'...Evidence is substantial only if it reasonably inspires confidence and is of 'solid value...'
>
> A finding of fact must be an inference drawn from [such] evidence rather than a mere speculation as to probabilities without evidence

As the reviewing court likewise emphasized in In re George Scott 119 Cal.App.4th 871 (2004) — citing McQuillion v Duncan 306 F.3d 895, 902 (9th Cir. 2002) and In re Caswell 92 Cal.App.4th 1017, 1027 (2001):

> Examined in light of the record, the Board's explanation of why Scott is not suitable for release from prison is revealed as no more than the mouthing of conclusory words. The reliable factual underpinning that is constitutionally required cannot be shown... (emphasis added)

In addition, it is well established that on habeas corpus review of a Board's decision denying parole release, reviewing courts have the authority to resolve conflicts in the record by weighing the relative credibility of disparate assertions; deference to the Board's implicit findings is not mandatory. As the reviewing court noted in In re DeLuna 126 Cal.App.4th 585,

595 (2005):

> There is conflicting evidence [in the record] about defendant carrying a gun...The prosecutor told the Board that defendant drove "from the scene of this restaurant a little over three miles to where he was residing on this farm.
>
> However, at an earlier parole defendant said he might have had the gun in his car for a week, but he could not remember...
>
> In our view, this does not amount to some evidence that [as the Board concluded] defendant carried a loaded gun 'as a matter of routine.'

In other words, the DeLuna reviewing court concluded that the "evidence" underlying the Board's finding of fact lacked sufficient credibility and reliability to warrant the Board's finding.

Accordingly, it is appropriate on habeas corpus to challenge the Board's credulous reliance on "evidence" that is neither reliable nor objectively able to inspire confidence, and this court has the authority to decide whether the testimony of petitioner's ex-wife at the 2005 hearing has credibility and thus "solid value" able to support the Board's subsequent finding of petitioner's purported unsuitability for parole release. Here, that finding resulted in large part from the credence given the victim's testimony by the Board, but an objective review of the record will show her readily apparent untruthfulness and lack of reliability.

STATEMENT OF FACTS

Eight examples from the transcript clearly demonstrate that the florid testimony of petitioner's ex-wife was an inappropriate basis for the Board's finding of unsuitability:

> 1. The only reason I was in that home was because I had consulted with an attorney and he said you can't move out without your son or you will lose all [your] parental rights.
> (Exhibit A, p. 75)

Petitioner is informed and believes, and on the basis of that information and belief asserts that no attorney having even a minimal degree of familiarity with divorce law would state that "moving out without her son" could cause the "loss of all parental rights." Since no reasonable attorney would have made such an irresponsible recommendation to her, the reason she gave the Board for having remained at the residence is dubious, at best.

It should be noted that the defense attorney at petitioner's trial stated on the record (Exhibit B, p. 2) that, "Because of her husband and son's reaction to her request for a divorce Mrs. Ferguson decided to delay moving out of the family home for one month. Mrs. Ferguson testified at trial that no threats were directed toward her after her announcement of intent to leave."

> 2. As far as the tool caddy being in the laundry room, no, didn't exist. It was in the garage. There were no tool caddies in the laundry room.
> (Id. at p. 75)

As the trial testimony established a tool caddy did, in fact, exist, and had, indeed, been in the laundry room, next to the garage, and the crescent wrench used in the attack had been in the laundry room — as petitioner stated earlier — because it had been used to change the gas cylinders on the BBQ.

> 3. He said we had a highly charged and bitter argument that morning about missing money. There was never any discussion about any missing money. There was no missing money.
> (Id. at p. 75)

The trial testimony did in fact establish that the argument preceding the attack did include a vehement disagreement about money and items of property which the victim had apparently removed from the house in anticipation of the impending division of assets which would inevitably accompany the divorce.

4. The police found under the blanket this rope, they found a [concealed] claw — a claw hammer, and I have no doubt that that wrench that he used in the attack that day came from beneath that same blanket.
(Id. at p. 78)

As noted by the defense attorney's statement in Exhibit B, at page 3:

The extent to which Mrs. Ferguson was willing to lie to convict her husband extended to planting evidence in the washroom two months after the assault and calling the Carlsbad Police Department to come photograph its location.

Proof that the evidence was planted was established when original crime scene photographs showed the objects in question [including the claw hammer] were in an entirely different location in the garage (i.e., not in the laundry room, under a blanket - or otherwise].

The hearing on the defense attorney's new trial motion of June 13, 1996 established that, contrary to her claim then and in 2005 at the Board hearing, the "claw hammer" was not "found [hidden] under the blanket [at the scene of the assault] by the police;" the original crime scene photographs showed it hanging on a peg board in the other room — the garage (See Exhibit G, pp. 5 & 28). The defense attorney's comment at the hearing on the motion for a new trial is equally relevant to the Board hearing of 2005:

I would offer as exhibits...four photographs...that were taken by the Carlsbad Police Department on the day of the incident...The other two photographs show a claw hammer hanging on a peg board in the garage right above the real estate signs...

What these photographs show I think is evidence that these items were planted by her, that she contacted Detective Trujillo [three months after the crime - see p. 5] in order to aggravate or accumulate false evidence against her husband...this would have been powerful evidence to present to the jury of her bias, of the fact that she is fabricating and willing to fabricate evidence to try and convict this man.
(Exhibit G, pp. 5 & 6)

5. And then he was strangling me...I knew I was a dead person. I was lying on the floor...And the reason I bit his thumb was because it was around my neck...
(Exhibit A, pp. 79 & 80)

However, as the defense attorney stated in Exhibit B at p. 2:

...Mrs. Ferguson's claims that she had been strangled were

controverted by the testimony of a physician noting that no bruising consistent with strangulation was present on Mrs. Ferguson's throat.

> 6. They life-flighted me. When I was in the helicopter, the paramedics were looking down at me. I was only wearing a bra and underwear and I was covered head to foot with blood.
> And the paramedic said to me, he said, are you wearing red underwear?
> And I said, no, its beige. I mean, that's how literally soaked [with blood] I was.
> (Exhibit A, p. 80)

Insofar as the Board's finding of unsuitability was based on their credulous acceptance of her testimony as worthy of belief, petitioner's hearing was a sham and a farce; a pro forma hearing characterized by partisan bias and this devoid of even a minimal due process. For the Board to believe the victim's claim — as the hearing transcript shows they did — they had to accept that: 1.) a paramedic could fail to notice that she was "covered from head to foot in blood"; 2.) due to that failure, wonder whether or not her underwear were red, and 3.) even assuming <u>that</u> degree of near-sightedness, a paramedic could ask such an inappropriate and unprofessional question.

> 7. The surgeon who attended me in the trauma room had been a M.A.S.H. unit surgeon in Korea. And he told me later, he said, in all my 40 years of being a surgeon, he said, I've never cried while operating on someone until I operated on you. That's how bad I was.
> (<u>Id</u>. at pp. 80-81)

At the 2005 Board hearing, petitioner deserved due process of law and an impartial evaluation of his suitability for parole release, but received pro forma consideration by a panel so biased that the wildest flights of fancy, the most florid fabrications, by his ex-wife were accepted as gospel truth by the panel members. In order for the Board to believe her claims, they must believe that the attending surgeon, with over forty years of medical attendance, with an early career in medicine placing him on the battlefield hospitals of Korea, had never seen such a horrific mess as her, and that he cried while operating on her. Such is not the professional conduct of a doctor with over forty years

of service in his industry. The Board would have to believe this exaggeration from the victim, in the face of knowing that the injuries involved a fractured finger, a bruise on the right forearm, scalp lacerations, and a minimally depressed skull fracture (See Exhibit C, p. 3). The victim's hospital treatment amounted to cleaning wounds, administering antibiotics, and minor stitches — hardly the stuff which would cover someone from head to toe in blood, and hardly the stuff to send a battlefield seasoned surgeon into tears during her "operation." The veracity that the Board attached to these comments clearly further displays the impartiality and bias the petitioner experienced at this hearing.

> 8. ...[my son] doesn't want anything to do with him...He writes to his father that he — his father writes to him. He does not write to his father...
>
> My son, he says, 'I don't have a father. I don't have a father. I haven't had a father for ten years.'
> (Id. at pp. 81-82)

However, as shown by the letter dated June 14, 2005 to petitioner from his son (Exhibit H), which is only one of dozens of letters sent to petitioner by his son during the past ten years, her statement to the Board on this matter was adopted by the Board as truthful.

CONCLUSION

The right to due process of law as enforced by state law and the United States Constitution requires that evidence underlying an administrative decision be credible and reliable. In the instant matter, the transcript demonstrates the Board's absolute reliance on the testimony of the victim here, in spite of the complete lack of veracity and credibility her testimony carried.

Accordingly, the Board's finding of unsuitability for parole release should be vacated. At this time, an Order to Show Cause should issue to the Office of

the Attorney General because the foregoing factual assertions, taken as true, comprise a prima face showing of entitlement to habeas relief (In re Cudjo 20 Cal.4th 673, 687 (1999); People v Duvall 9 Cal.4th 464, 474 (1995)).

## GROUND VI

PETITIONER'S STATE AND FEDERAL RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY THE BOARD'S REFUSAL TO CONSIDER SUBSTANTIAL AND LAUDATORY REPORTS BY PRISON STAFF

STATEMENT OF THE FACTS

As explained in detail in the previous grounds, the pro forma 2005 Board hearing failed to meet any semblance of the most minimal standards of due process of law. However, the Board also rendered the hearing an empty formality with a foreordained outcome by refusing to properly consider the substantial and reliable proof of his suitability for parole release provided through the various "chronos" placed in petitioner's C-file by the prison staff who had concluded, on the basis of their training, experience, and near-daily contact with petitioner for varying lengths of time, that he appeared to these professionals to be unquestionably suitable for parole release. Many of the authors of these reports or chronos had known petitioner for many years.

That refusal on the part of the Board demonstrated their partisan bias, as explained in Ground II, but it also separately violated his right to due process of law by denying him the "individualized consideration of all relevant factors" which is mandated by state law. As the reviewing court emphasized in In re George Scott 119 Cal.App.4th 871 (2004):

> The Board's failure to undertake the 'individualized consideration of all relevant factors' as required by Rosenkrantz, supra, 29 Cal.4th at p. 655, also offends the Board's own regulations, which require that "all relevant, reliable information available to the panel shall be considered in determining suitability for parole...
> ...its failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application is yet another indicator of an arbitrary and capricious determination. ([Ramirez] id. at pp. 571-572.)
> The Board's treatment of Scott is, if anything, more unfair than that condemned in Ramirez, because more evidence of circumstances tending to show suitability for release was ignored here than in that case.

Consideration of judicial economy constrain petitioner from including as exhibits the nearly 150 laudatory chronos presented to the Board and expressly denied any consideration whatsoever, so a more comprehensive review may not be conducted regarding the matter. Suffice it to be that between the argument in Ground II and the present argument, reviewed in their separate and adjoined contexts, work to comprise a lawful reason that habeas corpus should issue on the matter, and, at the very least, an Order to Show Cause should issue from this Court directed to the Attorney General, because the foregoing factual assertions, taken as true, comprise a prima face showing of entitlement to relief (<u>In re Cudjo</u> 20 Cal.4th 673, 687 (1999); <u>People v Duvall</u> 9 Cal.4th 464, 474 (1995).).

GROUND VII

THE BOARD FAILED TO SET A PRIMARY TERM — A DUTY EXPRESSLY MANDATED BY STATE LAW THAT IS ENTIRELY SEPARATE FROM ITS TASK OF DETERMINING HIS CURRENT SUITABILITY.

INTRODUCTION

Aside from the Board's task of determining the parole suitability of each prisoner appearing at a parole hearing, the Board has an entirely separate and distinct duty of setting a maximum term of imprisonment for each life sentence prisoner. That maximum term is expressly defined by state law with clear and mandatory language sufficing to create a federally cognizable due process liberty interest as the primary term, after which, absent substantial and proven deterioration in conduct, the prisoner will be paroled (In re Rodriguez 14 Cal.3d 639 (1975)).

Where, as here, the Board has not complied with that duty of setting the primary term of imprisonment, the Board will be deemed to have set the maximum term of imprisonment at the "MEPD" date (People v Wingo 14 Cal.3d 169 (1975)). Also, petitioner is informed and believes, and on the basis of that belief and information asserts, that in failing to set his primary term at the 2005 hearing, the Board acted in accordance with an unofficial policy of failure to set primary terms.

STATEMENT OF THE FACTS

At the 2005 Board hearing, petitioner's attorney invoked his client's right to the setting of the primary term of imprisonment proportionate to his lack of any criminal history and his degree of culpability, compared to other inmates convicted of the crime of "torture," thus preserving the issue.

The relevant law in the area is Penal Code Section 3041 which

> indicates the Board will meet with the inmate, shall normally set a parole release date, that the release date will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public.
>
> I would argue that Mr. Ferguson's crime is no greater or no less than other crimes of its type that come before the Board and under the auspices of Section 3041 and relevant case law, Mr. Ferguson is, by law, entitled to a date.
> (Exhibit A, p. 63)

In addition, petitioner reiterated the point when his turn to address the Board arose:

> ...aside from the question of suitability for parole...I believe that the Board is obligated to set a primary term at this time and I ask you to do so.
> (Id. p. 67)

Petitioner's request, as well as that of his attorney sufficed to notify the Board that the right to the setting of a primary term was being invoked (Peretz v U.S. 501 U.S. 923, 936 (1991); People v Barnum 29 Cal.4th 1210, 1224 (2003)), by clearly distinguishing between that duty and the task of determining parole suitability.

## STATEMENT OF THE LAW

Under California, any "life sentence" is considered an indeterminate sentence if, as here, parole is possible. As the State Supreme Court noted in People v Felix (22 Cal.4th 651 (2000)), the express legislative intent of the 1977 enactment of the DSL was to ensure fair notice of, and uniform sentences reasonably related to culpability, while providing parity with sentences imposed under the previous "Indeterminate Sentencing Law" (ISL). The State Supreme Court had repeatedly emphasized that the ISL did not provide uniform and proportionate sentences for similarly situated felons, in violation of the U.S. Constitution (In re Lynch 8 Cal.3d 410 (1972); In re Wingo 14 Cal.3d 169 (1975); In re Rodriguez 14 Cal.3d 639, 652 (1975)).

However, in light of the ex post facto doctrine, enactment of the DSL could not expressly or by implication repeal or invalidate any of the substantive due process protections provided by the ISL to previously sentenced felons and thus still available to those sentenced under the new DSL. Clearly, it served only to codify at Cal. P.C. § 1170 et seq the new additional protections provided by Wingo, Lynch, and Rodriguez (as the reviewing court acknowledged in In re Fain 139 Cal.App.3d 295, 306 fn.4 (1983); see also In re Bray 97 Cal.App.3d 510, 513 (1979)). The 1979 enactment of Proposition 7, codified at Cal. P.C. § 209, likewise did not alter those due process protections. It merely increased the penalty for first and second degree murder (In re Jeanice D 28 Cal.3d 210).

As the reviewing court acknowledged in In re Neal 114 Cal.App.3d 141, 144-145 (1980), a crucial aspect of the ISL process left intact by the DSL statutory revision was the express distinction between primary term-fixing (former Cal. P.C. §§ 2940-43 and 3020-25) and parole setting (Cal. P.C. § 3041). The "primary term" is the maximum term of custody proportionate to the circumstances of the offense and the criminal history of the offender — an immutable date of parole release determined by the Board, and was required by the reviewing court in In re Rodriguez supra, at p. 625. As the court explained in In re Neal, supra:

> With the advent of the 1976 determinate sentencing law, as amended...all prison sentences, including those previously imposed under the ISL, must be fixed for a term of imprisonment and a specific parole date set. (Emphasis added)

Such a determination is thus due each prisoner sentenced to life with the possibility of parole, a due process right which is federally enforceable (Connecticut Board of Pardons v Dumschat 452 U.S. 458, 465 (1981), as noted in In re Fain, supra, at 307.). In fact, in order to comply with In re Rodriguez, the parole authority chairman issued "Directive 75/30" on September 2, 1976,

which stated in pertinent part: "every effort will be made to establish parole dates the first time the inmate appears for regularly scheduled parole consideration" (In re Stanley 54 Cal.App.3d 1030, 1034 (1976), emphasis added). The Stanley court also noted, emphasizing the distinction between first setting a primary term and thereafter conducting parole suitability hearings:

> The constitutional consideration which impel promptness in [primary term] sentence-fixing are not present in [the] parole [suitability] setting.
> (Id. at p. 1044)

Accordingly, the governing authority over the Board of Prison Terms, CCR 2100, currently states:

> A primary term is the term fixed to prisoners by the BPT for adult felons committed to prison under the ISL, including time credits and time served inside prison walls and on parole.

Although the primary term fixing of the Board inarguably applies to prisoners sentenced under the ISL, equal protection considerations founded on the state and federal constitutions require the state to apply it to its prisoners, such as petitioner here, sentenced under the DSL. In other words, since enactment of the DSL did not revise or repeal any of the due process protections set forth by the ISL, including the setting of a primary term, it is readily apparent that the Board still has a duty to set such a primary term in each case of life with the possibility of parole. As the reviewing court acknowledged in In People v Scott 150 Cal.App.3d 221, 230 (1985), the Board's duty to determine and comply with a primary and thus a maximum term of incarcertion applies with equal force to all ISL and DSL prisoners. As the Duran court noted: "once this figure has been determined, a defendant will be released as soon as his term expires." (People v Duran 140 Cal.App.3d 485, 502 (1983))

In comparison, the "parole setting" per suitability function of the Board

is entirely separate and distinct, coming into play only after the primary term has been determined by the Board. However often conducted for each life term prisoner, the subsequent "parole setting" hearings are the means by which the primary terms may be reduced for good behavior and work credits, unless a prisoner forfeits such credits through misconduct or refusal to take advantage of a job offer when one is tendered. That is, the parole hearings held pursuant to Cal. P.C. §§ 3040-41 and 3046 are conducted solely to determine whether a date for release on parole earlier than the maximum, set as the primary term, would be appropriate given the prisoner's conduct while in custody thus far.

This two-step procedure has been expressly and uniformly acknowledged by the state courts, as with People v Scott 150 Cal.App.3d 910, 919 (1984), citing California State Supreme Court authority (Rodriguez, supra, at p. 652) and noting that the holding was mandated by federal constitutional requirements:

> This basic term-fixing responsibility of the [parole Board] Authority is independent of the Authority's power to grant parole and of its discretionary power to later reduce the term thus fixed, which fixed, constitutionally proportionate, term we shall hereafter refer to as the 'primary term.'
>
> The Authority's power to grant parole and to later reduce the primary term remain unaffected. That power enables the authority to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to live a crime-free life in society. On the other hand, however, this discretionary power also permits the Authority to retain the prisoner for the full primary term...and refix a reduced term at a greater number of years up to the primary term if the prisoner...engages in conduct which affords cause to believe he cannot or will not conform to the conditions of parole, or would pose a danger to society if free.
>
> These considerations, however, are based in large measure on occurrences subsequent to the commission of the offense. Conversely, the primary term must reflect the circumstances existing at the time of the offense. Both the Eighth Amendment and Article 1, Section 17 [of the California Constitution] proscribe punishment which is disproportionate. (emphasis added)

In sum, the state courts have traditionally and consistently conceded the constitutionally-compelled right of life-sentence prisoners to a primary term

release date and to regular subsequent parole hearings, at which time that date may be reduced for good behavior or increased for misconduct. In fact, when a primary term is increased for misconduct, a new release date must be set, which will be the term required by the disciplinary loss pursuant to P.C. § 3041.5(b)(4) (See In re Fain, supra, at 303). Also, under state law any amendments to the statutes in question here, repealing the benefit or restricting its application, would be the sole source of authority for the Board's refusal to set a primary term. There have been no such legislative enactments, and the Board exceeds the scope of its lawful authority by acting as though the duty to set primary terms does not exist (Terhune v S.Ct. 65 Cal.App.4th 864, 873 (1998)).

As such, the Board acted without lawful authority in refusing to set a primary term, by a clearly illicit reliance on the state's pretextual claim that primary terms can be determined only after parole suitability is established.

Petitioner is informed and believes, and on the basis of that belief and information asserts that the executive branch of California government routinely cites In re Seabock 140 Cal.App.3d 29 (1983), as authority for a claim that life-sentence prisoners were not disadvantaged by the change from ISL to DSL in order that there would never be an ex post facto bar to its retroactive application, because there were supposedly no changes in how parole dates were thereafter determined. However, the Seabock court failed to follow the State Supreme Court's holding in In re Stanworth 33 Cal.3d 176, 186 (1982) that, "the standards by which...date of release is to be determined have altered to [their] detriment," and that, "the new [DSL] regulations...reflect legislative alterations in the underlying parole scheme (Id. at p. 177). In re Duarte explained that the ISL had individualized punishment on the basis of administrative review, where the DSL stressed uniformity of sentences served,

in compliance with Hicks v Oklahoma 447 U.S. 343, 346 (1980).

However, the conclusion of In re Duarte that the change from ISL to DSL regulations did not impose more onerous parole suitability guidelines and thus did not involve ex post facto concerns was plain error; an error of law contrary to the Stanworth holding and evident from the state's own records. Thus, as will be shown, the Duarte and Seabock courts erroneously concluded that the change from ISL to DSL did not involve ex post facto concerns, and failed to acknowledge the state's clear and continuing duty to set the primary term.

To reach that flawed conclusion, the Duarte court compared the "Parole Board Rules" of 1975 which had been carried forward "into the BPT Rules [i.e., the DSL] substantially unchanged" (Id. at 950 fn.9) with the DSL regulations of 1977, then determined that, "any changes in the new regulations have been to the petitioner's advantage" (Id. at 951). It is especially significant that Duarte cited the Stanworth court's dicta (at 183) that, "under both the 1976 and the current rules, a life prisoner must first be found suitable for parole before a parole date is set" (citing the Parole Board Rules). Nevertheless, this dicta had no force or effect because, as shown, the ISL expressly required the setting of a "primary term" parole date at the first Board appearance, followed by "suitability" evaluations which could only advance that release date or retard it to the fixed primary term date. Obviously, compliance with that dicta would allow the state to convert any and every sentence of life with the possibility of parole into a sentence of life without any possibility of parole, by the simple pretext of never finding such prisoners "suitable" for parole and thus never setting a primary term. This is in fact what the state has done without any lawful authority, for nearly two decades, and thus far in the present matter.

Also, in order to reach its unsound result, giving judicial approval to the

executive branch's illicit tactic by ignoring the holding of the State Supreme Court in In re Stanworth, the Duarte court stated with no basis in law that the DSL revision was not detrimental to life sentence prisoners, expressly contradicting the finding in Stanworth, supra, at 186-88, that:

> The critical issue before us thus becomes...whether the standards by which defendant's date of release is to be determined have been altered to his detriment.
>
> ...we conclude that the standard of punishment has been altered to defendant's prejudice in violation of ex post facto principles.

Stanworth concerned a prisoner sentenced under the ISL who was thus entitled to parole release consideration and primary term fixing under those criteria but, as shown in detail above, that primary term fixing duty of the Board was not eliminated by enactment of DSL.

It should also be noted that the exact pretextual argument routinely and consistently invoked by the Board and the Office of the Attorney General to deny petitioner and all other life sentence prisoners a primary term date, that it will only be set after the prisoner is found suitable for parole release, was raised by the state in Stanworth and emphatically rejected by the State Supreme Court:

> The People appeal, arguing primarily that (1) defendant's rights to a parole release date had not vested until he was adjudged suitable for parole... (Id. at p 179)
>
> Weaver [v Graham 1981 450 U.S. 24, 29] thus quickly disposes of the People's claim that because no parole date had been set no "vested right" to which the bar against ex post facto law attached. (Id. at p. 180)
>
> Prisoners with [primary term] release dates set under prior regulations retain that date and are also reviewed in accordance with the new [DSL] regulations. They are to be released on the earlier of the two dates. (Id. at p. 187)

The state's consistent though pretextual claim that primary terms are to be set only after a finding of suitability seems to have begun with an April 1975 "Directive 75/20" — as the reviewing court acknowledged in In re Stanley (54 Cal.App.3d 1030, 1045 (1976)): "the [State's] petition for rehearing informs

us that the full [Parole Authority has]...adopted the chairman's 1975 Directive [into the Parole Board Rules]." The crucial point here is that Directive 75/20 implicitly — not expressly — stated that the primary terms would henceforth be set after a finding of suitability, but that directive was ordered stricken by the reviewing court in Stanley. Apparently, the Board and the executive branch of government obtained through bureaucratic redefinition of the statutes a power denied by the courts; the ability to deny all life sentence prisoners primary term dates, a power lacking any semblance of judicial sanction.

SUMMARY

As noted above, in People v Felix 22 Cal.4th 651 (2000), the State Supreme Court acknowledged that the legislative intent underlying the 1977 DSL had been to ensure fair notice of, and uniform, sentences proportionate to culpability, to enforce the state and federal constitutional rights to due process of law and equal protection of the law. Accordingly, the Parole Authority chairman's Directive 75/30 of September 2, 1976 stated in pertinent part: "every effort will be made to establish parole dates the first time the inmate appears for regularly scheduled parole consideration."

The California Legislature has codified its concern that this point of law must be followed by the executive branch, having used mandatory language which suffices to create a federally enforceable due process liberty interest, by its enactment of P.C. § 1170.2(c):

> Nothing in this section shall be deemed to keep an inmate in the custody of the Department of Corrections for a period of time longer than de would have been kept in custody under [prior] provisions of the law [i.e., the ISL].

In the present matter, the Board has ignored its duty to set a primary term based on culpability and proportionate to other terms of custody for the offense

of torture as charged by California P.C. § 206, at petitioner's initial hearing, at his 2005 hearing, and at his latest hearing on November 19, 2007. Thus, the right under California P.C. § 3041(a) to the setting of a primary term of custody in order to implement the principles of uniform incarceration and rehabilitation, as required by the United States Constitution (People v Jefferson 21 Cal.4th 86, 95-96 (1999)), is subject to federal enforcement.

Therefore, it should be noted that the recent State Supreme Court decision in In re Dannenberg 34 Cal.4th 1061 (2005), did not address the question of whether the U.S. Constitution independently requires primary term setting. As the court noted:

> Aside from his argument that the Board's decision [denying parole] lacked the support of "some evidence" - a contention we have rejected - Dannenberg does not contend that he was denied any procedural rights he was constitutionally due in the course of the Board's decision. (Id. at fn.18)

Accordingly, the issue of whether the U.S. Constitution requires the setting of a primary term in the present matter is subject to consideration by way of habeas corpus because that point of law was neither addressed nor resolved by the Dannenberg court. For good reason, too, since that requirement is well enough settled in law that it motivated the California Legislature to enact the DSL, as explained above.

In sum, Cal. P.C. § 3041(a) requires the setting of primary terms to enforce the Due Process and Equal Protection Clauses of the U.S. Constitution (People v Allen 42 Cal.3d 1222, 1295 fn.5 (1986)), but the Dannenberg court chose the simple expedient of invoking the vague concept of "public safety" in order to trump the Constitution:

> ...the overriding statutory concern [at P.C. 3041(b)] for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders.

It would be difficult to conceive of any situation where a court would not be able to justify and excuse the state's violation of constitutional rights by invoking the doctrine of "public safety" -- the age-old refrain of tyrants. Warrantless searches, coerced confessions, and all other abuses of liberty barred by the U.S. Constitution flow quite naturally and inevitably from judicial deference to whatever excuses the state piously invokes in the purported service of public safety.

CONCLUSION

By reason of the foregoing argument and authority, the findings of the Board and consequent denial of parole should be vacated and the matter be remanded for a new parole hearing, at which the panel members should be required to set the primary term of custody as required by California Penal Code law. In the alternative, an Order to Show Cause should issue to the Office of the Attorney General.

PRAYER FOR RELIEF

Petitioner prays that this court grant the remedy herein requested, by immediate release from custody to parole pursuant to the authority of In re Smith 109 Cal.App.4th 489, 507 (2003) or, in the alternative, by whatever other relief this court deems just fair and equitable. Further, petitioner respectfully requests that, by reason of the argument and authority herein presented -- which comprises a prima face showing of substantial entitlement to relief -- an Order to Show Cause issue to the Office of the Attorney General, as mandated by People v Duvall 9 Cal.4th 464, 474 (1995).

In addition, petitioner respectfully requests that an evidentiary hearing be ordered by this court to provide an adequate and factual record and allow

issues of fact herein set forth to be accurately and equitably resolved, within the meaning of In re Visciotti 14 Cal.4th 325, 335 (1996).

VERIFICATION

I am the petitioner in this matter. I hereby verify that all of the facts and assertions within this petition not otherwise supported by citation to the record, all attached exhibits or other documents cited, are true of my own personal knowledge, except that as to any matters asserted upon information and belief, and those, I believe to be true.

I further certify that all citations to the record, exhibits attached to this petition, and other documents cited, are true, correct and complete to the best of my own personal knowledge and belief.

Finally, I verify that, other than the Warden of the California State Prison at Solano and the Office of the Attorney General of the State of California, there are no interested parties.

I declare under penalty of perjury under the laws of the United States and the State of California that all of the foregoing is true, correct and complete.

Executed on May 26, 2008, at Vacaville, California, in the County of Solano.

Kenneth M. Ferguson
Kenneth M. Ferguson
Petitioner in Pro se

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

2254 ✓ 1983
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ___ No ✓
COPIES SENT TO
Court ___ ProSe ___

FILED
MAY 29 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY KM DEPUTY

I (a) PLAINTIFFS

**Kenneth Michael Ferguson**

DEFENDANTS

**D. K. Sisto**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Solano
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**Kenneth Michael Ferguson**
**PO Box 4000**
**Vacaville, CA 95696**
**K-11229**

ATTORNEYS (IF KNOWN)

**'08 CV 0955 JLS WMC**

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

**28 U.S.C. 2254**

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 660 Occupational Safety/Health | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 690 Other | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | | LABOR | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | | | ☐ 710Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectmant | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | | | | |

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 DEMAND $ Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE Docket Number

DATE 5/29/2008 ~~SIGNATURE OF ATTORNEY OF RECORD~~

R. Mullen

CR

# EXHIBITS

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life Term Parole Consideration Hearing of: )

KENNETH FERGUSON )

CDC Number K-11229

COPY

INMATE

CALIFORNIA STATE PRISON, SOLANO

VACAVILLE, CALIFORNIA

JANUARY 12, 2005

9:00 A.M.

PANEL PRESENT:

AL ANGELE, Presiding Commissioner
J. NIELSEN, Deputy Commissioner

OTHERS PRESENT:

KENNETH FERGUSON, Inmate
JOHN STRINGER, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney
ALIDA HEDRICK, Victim
ROGER HEDRICK, Victim's Next of Kin
MARK CORIOSO, Victim Services Representative

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes

See Review of Hearing Transcript Memorandum

Marsha Mees

Capitol Electronic Reporting

# INDEX


| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 16 |
| Pre-Commitment Factors | 19 |
| Post-Commitment Factors | 31 |
| Parole Plans | 21 |
| Closing Statements | 59 |
| Recess | 83 |
| Decision | 84 |
| Adjournment | 91 |
| Transcriber Certification | 92 |


--oOo--

PROCEEDINGS

PRESIDING COMMISSIONER ANGELE: This is going to be a Subsequent Parole Consideration Hearing for Kenneth Ferguson, CDC number KK-11229 (sic). Today's date is January 12, 2005. The time is approximately 9:00 am. We're located at CSP, Solano. Inmate received on June 18, 1996 from San Diego County, charge of torture with use of a deadly weapon, case number S Sam C Charles N Nora 029 -- pause us.

DEPUTY COMMISSIONER NIELSEN: Pardon?

PRESIDING COMMISSIONER ANGELE: Put us on pause.

[Off the record]

PRESIDING COMMISSIONER ANGELE: Once again, from San Diego County, the charge of torture with use of a deadly weapon, case number S Sam C Charles N Nora 029511, count number two, 206 of the Penal Code, 12022(b) boy of the Penal Code. Receiving a term of life plus (inaudible) with an MEPD of 7-5-2003. An additional charge of corporal injury to spouse, 273.5, 12022.7 and 12022(b), same county, same case number, count three, and assault with a deadly weapon, 245(a)(1), 12502.7(d) of the Penal Code, same county, same case number, count four. Mr. Ferguson, this hearing is going to be tape

recorded. And for the purpose of voice identification, each of us -- state our first and last name, spelling our last name. When it comes to your turn, after you spell your last name give us your CDC number. I'm going to go my right. My name is Al Angele, A-N-G-E-L-E, Commissioner, Board of Prison Terms.

**DEPUTY COMMISSIONER NIELSEN:** J. Nielsen, N-I-E-L-S-E-N, Deputy Commissioner, Board of Prison Terms.

**MS. HEDRICK:** Alida (phonetic) Hedrick, H-E-D-R-I-C-K, victim.

**MR. HEDRICK:** Roger Hedrick, H-E-D-R-I-C-K, brother.

**MR. CORIOSO:** Mark Corioso, C-O-R-I-O-S-O, victim services representative, CSP, Solano.

**ATTORNEY STRINGER:** John Stringer, S-T-R-I-N-G-E-R, attorney for Mr. Ferguson.

**INMATE FERGUSON:** Kenneth Ferguson, spelled F-E-R-G-U-S-O-N. K-11229 is my CDC number.

**PRESIDING COMMISSIONER ANGELE:** Thank you. Let the record reflect there is also two correctional officers in the room for security purposes who will not be participating in today's hearing. Mr. Ferguson, before we go any further, would read that statement in front of you out loud that's beneath your folder there.

**INMATE FERGUSON:** The Americans With Disabilities Act, ADA, is a law to help people with disabilities. Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work or take care of themselves than others. Nobody can be kept out of public places or activities because of a disability. If you have a disability, you have the right to ask -- help to get ready for your BPT hearing, get to your hearing, talk, read forms and papers and understand the hearing process. BPT will look at what you asked for to make sure that you have a disability that is covered by the ADA and that you have asked for the right kind of help. If you do not get help or you think you got the kind of help you need, ask -- the BPT 1074 Grievance Form. You can also get help to fill it out.

**PRESIDING COMMISSIONER ANGELE:** Thank you. Do you understand what your rights are under the Americans With Disabilities Act?

**INMATE FERGUSON:** I believe so, Sir.

**PRESIDING COMMISSIONER ANGELE:** Any questions?

**INMATE FERGUSON:** I have my disability form with me, the 1824, whatever it's called.

**PRESIDING COMMISSIONER ANGELE:** The record

does reflect that you signed BPT Form 1073 on July 16, 2004, and that's the reasonable accommodation notice and request in accordance with the provisions of the Americans With Disabilities Act, indicating that you do have a disability and that's walking.

**INMATE FERGUSON:** Yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** Okay. Have you been given any sort of accommodation?

**INMATE FERGUSON:** I normally or sometimes use a cane, but I don't have it with me right now, but I'm all right.

**PRESIDING COMMISSIONER ANGELE:** Okay. So you didn't need it to come in here today?

**INMATE FERGUSON:** No, I'm fine.

**PRESIDING COMMISSIONER ANGELE:** Okay. Are you currently Triple CMS?

**INMATE FERGUSON:** Yes, Sir, I am.

**PRESIDING COMMISSIONER ANGELE:** And currently on psych medication?

**INMATE FERGUSON:** I take 10 milligrams of Prozac which is the smallest amount you can take and then I take -- I think it's 20 milligrams of Trazodone at night which is a sleep enhancer which again is the smallest amount of that drug that's administered.

**PRESIDING COMMISSIONER ANGELE:** Okay. The

information contained in your 1073 was back in July, it's still current and correct (inaudible)?

**INMATE FERGUSON:** Yes, Sir. That's the CC-I report?

**PRESIDING COMMISSIONER ANGELE:** No. Yes. Well, no, it's the 1073 Form, the one you signed with regards to ADA issues.

**INMATE FERGUSON:** Yes, I believe -- Yes.

**PRESIDING COMMISSIONER ANGELE:** Okay. I'll ask you a series of questions. Do you have any problems walking up and down stairs or for distances of 100 yards or more?

**INMATE FERGUSON:** Yes, I do.

**PRESIDING COMMISSIONER ANGELE:** And when that does occur, you are accommodated by using a cane?

**INMATE FERGUSON:** Yes, Sir, I do.

**PRESIDING COMMISSIONER ANGELE:** And that cane has been available to you when --

**INMATE FERGUSON:** Yes, Sir, it is -- has been.

**PRESIDING COMMISSIONER ANGELE:** Do you need glasses or a magnifying device in order to see or read documents?

**INMATE FERGUSON:** I have those with me.

**PRESIDING COMMISSIONER ANGELE:** Okay. Were the glasses available for you when you did your

Olson Review?

INMATE FERGUSON: Yes, they were.

PRESIDING COMMISSIONER ANGELE: And when you read your psychological evaluation and your counselor's report?

INMATE FERGUSON: Yes, Sir.

PRESIDING COMMISSIONER ANGELE: So you need no further accommodation for your sight, correct?

INMATE FERGUSON: No, my sight's fine.

PRESIDING COMMISSIONER ANGELE: Okay. Any hearing impairments?

INMATE FERGUSON: No, I'm all right.

PRESIDING COMMISSIONER ANGELE: You are, once again, involved in Triple CMS and you are on psychotropic medication. When do you generally take your medications?

INMATE FERGUSON: In the evening.

PRESIDING COMMISSIONER ANGELE: Both of them?

INMATE FERGUSON: Yes, Sir.

PRESIDING COMMISSIONER ANGELE: Okay. How far did you get in school on the outside?

INMATE FERGUSON: I almost completed college.

PRESIDING COMMISSIONER ANGELE: While growing up, did you have to take any special education classes like remedial classes?

**INMATE FERGUSON:** No, I did fairly well in school. I didn't need any remedial courses.

**PRESIDING COMMISSIONER ANGELE:** All right. Do you suffer from any disability that would prevent you from participating in today's hearing?

**INMATE FERGUSON:** I don't believe so.

**PRESIDING COMMISSIONER ANGELE:** Counsel?

**ATTORNEY STRINGER:** We have no ADA objections, Commissioner. I would stipulate on the reasonable accommodation per Armstrong.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you. All right. This hearing is being conducted pursuant to Penal Code sections 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing parole consideration hearings for life prisoners. The purpose of today's hearing is to once again consider your suitability for parole. In doing so we're going to consider the crimes you were committed for, your prior criminal and social history and your behavior and your programming since your commitment. We've had the opportunity to review your Central File and your prior transcripts, you'll have the opportunity to correct or clarify the record. We are going to consider your progress since your last hearing, any new psychiatric reports and any other information.

which may have a bearing on your suitability for parole.

**DEPUTY DISTRICT ATTORNEY SACHS:** Commissioner, I just wanted to make my appearance. This is Richard Sachs, Deputy District Attorney from San Diego. S-A-C-H-S.

**PRESIDING COMMISSIONER ANGELE:** Thank you.

**DEPUTY DISTRICT ATTORNEY SACHS:** And I didn't get the name of the inmate's attorney.

**PRESIDING COMMISSIONER ANGELE:** It is Richard -- excuse me, John Stringer, S-T-R-I-N-G-E-R.

**DEPUTY DISTRICT ATTORNEY SACHS:** Thank you. I'd also like to say hello to Alida. Thank you very much.

**PRESIDING COMMISSIONER ANGELE:** All right. You'll receive a copy of our written and tentative decision today. That decision becomes final within 120 days. You'll then receive a copy of the decision, a copy of the transcript. Effective May 1, 2004 there are major changes in your ability to appeal Board decisions or actions directly to the Board. Title 15, sections 2050 to 2056 have been repealed and the new regulation can be found in the BPT's Administrative Directive 04 slash 01, and that can be found in the prison law library. Are you familiar with the change in the

law in regards to appeals?

**INMATE FERGUSON:** Not completely.

**PRESIDING COMMISSIONER ANGELE:** Okay. What it basically says, prior to May 1, 2004 any appeal that you bring forward with regards to any action or decision by the Board of Prison Terms, you bring directly to the Board of Prison Terms. Those regulations have been -- have been repealed since that date. Any appeal you bring forward goes directly to the courts. You understand the difference?

**INMATE FERGUSON:** Yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** You're not required to discuss your offense with us. You're not required to admit your offense. However, this Panel does accept as true the findings of the court. Do you understand what that means?

**INMATE FERGUSON:** Yes.

**PRESIDING COMMISSIONER ANGELE:** Any confidential information to be used today, Commissioner Nielsen?

**DEPUTY COMMISSIONER NIELSEN:** No, Mr. Chairman.

**PRESIDING COMMISSIONER ANGELE:** I'm passing a hearing checklist marked Exhibit One to your attorney to ensure that we all have the same set of documents.

**ATTORNEY STRINGER:** I don't know that I have that, Commissioner.

**PRESIDING COMMISSIONER ANGELE:** Under the white pad maybe.

**ATTORNEY STRINGER:** The list of exhibits, no, I'm sorry, I don't see it.

**PRESIDING COMMISSIONER ANGELE:** (Indiscernible) documents?

**ATTORNEY STRINGER:** No.

**PRESIDING COMMISSIONER ANGELE:** Okay. Mr. Ferguson -- Mr. Stringer, do you have those documents?

**ATTORNEY STRINGER:** I do.

**PRESIDING COMMISSIONER ANGELE:** Any additional documents to be submitted?

**ATTORNEY STRINGER:** Not at this time, Commissioner. We reserve our right to submit those during the relevant portion of the hearing.

**PRESIDING COMMISSIONER ANGELE:** Mr. Sachs, do you have the documents as listed on the hearing checklist dated 12-16-04?

**DEPUTY DISTRICT ATTORNEY SACHS:** Commissioner, I stipulate I have all those documents on behalf of the People.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you. Will the inmate be speaking with us today?

**ATTORNEY STRINGER:** He will.

**PRESIDING COMMISSIONER ANGELE:** Do you have any preliminary objections?

**ATTORNEY STRINGER:** I do, Commissioner. We object to any use of my client's initial hearing at this subsequent hearing, any use of the transcript. It's our view that the initial hearing was fraught with due process problems in that confidential material was used by the Board to arrive at its unsuitability decision. That confidential material was never provided to the attorney, is not confidential under the Board's law and should not have been used at the hearing as a basis for the Board arriving at its unsuitability decision. Therefore, we would ask that the Board not use any element of the transcript from the initial hearing. Obviously, the Board has abolished its appeals unit so no objection or no appeal could be made to the appeals unit regarding that initial hearing. My client doesn't have the funds to mount an appeal through the court on a Writ of Habeas Corpus, so the only objection he can make is at his subsequent hearings to what occurred at the initial.

**PRESIDING COMMISSIONER ANGELE:** I'm going to hold my decision in abeyance until I look in the

C-File and see why they were included in -- confidential, and they may very well at that time have been referred to as fearful type letters maybe, and I'll also have to look into the rest of the transcript to see what was said there. All right, I see why, and I'll overrule your objection. The reason why they were confidential is that they had not be redacted and they contained the names and addresses of those individuals who wrote the letters. There very well, at that point, may have been what we consider fearful letters. There are a number of letters contained in the current package that I'm sure you have there, and if I'm not mistaken, I believe they have been redacted. Yes, they have, and that is the reason they were confidential and the reason why you didn't receive those because they were confidential.

**ATTORNEY STRINGER:** Well the problem is, from my client's standpoint, are the authors of the letters that I have today the same authors of the letters that were used at the first hearing? And I have no way of knowing that because they're not included in the record.

**PRESIDING COMMISSIONER ANGELE:** And what would that do to (inaudible) client's rights if they were or weren't?

**ATTORNEY STRINGER:** Well, redaction is certainly not a reason to deny the attorney access to those letters, that's a simple administrative function.

**PRESIDING COMMISSIONER ANGELE:** It might have been, but that was CDC's call, and if that's what they did, that's what they did. I can't speak to that issue except for the fact that they were in there. I have not read them. I'm not going to use them in this hearing. We have another set of letters in this hearing you have copies of...

**DEPUTY COMMISSIONER NIELSEN:** Though he did not appeal -- You say he did not exercise his right to appeal with the courts because he didn't have the funds to do so, is that correct?

**ATTORNEY STRINGER:** Yes.

**DEPUTY COMMISSIONER NIELSEN:** Okay. I would note in the decision of the 2000 hearing it was acknowledged: "The victim is also opposed, along with 19 others that have written letters in opposition to parole." But I would certainly note that that is but one of many, many, many factors noted in the decision for the denial. And certainly one of the more or the lesser significant -- those opposition letters. There were just many other discussions here and reasons

for the decision. And decision review did review the decision and only made a couple of minor corrections in it, so it would appear to me that the decision was well founded.

**PRESIDING COMMISSIONER ANGELE:** The objection is overruled.

**ATTORNEY STRINGER:** Secondly, Commissioner, we would object to a portion of the current psychological evaluation prepared by Dr. Nancy Van Couvering, that's in the estimated dangerousness section, I believe it's roman numeral three which indicates moderate degree of threat to the victim if released to the community. I find no basis at all for that conclusion in the psychological report, nor any basis at all in the previous psychological report. And I would ask that that be stricken from the record and not be used in this hearing.

**PRESIDING COMMISSIONER ANGELE:** I'm going to overrule that objection. In reading it, it seems obvious to me that the victim is the inmate's wife and that the clinician during the evaluation based upon the answers that she was given feels that the inmate's wife is still at risk, at least moderately, if the inmate was released to the community. That's her opinion based upon her expertise and her education. I'm going to

overrule that objection also.

**DEPUTY COMMISSIONER NIELSEN:** Mr. Chairman, I would further observe the prefacing statements -- Van Couvering -- do in fact give reasons in part, externalizing the accountability which in another word would be not accepting full responsibility for behavior, for avoiding repetition of violence, it would not be enough to avoid similar situations, so there is a direct nexus to a reason and she is observing his ability -- some question of his ability to control his own motivations. And she does qualify it as at this time of course. But she also -- a couple of paragraphs before -- acknowledges -- did not address the issue of whether he might need to make any changes within himself, that's a part of personal responsibility and accountability. And I would find that that is a normal, natural, historic -- very consistent with precedent type evaluations by licensed psychological (inaudible).

**ATTORNEY STRINGER:** Ready to proceed, Commissioner.

**PRESIDING COMMISSIONER ANGELE:** If there are no objections, I would like to incorporate by reference the Statement of Fact. I'm going to take this from the Appellate decision, pages two through five.

ATTORNEY STRINGER: No objection, Commissioner.

PRESIDING COMMISSIONER ANGELE: Mr. Ferguson, you are serving a life term for the torture of your spouse at that time, use of a deadly weapon, occurring on or about August 28, 1995. Is that correct?

INMATE FERGUSON: Yes, Sir.

PRESIDING COMMISSIONER ANGELE: Now you apparently had been married for about 23 years and had fought often, particularly the last five years of the marriage. Your wife had told you in July of '98 --- '95 that she was going to file for divorce. You wound up getting involved in a (inaudible) discussion. She left the room, went to the washroom, and the next thing she knew she was struck in the back of the head. Did you commit this crime?

INMATE FERGUSON: Yes, Sir, I did.

PRESIDING COMMISSIONER ANGELE: Now this was a crescent wrench that was used. She was struck about two or three times, also choked and smothered. Was your intent to kill your wife?

INMATE FERGUSON: No.

PRESIDING COMMISSIONER ANGELE: What was your intent?

INMATE FERGUSON: Well, we had had a highly

charged divorce situation. It was very bitter. As you mentioned, we'd been married for over 23 years. She decided that she wanted a divorce, then she would change her mind and give an extension of time before she would think about, you know, divorce again. And it was just a highly charged, bitter, psychologically bad time in our lives. And I regret what I did, but I did hurt my wife of over 23 years. I have no excuse for that.

**PRESIDING COMMISSIONER ANGELE:** Okay. The day this happened apparently you were discussing the jewelry and other items of value, property, things that you wanted to split up.

**INMATE FERGUSON:** Well that was one of the things. We were actually discussing money that was gone and assets that were gone from the home, which included the jewelry, and the disposition of our son.

**PRESIDING COMMISSIONER ANGELE:** Kyle?

**INMATE FERGUSON:** Yes. That was -- The most emotional part was whom would Kyle be with. Would he be with me or would he leave and go to a rental property that she had. Kyle didn't want the divorce. I didn't want the divorce. My wife at the time sometimes wanted the divorce and sometimes she didn't. And this atmosphere, it led to a violent confrontation which I regret.

**PRESIDING COMMISSIONER ANGELE:** Had there been other altercations with your wife?

**INMATE FERGUSON:** We never had any --

**PRESIDING COMMISSIONER ANGELE:** Physical?

**INMATE FERGUSON:** We never had any physical altercations. We never had any violence, but we did argue, there were verbal things said. I regret the things that I said verbally too. I shouldn't have said the things that I said. I shouldn't have gotten angry, but I did. But this is the first time in 23 years that we had a violent episode where there would be any bruising or blood.

**PRESIDING COMMISSIONER ANGELE:** Now this was inside the residence.

**INMATE FERGUSON:** Excuse me, Sir?

**PRESIDING COMMISSIONER ANGELE:** This was inside the residence.

**INMATE FERGUSON:** It was in the laundry, dog room. Yes, Sir, it was.

**PRESIDING COMMISSIONER ANGELE:** And were did you get the wrench?

**INMATE FERGUSON:** Well the wrench was in the room that we were in. There was what I think they call a tool caddy.

**PRESIDING COMMISSIONER ANGELE:** Okay.

**INMATE FERGUSON:** And it was -- The wrench

was used to change butane bottles on a barbeque.

**PRESIDING COMMISSIONER ANGELE:** All right. Your prior convictions, you have none apparently. Nothing as a juvenile and this appears to be your only offense as an adult. Is that correct?

**INMATE FERGUSON:** By definition by the CDC I'm called a first-termer with an instant offense, meaning that I have never had any --

**PRESIDING COMMISSIONER ANGELE:** I don't need --

**INMATE FERGUSON:** Right, yes, Sir, never had any problems with the law before.

**PRESIDING COMMISSIONER ANGELE:** So the instant offense is your first and only --

**INMATE FERGUSON:** My only contact with police, yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** Okay. You were born December 23, 1942 in Kansas City.

**INMATE FERGUSON:** Yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** Raised by both natural parents.

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** You have a younger brother. Graduated high school in Kansas City in 1961. Attended college for three years. Now you apparently had been out of work for a while? Were you out of work?

**INMATE FERGUSON:** Excuse me?

**PRESIDING COMMISSIONER ANGELE:** Were you out of work for a while?

**INMATE FERGUSON:** Well I started up my own venture, my own company. And it was, you know, getting off the ground and doing things. I wish -- I wish it had been more successful at the time, but I would not say that I was not gainfully employed.

**PRESIDING COMMISSIONER ANGELE:** It was F&G International?

**INMATE FERGUSON:** Yes, Sir. F meaning Ferguson, G meaning Graff (phonetic).

**PRESIDING COMMISSIONER ANGELE:** You were married to the victim in 1972. Correct?

**INMATE FERGUSON:** We were married, yes, Sir, at the Long Beach Naval Station in Long Beach.

**PRESIDING COMMISSIONER ANGELE:** However, you did not serve in the military.

**INMATE FERGUSON:** No, Sir, I did not serve in the military.

**PRESIDING COMMISSIONER ANGELE:** You have the one child?

**INMATE FERGUSON:** No. We had two sons. Our oldest son's name is Kyle Michael Beau Ferguson and our second son's name is Eric Christopher Ferguson.

**PRESIDING COMMISSIONER ANGELE:** You stay in contact with them?

**INMATE FERGUSON:** I stay in contact with Kyle Michael Beau Ferguson. He's a senior at the University of California, Santa Barbara. Our other son is deceased.

**PRESIDING COMMISSIONER ANGELE:** Sorry to hear that. In regards to any sort of substance abuse, your drinking was only social?

**INMATE FERGUSON:** We would normally have a glass of wine or beer or something like that with dinner. We would have the normal party functions, friends, football games, things like that that we would have a libation at.

**PRESIDING COMMISSIONER ANGELE:** Had you ever experimented with any form of controlled substance other than alcohol?

**INMATE FERGUSON:** No. I'm glad to say that I've never abused any drugs whatsoever.

**PRESIDING COMMISSIONER ANGELE:** None at all?

**INMATE FERGUSON:** No, I'm drug clean.

**PRESIDING COMMISSIONER ANGELE:** Your plans upon release?

**INMATE FERGUSON:** I have a small presentation here, and that's part of what I was going to say to you, not to repeat it.

**PRESIDING COMMISSIONER ANGELE:** Okay.

**INMATE FERGUSON:** Because it is in pretty good detail. There's a letter in my file from a minister group called -- Methodist group called Home Free Ministries.

**PRESIDING COMMISSIONER ANGELE:** Okay.

**INMATE FERGUSON:** And it speaks to my detailed parole plans and job offer.

**PRESIDING COMMISSIONER ANGELE:** And that's changed since your hearing when you planned to reside with the Salvation Army, correct?

**INMATE FERGUSON:** Well I had permission to go to the Salvation Army before I discovered this Methodist home, group, so actually I think I could say both.

**PRESIDING COMMISSIONER ANGELE:** I do have one letter in the file; this is apparently from your father, Ken Ferguson?

**INMATE FERGUSON:** My father's name is Albert Kenneth Ferguson.

**PRESIDING COMMISSIONER ANGELE:** Initial A. Kenneth Ferguson is the way it's written, 27 May 2004. He lives in Sandy Spring, Maryland. He indicates that he has set aside some funds that would help you establish a new life upon your release.

**INMATE FERGUSON:** Yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** Now that's

the only letter of support I have in the file. If you have something there in regards to job offers, I'd like to put them into the record.

**INMATE FERGUSON:** Well, this is in my little presentation I have, but I'll jump ahead. What you want is the job offer?

**PRESIDING COMMISSIONER ANGELE:** Well I'd like to see letters that refer to job offers or any letters of residence.

**INMATE FERGUSON:** Give me a minute please.

**PRESIDING COMMISSIONER ANGELE:** Sure.

**INMATE FERGUSON:** This should be in the file.

**PRESIDING COMMISSIONER ANGELE:** It's not in the file.

**INMATE FERGUSON:** Let me give you a copy. In fact CC-II Nielsen put this in the file.

**PRESIDING COMMISSIONER ANGELE:** It may be in the C-File but it's not in my packet, so (inaudible).

**INMATE FERGUSON:** I'm going to go ahead and read this into the record. Okay.

**PRESIDING COMMISSIONER ANGELE:** Well, what is it?

**INMATE FERGUSON:** It's the place where I would go upon parole and the job offer.

**PRESIDING COMMISSIONER ANGELE:** Okay. Is

that what you've given me?

**INMATE FERGUSON:** Yes, Sir.

**PRESIDING COMMISSIONER ANGELE:** Well let me put it in the record.

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** That's my job.

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** Okay. Here's a letter from the Placentia Methodist Church, Home Free Ministries, signed by Juan Lopez, president and overseer of Home Free Ministries. "I've been in business since 1989. Our program is nine months to a year, highly structured." It indicates should you be released to their facility that they will agree to any conditions or stipulations necessary to effect this condition. This is a live-in, lockdown situation?

**INMATE FERGUSON:** It's a Christian home that provides employment and then it has a structured situation which I think the letter gets into in better -- good detail. And that's a brochure that you have in your hand right now that goes into the different programs. It's quite an involved, lengthy process.

**PRESIDING COMMISSIONER ANGELE:** Any other

letters?

**INMATE FERGUSON:** I don't believe so.

**PRESIDING COMMISSIONER ANGELE:** Is this the letter that you're referring to that will offer you employment?

**INMATE FERGUSON:** Yes, Sir, it says right there -- it says -- I can read it to you if you want me to.

**PRESIDING COMMISSIONER ANGELE:** I can read it. I'll look at it. Well, it actually says outside work assignments to support our ministry are also required.

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** So that a sense of community is developed. That means they require it, that doesn't indicate to me that they will supply a job. Is that what you're telling me they do?

**INMATE FERGUSON:** Yes. They say here -- let me get to it. I think it's -- In an answer to your question, I think I need to read it and I'm going to do so. This is written on 9-9-04 to Ken Ferguson. It said to whom it may concern. Dear Sir or Madam. This letter --

**PRESIDING COMMISSIONER ANGELE:** Mr. Ferguson, I've looked at the letter. The letter does not specifically offer you a job. It says merely that it

is a program which -- talks about outside work assignments which are required.

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** Okay. Now let me go through the brochure and see if that's what they're talking about. If you can -- Do you have a copy of the brochure there?

**INMATE FERGUSON:** Yes, Sir, I do.

**PRESIDING COMMISSIONER ANGELE:** You need to point out to me where in the brochure it tells you that you're going to be employed, it'll help because I'm reading things that skirt on the issue. It says: "I've accomplished this by providing low rent living situations which are called work homes --

**INMATE FERGUSON:** Right.

**PRESIDING COMMISSIONER ANGELE:** -- for graduates, connecting them to -- local church and guiding them toward lifelong success."

**INMATE FERGUSON:** Right.

**ATTORNEY STRINGER:** I think what my client's referring to, Commissioner, is the initial letter that is a part of the record where they indicate, we will agree to any conditions or stipulations necessary to effect the condition, i.e., being released, work being one of those conditions necessary for release. We're inferring that that

is a job offer, together with the other facts of the letter, including that he would have to participate in outside ministry (inaudible).

**PRESIDING COMMISSIONER ANGELE:** What type of work are you able to do, Mr. Ferguson?

**INMATE FERGUSON:** In the prison I'm a health educator and a Laubach Literacy teacher. So what I do is I go from class to class in education and I teach four basic health subjects to the inmates. I've done this for over five, six years now. And also I'm a Laubach Literacy teacher which I teach people how to read and write, and write letters home, there's a lot of things I do, help them with their spelling, their grammar, their punctuation, so they can communicate with other people. So actually I have two jobs, both have to do with education.

**PRESIDING COMMISSIONER ANGELE:** Anything else in regards to parole plans?

**INMATE FERGUSON:** No. My parole plans are quite clear. I've been welcomed to come to this Methodist ministry which is a one year commitment and then they train me to be reintroduced into the community after that time.

**PRESIDING COMMISSIONER ANGELE:** Let me ask you a question. Do you know how many beds they have at this ministry?

**INMATE FERGUSON:** Well they have -- I know they have several buildings and then on different floors -- I haven't seen it. But on different floors they have dormitory settings. I know several inmates that have paroled and gone there. In fact, they hire some of these people. And they're interested in me; they wanted me to be able to teach health education to these drugs addicted people and other people that have bad habits. And I've sent them my resume that I made up concerning this, and this would give me a unique opportunity, a unique job in their ministry, something that they don't have currently, and that's trying to keep people healthy by reducing their bad behaviors, which is actually what a peer health educator does in the prison setting.

**PRESIDING COMMISSIONER ANGELE:** Okay. Now we send out what we call 3042 Notices.

**ATTORNEY STRINGER:** Commissioner, if I could add one thing. I think it's worth noting for the record that because of Mr. Ferguson's age he would qualify at age 62 for some social security benefits and because of his Triple CMS status within the institution he would have the ability to apply for SSI benefits. Whether or not he'd be granted SSI is another story, but he would have

the ability to apply for those benefits and standard social security benefits.

**PRESIDING COMMISSIONER ANGELE:** (Indiscernible) just turned 62 in December, so I don't know if the age bracket has to be 62 and so many months, but you're right, at age 62 (indiscernible) for social security benefits. I guess I should ask that, have you received any letters from social security yet?

**INMATE FERGUSON:** I can't remember the name of the form, but I filled out all kinds of federal forms. And there's an office in Fairfield and I sent these things to Fairfield and I can't get them to respond to me. All I want to do is get a statement showing that I'm eligible, which I am.

**PRESIDING COMMISSIONER ANGELE:** I'm surprised you didn't already get one. I (inaudible) --

**INMATE FERGUSON:** No, I keep --

**PRESIDING COMMISSIONER ANGELE:** -- automatic.

**INMATE FERGUSON:** I wrote them on a legal pad (inaudible) because there's certain criteria they want. They want your name, place of birth, date of birth, your mother's maiden name. I gave them all the information that they require. Then I got a hold of a form and I actually put the

information -- the same information on a form and I sent it off to them and I can't get Fairfield to do anything.

**PRESIDING COMMISSIONER ANGELE:** Can I assume you've put in 40 quarters?

**INMATE FERGUSON:** Oh, yeah, I'm eligible. I knew that before any of this happened.

**PRESIDING COMMISSIONER ANGELE:** All right. As I was saying, we send out 3042 Notices. And those are notices that go out to agencies that have a direct interest in your case. I do have a response from the District Attorney's Office from the County of San Diego. This letter is signed by Richard Sachs who is present by way of audio conference with the San Diego County District Attorney's Office. I won't go into the letter since he is here to speak to the issue. There's also a number of letters that have been submitted and these are contained in your packages. I have gone over each and every one of those letters. There are actually 59 letters, 14 are duplicates which means there are actually 45 letters which contain 48 signatures, meaning three of the letters were signed by Mr. and Mrs. These are letters that are in opposition to your release. And once again, they are contained in the notices section of your packet. With that, we're going to

go to post-conviction factors please, Commissioner Nielsen.

**ATTORNEY STRINGER:** If I could, regarding the letters, Commissioner, we have of course no way of knowing if those letters are from people that actually know the facts of this or have simply been generated by victim's rights groups. I would ask the Board, when they're weighing the letters, to at least take that into consideration.

**PRESIDING COMMISSIONER ANGELE:** We will do so.

**DEPUTY COMMISSIONER NIELSEN:** Okay. Let's go into post-conviction, sir. First let's talk about the pending 115 of 12-15-04. Any adjudication on that 115 to this point?

**INMATE FERGUSON:** Yeah, I have it right here. It's been dismissed.

**DEPUTY COMMISSIONER NIELSEN:** Okay.

**INMATE FERGUSON:** I want to read it.

**DEPUTY COMMISSIONER NIELSEN:** Okay.

**INMATE FERGUSON:** It was -- It says findings not guilty. It says:

"Findings. Inmate Ferguson found not guilty. The evidence does not substantiate the charge of failure to report. All white inmates were on lockdown and on modified program with

escorts to medical. There is insufficient evidence to support the charge. Disposition. Dismissed in the interest of justice. Inmate was advised of (indiscernible) rights to appeal and/or disposition."

So this was dismissed by Sergeant Martinez.

**DEPUTY COMMISSIONER NIELSEN:** All right. Officer, if you would be so kind to grab that and hand that to the Chair. We can look at that while we proceed. I'm going to go over a number of different things in no particular order, some -- semi-chronological. A letter about your participation in VORG in '96, '98. Men's Violence Prevention. Sustained involvement as a peer educator, numerous chronos, favorable, about that, we'll get to that a little later. You were part of some kind of a correspondence course (indiscernible) mentioned. I think that's also part of your parole plan, isn't it?

**INMATE FERGUSON:** Yes, Sir.

**DEPUTY COMMISSIONER NIELSEN:** And Clean & Sober chrono, certificate, 5-98. VORG, acknowledging five years involvement in VORG. A number of -- Another certificate of your participation as a peer educator. You've mentioned it. It's also in the record here,

chronos and certificates as to your efforts as a Laubach tutor. Participation in the Good Shepard seminar, '01. A certificate of baptism. Substance abuse in February of '01. Parenting For Young Parents, Parenting For Youthful Parents, Substance Abuse, something called H-E-C, I don't know what H-E-C is, in June of '01. What was H-E-C?

**INMATE FERGUSON:** You got me, Commissioner.

**DEPUTY COMMISSIONER NIELSEN:** Okay. It was just a little chrono for that. Advanced reading, math and language, arts chrono. Anger Management, patient education -- Parent Education I guess in '01. Peer Education chrono in '02. Anger Management, 16-week course, 5-02. Coping Skills, Anger Management chrono from '04, 9-04, 6-04, a laudatory chrono for your work in peer health education. And Dominquez writes of your efforts as a Laubach teacher. You were mature and trusted. We'll get to some of these other chronos, '98, '99, '04, various chronos for participation in NA or AA. Another Men's Violence Prevent, Anger Management chrono. Most recent efforts in work were as a porter, above average to satisfactory recognition. In terms of chronos, these are (inaudible) C-File order if you will. Dominquez I've mentioned. Yeah. Okay. Thank

you. The Chair just acknowledged from the Board report: "Writer has observed inmate Ferguson has solicited laudatory chronos from same staff members on numerous occasions. Some are written by same staff members only days, months apart from same topics. In my opinion this detracts from the validity of the chronos." Counsel, would you or your client like to respond to that at this point before I go through the positive chronos? It does tend to discount them a bit.

**ATTORNEY STRINGER:** May I see that, Commissioner?

**DEPUTY COMMISSIONER NIELSEN:** It's in the Board report.

**PRESIDING COMMISSIONER ANGELE:** It's in the Board report dated April 2, 2002, page seven, item number nine.

**ATTORNEY STRINGER:** Item number, roman numeral nine?

**PRESIDING COMMISSIONER ANGELE:** No, it's page seven of seven, significant events.

**ATTORNEY STRINGER:** The Board isn't doubting the validity of the chronos, correct?

**DEPUTY COMMISSIONER NIELSEN:** I think the point made by the counselor would be that there's -- not a validity of the chrono but that they are solicited which tended to detract from them a

little bit. It would be just like solicited letters of support or opposition, it sort of discounts if it's a solicited communication.

**ATTORNEY STRINGER:** But we could agree that the author has a choice or whether or not to issue the chrono? Is that fair to say?

**DEPUTY COMMISSIONER NIELSEN:** Yeah. Yeah, that's --

**PRESIDING COMMISSIONER ANGELE:** I would think so.

**DEPUTY COMMISSIONER NIELSEN:** -- fair to say.

**ATTORNEY STRINGER:** There's nothing from the authors of the chronos that would indicate it was done under duress or any other reason other than they believe they should issue a laudatory chrono.

**PRESIDING COMMISSIONER ANGELE:** There was no claim that that was the intent. Merely because of the solicitations, the opinion of the correctional counselor was that it detracts from the validity of the chronos.

**ATTORNEY STRINGER:** I think it would be -- it's fair to point out that that is an opinion that you don't often see at lifer hearings when referring to chronos.

**PRESIDING COMMISSIONER ANGELE:** That might be because other counselors don't believe that the

chronos are being solicited. I can't answer that question. That's his opinion of the chronos.

**ATTORNEY STRINGER:** Of course in preparation for the hearing, though, it's incumbent upon the inmate to obtain letters of support from whatever source the inmate can, that entails solicitation.

**PRESIDING COMMISSIONER ANGELE:** Well I'm not going to --

**DEPUTY COMMISSIONER NIELSEN:** No. And I think we've --

**PRESIDING COMMISSIONER ANGELE:** -- discuss it any further.

**DEPUTY COMMISSIONER NIELSEN:** -- kind of beaten this horse. I mean, we, Mr. Stringer, wanted to give you a chance to kind of respond to that observation, that's all. And I think we've covered it sufficiently.

**PRESIDING COMMISSIONER ANGELE:** We will give to these chronos as much attention as we normally do.

**ATTORNEY STRINGER:** Thank you.

**DEPUTY COMMISSIONER NIELSEN:** Correctional Officer Dominquez, positive chrono, August, talks about a model inmate, minds -- own business, offers assistance. You frequently hold informal peer counseling sessions, teaching inmates about public health topics. Morales, registered nurse,

in '02, talks about peaceful, kind, considerate gentleman. Galbraith, correctional officer, positive program, helpful to staff, based on 15 years as a CO. Carter, CO, talks about your Laubach efforts, peer health educator, positive programmer, helpful to staff. Morales, registered nurse, peaceful, kind, considerate gentleman, high of stature, ready to (inaudible) in society. Matlock, correctional officer, well-behaved, programming well, knows what you do as a peer health educator, facility one, that would be his personal experiences with you. Donahue, teacher, (indiscernible) complex, peer health educator, several presentations in classroom, great expertise in field of work, gets his message across, cooperative, willing to do what it takes, recommend excellent -- commend him on doing an excellent and informative job of bringing the truth to various classes. Wynne (phonetic), academic teacher, great expertise in field of work, articulate, gets his message across very well. August '02, Aulander (phonetic), Laubach education, fulfills Board voc skill requirements for parole. Talked about your proficiency in your teaching assignment as a Laubach tutor. And let's see. Talks about your -- Chrono about your education, but the Chair already covered that.

Nightingale, teacher in ward SD-1, talks about your peer health educator efforts commendably. Nightingale gives his own chrono in '00 saying participation as a peer health educator -- There's a chrono for your eight hours of psychiatric consultation with Downs (phonetic), a psychiatrist, and consulting training by Dr. Kauffman, psychodynamic and psychosocial behavior. Alexander writes in 2000 about -- Laubach tutor. Good standing in VORG, M. Reese, sponsor of the Victim's Offender Reconciliation Group. Chrono, August (indiscernible) September of the NA participation, mentioned that already. Makamura (phonetic) Newman, more laudatory -- of your participation in peer educators -- inmate peer education program and you are proficient in your assignment and fulfills the requirements. Your AA chrono in '98. I think I covered all those. Positive chrono for your efforts as a porter in March of '98. Black, job supervisor, control booth, calls you a cooperative programmer, most helpful to staff and inmates alike, thinks you could successfully rejoin society. Aulander (indiscernible) another one about your literacy training efforts. AA chrono from '98. Men's Violence Prevention chrono, 7-98, this talks about your ability to reenter society as a peaceful

member of that society. A model inmate chrono from Correctional Officer Young from '98, as well as from Taylor in '98, Correctional Officer Taylor. VORG sponsor, M. Reese, positive chrono about your VORG participation. Regularly attending Protestant chapel, October '97, from a Reverend (indiscernible). Faithful participant in chapel program chrono in '97. Positive program at Salinas Valley by Correctional Officer Vanich (phonetic), likewise from Officer Santillean (phonetic), 5-97, and more from -- another from Vanich. Laudatory chrono from Salas, correctional officer, positive influence, 3-97. O'Shea, correctional officer, 1-97, and 1-97, McCormick, correctional officer, all positive as to your responsible behavior and comportment while in prison. Anything I may have missed, sir, either you or Mr. Stringer would like to bring to our attention as to your self-help therapy, etcetera?

**INMATE FERGUSON:** Yes, Sir. Mr. Stringer's taking a look at my short presentation I have. I have some new laudatory chronos which the Board does not have. I was supposed to have my hearing back on June 18 of last year and the State cancelled that and they moved it ahead, so there are some gaps in --

**DEPUTY COMMISSIONER NIELSEN:** Well it wasn't

just the State, as I recall, you somewhat wanted those postponements too, didn't you?

**INMATE FERGUSON:** As I recall, there were five postponements by the State and one by my attorney.

**DEPUTY COMMISSIONER NIELSEN:** Okay. Well, let's go ahead with the point you're trying to make.

**INMATE FERGUSON:** Right.

**ATTORNEY STRINGER:** Commissioner, there are --

**INMATE FERGUSON:** The chronos.

**ATTORNEY STRINGER:** Some of the chronos have been submitted or you reviewed them.

**DEPUTY COMMISSIONER NIELSEN:** Okay.

**ATTORNEY STRINGER:** (Indiscernible) --

**DEPUTY COMMISSIONER NIELSEN:** If there's any I missed --

**ATTORNEY STRINGER:** -- but we have one of April 30 from registered nurse Alayhe (phonetic), one of September 4 from Reverend Carl Spect (phonetic), and then two very recent ones, one of January 12, '05 from Correctional Officer Nears (phonetic) and one from Correctional Officer Dominquez. We'd like to have those entered into the record.

**DEPUTY COMMISSIONER NIELSEN:** Okay.

**ATTORNEY STRINGER:** It is my understanding the Board does not have those chronos.

**DEPUTY COMMISSIONER NIELSEN:** I've covered all that I saw, counsel. So you have read them into the record so they will appear on the record. And if you'd take the responsibility, Mr. Ferguson, when you see your correctional counselor, to avail him of those documents that you have and ensure that he gets them into the Central File. Okay.

**INMATE FERGUSON:** Yes, Sir.

**DEPUTY COMMISSIONER NIELSEN:** All right.

**ATTORNEY STRINGER:** Then we will submit it then in narrative form during our presentation.

**DEPUTY COMMISSIONER NIELSEN:** Sure. Okay. Very good. Let's go on to the psychological, psychiatric evaluations. Previous one by Taylor, and it notes -- June '02 -- symptoms of anxiety, depression in the dorm settings, symptoms of defective disorder. You said you had some bad days, they lasted a few days at a time. You said you were withdrawn, irritable and having hopeless thoughts and helpless thoughts. Some medication was prescribed. In May you said you had a little more anxiety, irritability, insomnia, and you thought that was because you had a little too much Prozac I guess. There was a discussion of the

life crime with Taylor. I'll talk about that a little bit later. The assessment of dangerousness. You're characterized as a motivated man, excited about work and work prospects, that you denied any ill feelings towards anyone, you had realistic plans, not quite yet solidified. It is noted, no particular mental issues appeared present nor do adverse personality, attitude, impulse, emotional discontrol factors appear to be at play. It said you've successfully been treated for mild depressive symptoms and there's little to suggest that you would be dangerous if released. The most recent report by Van Couvering of August '04, diagnosis, Depressive Disorder Not Otherwise Specified In Partial Remission. No Diagnosis on Axis II. Various health problems noted on Axis III. And talks about your regiment of treatment right now. You did recognize that you have symptoms of a depressive disorder. You have shown greater insight into your own behavior. In the past you have both rationalized and denied aspects of your crime; however, you have recently written two letters of remorse in which he admits he committed the violent crime against his wife, deserved to be arrested and to serve jail and prison time. He was glad his wife recovered from

her injuries but that he believes she would be angry with him for the rest of her life. Van Couvering characterized this as a positive development considering that at first you claimed that your wife initiated the crime by attacking you. Talks about the crime a little bit and we'll talk about that. Your expression of remorse at the time of the interview constituted you saying, I feel terrible about it. Van Couvering observes you did not address the issue of whether you might need to make changes within yourself. "Nevertheless, he seems to have come a long way from where he started." And in conclusion in the assessment of dangerousness:

"To all appearances -- crime was a once in a lifetime event. There's no record of comparable violence before or after. However, his victim has expressed concerns that he would seek revenge if released. In relation to the crime, he appears to externalize accountability for his own behavior to some extent. For avoiding a repetition of violence towards his wife, it would not be enough to avoid a similar -- to avoid similar situations, he would be a danger as

long as he did not and therefore did not own -- and therefore did not control his own motivations. At this time, estimated risk to wife is moderate and the community at large he is low."

(Inaudible) would be the evaluations, counsel, would you or your client like to -- have any observations related thereto?

**ATTORNEY STRINGER:** No. I put my objection already on the record, Commissioner.

**DEPUTY COMMISSIONER NIELSEN:** Okay. Fine. I will return to the Chair.

**PRESIDING COMMISSIONER ANGELE:** Mr. Ferguson, if this situation arose again, what would you do differently?

**INMATE FERGUSON:** Well I didn't understand at that time how to control my temper which actually turned into a state of rage at the divorce, the threatened divorce. I needed -- I needed help which would be professional help. I need to see a marriage counselor. I need to see a psychiatrist or a psychologist or a minister or somebody that would get me through the rough times before it built up. I see myself as a volcano in fact, inside the volcano this pressure built up and then it spewed forward in the crime that I

committed. There is no excuse for the crime though. I should -- somehow -- better control of myself than I did. I did commit a terrible crime against my wife and I am ashamed of it. And my shame is an everyday thing.

**PRESIDING COMMISSIONER ANGELE:** What did you learn from Anger Management?

**INMATE FERGUSON:** Anger Management, I learned to control my anger. I've had Anger Management every week that I've been in prison.

**PRESIDING COMMISSIONER ANGELE:** A group?

**INMATE FERGUSON:** Yes, Sir, it's called a therapy group.

**PRESIDING COMMISSIONER ANGELE:** Any questions, Commissioner Nielsen?

**DEPUTY COMMISSIONER NIELSEN:** Yes. Kind of setting the stage, the sentencing judge, in explaining the factors in aggravation that affected the high term, characterized your behavior has a vicious attack on Ms. Ferguson.

"This wasn't just a beating. This was a surprise attack from behind on her with a weapon that could easily have killed her. In fact it was I guess unfortunate for her -- fortunate for her and perhaps a miracle that she didn't have a

crushed skull and perhaps permanent organic damage -- brain damage or a more serious problem, even death. This attack was planned. This was not in the course of (inaudible) a sudden outburst of (indiscernible) or frustration. I don't know if the rope and the duct tape and so forth, the hammers, some of which were referred to during trial, some of which have been referred to in her letters to the court, I don't know that that is -- that I should give that a tremendous amount of weight." He goes on: "Not only did he strike her a dozen or a baker's dozen of times on the head with his crescent wrench, he also tried to strangulate her. He also tried to suffocate her. This was a grossly -- This was gross, inappropriate conduct, that circumstance alone merits the upper term. I acknowledge he had no prior crimes of violence, no criminal record -- factor in mitigation. But his lack of remorse, his focus, totally on himself and indirectly on

his son, his blaming his wife for his problems, his -- as the jury has concluded -- concocting a story of self-defense or that his wife initiated the attack, just as the jury rejected that scenario, the court finds likewise. It was preposterous, it just didn't happen. The court doesn't believe it."

That's pretty strong language for a sentencing judge. I've read a lot of sentencing transcripts. What would you observe about that statement by the sentencing judge, sir?

**INMATE FERGUSON:** Well, I don't have any excuse for the crime I committed. I regret it. I have the most bitter remorse for it. The one area though I do have problems with there is when I was charged with attempted murder. I was acquitted of the crime of attempted murder. The reason I was acquitted is there wasn't any premeditation. There was no premeditation.

**DEPUTY COMMISSIONER NIELSEN:** That's not what the judge at sentencing said.

**INMATE FERGUSON:** I understand.

**DEPUTY COMMISSIONER NIELSEN:** He said it was planned.

**INMATE FERGUSON:** I understand, sir, what

you read. I understand what Judge Mooney (phonetic) said also.

**DEPUTY COMMISSIONER NIELSEN:** Okay. Go ahead.

**INMATE FERGUSON:** But I'm the man that committed the crime. And nobody knows the crime better than I. I did not preplan anything. There was no premeditation.

**DEPUTY COMMISSIONER NIELSEN:** Do you know the crime better than the victim?

**INMATE FERGUSON:** Well, I'm the one that committed the crime, so I don't know whether I know the crime better than the victim or not, I would think I probably would.

**DEPUTY COMMISSIONER NIELSEN:** Okay.

**INMATE FERGUSON:** Since I'm the one that's in prison. But there was no premeditation. And the reason that I was acquitted of attempted murder was because there wasn't any premeditation. The crime of torture does not ask for premeditation. Well, whatever the crime was called, I did commit the crime. I'm totally responsible for it. And in this last decade, like Dr. Van Couvering said in her report, I have made remarkable progress.

**DEPUTY COMMISSIONER NIELSEN:** Well tell me this. These years you've been down, and a lot of

programming commendably you've done, but today you start off telling us you didn't intend to kill your wife, but you attack her from behind when she's vulnerable. You further continue to beat her when she's down flat on the ground, vulnerable, you're using a wrench, you're hitting her numerous times, up to 13, and then you try to choke her. Now, you're trying to tell me you weren't attempting to kill her? That was just kind of -- what was it -- a moment of rage, but you had no concept at the time that all of that kind of behavior, all those repetitious blows with a crescent wrench and trying to choke her could result in death?

**INMATE FERGUSON:** Commissioner, I stated that I had anger which turned to rage. I admit to my crime. I did something that I should never have done no matter what. I was out of control. I'm sorry I was out of control. I was in a state of rage. And I wish I hadn't of done it. As I think back on it now, it's hard for me to even grasp the idea that I could have lost it completely and did what I did. But I did lose -- I lost control of myself. And in losing control of myself I committed the most hideous crime against my wife whom I should never have touched under any circumstances. I make no excuse for my

crime. I admit to my crime.

**DEPUTY COMMISSIONER NIELSEN:** Okay. In reviewing your life crime with Dr. Taylor, and this is fairly recent, my wife and I -- this is your version: "My wife and I were having an argument. It got more heated and she bit me on the thumb. When she did, I grabbed the wrench and tried to get my thumb out of her mouth. I hit her in the head. I shouldn't have, but I did until she released my thumb." That sounds like to me that you were telling Dr. Taylor that the reason you started slamming your wife in the head was because she was biting your thumb. Was that accurate, what you meant -- to the doctor at that time? This is a very recent evaluation by Dr. Taylor. You then said you went ahead and called the police for an ambulance. And she left the house and you followed her until you saw that she was going in the front yard. But this sounds like to me you're saying that she bit your thumb and you're trying to stop her from biting your thumb so you beat her with a crescent wrench. Is that what you meant?

**INMATE FERGUSON:** No. At the end of my last Board hearing, Commissioner Bordonaro, is that how you say it, okay, asked me to take a look at the Appellate decisions and take a look at my crime

and see what I could come up with and articulate it better. I did so. And one of the reports that's here that I'm going to try to get to if you give me a minute, if you look at the life prisoner evaluation report of 7-26-04, under number two, prisoner's version, it says: "Since Ferguson's last appearance before the Board of Prison Terms he has revised his version of the commitment offense." Third paragraph says: "He said he has reviewed the transcript recommended by Commissioner B-O-R-D-O-N-A-R-O and stated: 'I agree and I stipulate with the events presented by the prosecution. I had amnesia and I did not clearly remember the events during the commission of my crime.'"

**DEPUTY COMMISSIONER NIELSEN:** Was this recent amnesia?

**INMATE FERGUSON:** No, the amnesia was that I didn't remember the chronological order of what happened at the scene of the crime.

**DEPUTY COMMISSIONER NIELSEN:** Okay. All right. I have no further questions.

**PRESIDING COMMISSIONER ANGELE:** You alone?

**INMATE FERGUSON:** Excuse me, Sir?

**PRESIDING COMMISSIONER ANGELE:** You were alone in the house with your wife and your son?

**INMATE FERGUSON:** No. My wife was in the

house, I was in the house and our two dogs were in the house. Our son was next door playing with a friend.

PRESIDING COMMISSIONER ANGELE: My last question I have, what was your intent then, to do what?

INMATE FERGUSON: Commissioner, I had no intent. I lost it. Okay. I was angry. And my anger turned into rage and I lost control of myself as a human being. I wish I hadn't had done that, but I did do that.

PRESIDING COMMISSIONER ANGELE: And when did you regain control?

INMATE FERGUSON: I probably -- Well, at the end of the episode of the crime, as I recall, she released my thumb from her mouth and in so doing I backed up and went in the kitchen and called the police and asked for an ambulance and the police to come. And at that time she left and went out the garage.

PRESIDING COMMISSIONER ANGELE: Okay. Anything further?

DEPUTY COMMISSIONER NIELSEN: No, thank you.

PRESIDING COMMISSIONER ANGELE: Any questions -- Mr. Sachs, any questions?

DEPUTY DISTRICT ATTORNEY SACHS: Yes. Could you ask the inmate at what point in time he

decided to change his version of the events from self-defense to he attacked her in a rage?

**PRESIDING COMMISSIONER ANGELE:** You hear the question?

**ATTORNEY STRINGER:** Commissioner, I don't know that he's ever asserted a self-defense argument.

**PRESIDING COMMISSIONER ANGELE:** It's in the record.

**DEPUTY DISTRICT ATTORNEY SACHS:** That was exactly what was asserted two years ago. It was asserted that she was coming at him and going to attack him and he decided to defend himself.

**ATTORNEY STRINGER:** I don't see anything in the record that uses the word self-defense, that he asserted that defense. Now, if the District wants to draw --

**DEPUTY DISTRICT ATTORNEY SACHS:** (Inaudible) --

**ATTORNEY STRINGER:** -- that conclusion --

**DEPUTY DISTRICT ATTORNEY SACHS:** -- me out. I was at his last and first hearing. He claimed the victim came at him with a knife and a wrench and he was defending himself. And I'm asking when did he decide to change that to he lost it and attacked her in a rage? At what point in time? The transcript will bear me out on this. This was

during my questioning of the inmate through the Board at the last hearing.

**INMATE FERGUSON:** May I respond?

**PRESIDING COMMISSIONER ANGELE:** Certainly, it's a question.

**INMATE FERGUSON:** I think I just answered this when I read my statement that is in the report. I said that the Commissioner in the first suitability hearing told me to go back and take a look at the Appellate decisions and told me to come back and articulate after that time -- to rethink it. And he planted the seed by doing so. Then I went back and read the transcripts, all the transcripts, the Appellate transcripts and others, and I started thinking about what happened at the time of the crime. All right. That's when I decided that the prosecution's version of events were the version of events that I would agree with. And one of the reasons for that is that I have never had a clear memory of all the events of that day. I've had a hazy memory and I get the events that happened out of chronological order, not knowing what happened first.

**DEPUTY DISTRICT ATTORNEY SACHS:** Could you ask the inmate, Commissioner, when he said at the last hearing that she came at him with a knife and a wrench, that was untrue then, wasn't it?

**DEPUTY COMMISSIONER NIELSEN:** Counsel, I've got that page if you want to review it. It's page 58 of the transcript if you want to see that. Would you hand that to the attorney. Let me have it back when he's done.

**ATTORNEY STRINGER:** Well I think he's answered that question, that his memory is not intact on that, which commonly happens when a person loses controls of their faculties in a moment of rage. I mean, there's nothing new about that in these types of crimes. That's why they have manslaughter.

**PRESIDING COMMISSIONER ANGELE:** I understand that, but the question of the inmate was when did he decide to change from it being self-defense to admitting to the crime itself (inaudible)?

**ATTORNEY STRINGER:** I don't know -- I mean, you can characterize that if you want to as self-defense. He's simply reiterating what he believes the sequence of events are. I don't see that word self-defense in the transcript. Now if it was asserted as an affirmative defense at the trial, so be it, but I don't have that transcript. I mean, was it asserted as an affirmative defense at trial, self-defense?

**PRESIDING COMMISSIONER ANGELE:** What page are you on Mr. Sachs?

**DEPUTY DISTRICT ATTORNEY SACHS:** Well I don't have the transcript in front of me. I'm just working off my notes from the last hearing. Basically I just have one more question for the inmate if you would, Commissioner.

**PRESIDING COMMISSIONER ANGELE:** Go ahead.

**DEPUTY DISTRICT ATTORNEY SACHS:** If you could ask him, when he said that she came at him with a knife and a wrench, that was simply untrue, wasn't it?

**PRESIDING COMMISSIONER ANGELE:** It's a straightforward question.

**INMATE FERGUSON:** Ask the question again.

**PRESIDING COMMISSIONER ANGELE:** When you claimed that she came at you with a wrench and a knife, that statement was untrue, wasn't it?

**INMATE FERGUSON:** I've said that -- I've said that all the testimony was untrue, that I now agree with the prosecution's version of events.

**PRESIDING COMMISSIONER ANGELE:** Okay. Well the original question was --

**INMATE FERGUSON:** That's the answer.

**PRESIDING COMMISSIONER ANGELE:** The original question was when did you agree?

**INMATE FERGUSON:** You see, I've tried to answer this and I've got the transcript in front of me.

**PRESIDING COMMISSIONER ANGELE:** The question was when did you agree to that?

**ATTORNEY STRINGER:** I thought he answered that when he said it was in response to Commissioner Bordonaro's (inaudible) --

**PRESIDING COMMISSIONER ANGELE:** That's all he had to say in the first place. That's the answer. We're going through all this -- all this verbiage because you won't answer the questions. The question was when did you finally decide that that was untrue? Hang on. Hang on. The answer was when Commissioner Bordonaro told you to read through the transcripts, and once you read through the transcripts obviously it enlightened you. Now that's what you agree with, correct?

**INMATE FERGUSON:** Absolutely.

**PRESIDING COMMISSIONER ANGELE:** All right. (Indiscernible). You got it Mr. Sachs?

**DEPUTY DISTRICT ATTORNEY SACHS:** Yes. I'm done with my questions. Thank you.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you. Any questions of your client, sir?

**ATTORNEY STRINGER:** Thank you, Commissioner. Mr. Ferguson, if a number of restrictions were placed upon you by the Board of Prison Terms if your parole was granted, would you have any problem in abiding with those restrictions?

**INMATE FERGUSON:** No. I would abide with any restrictions they have. Also, the Home Free Ministries states in there that they would help me have a successful parole. There is no recidivism in me whatsoever.

**ATTORNEY STRINGER:** And if one of the restrictions was that you attend an Anger Management program for the duration of your parole, would you do that?

**INMATE FERGUSON:** Absolutely. I've done it every week since I've been in prison. There's no reason why I'd change.

**ATTORNEY STRINGER:** And you are involved in the institutions in a number of programs that assist other inmates with reading and self-improvement?

**INMATE FERGUSON:** I teach health education and I teach people how to read and write, which is the Health Education program and the Laubach Literacy teaching program.

**ATTORNEY STRINGER:** And during your time within the State prison system you've never been involved in any episode of violence whatsoever, is that correct?

**INMATE FERGUSON:** The only episode of violence in my 62 years is my crime. Nothing else.

**ATTORNEY STRINGER:** Thank you. Thank you, Commissioner.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you. Mr. Sachs, closing please.

**DEPUTY DISTRICT ATTORNEY SACHS:** Yes. On behalf of the People of the State of California we would respectfully oppose parole because we feel the release of Mr. Ferguson would pose an unreasonable risk of danger to society. Mr. Ferguson has not yet really embarked upon a journey or the work that needs to be done in order for the Board to have any assurance that he no longer represents an unreasonable risk of danger and would act any differently if a similar trigger, as it presented itself in this event, were to reoccur. In making this statement we are mindful of the fact that Mr. Ferguson has done well in prison, has programmed well and achieved laudatory chronos. We're not trying to take that away from him. However, there is an unexplored side to this inmate which basically is somewhat of a ticking time bomb that could go off anytime rage is triggered by a situation he believes is completely out of his control, and so it was with this case. When he makes the statement that he did not premeditate attempted murder in this case and that's why he was acquitted, I think what he's

really saying is he did not for days before the offense plan to kill her. And I would accept that statement. I'm sure there were arguments, there was marital strife, there was acrimony, there were lots of difficulties, but a plan to kill her prior to this offense was probably not on his mind. However, what needs to be brought out in this case and what is abundantly clear is that at the time he got into this argument with her and things sort of were getting ugly, he made a decision in his mind at that point that he was going to attack his wife. And I think the evidence, even taken in the light most favorable to him, shows that during that attack he didn't care if she lived or she died. There was sufficient brutality in that attack and (inaudible) to that attack to kill her at that time. And in the light most favorable to him, that was not a concern of his, whether she lived or died. In his opinion she just may as well have just died. Now, in a more objective light in what really obviously happened here was as she was standing in the laundry room with her back to him, he made the decision at that point that he was going to kill her, that he was going to attack her, that his rage and his anger had went to such a degree that he decided he was going to attack her and kill her at that point. And so

he did hit her 13 times with a crescent wrench, took a doggie blanket and tried to suffocate her and strangle her. Now, these are not the actions of a man who basically is indifferent to the marital strife with his wife, these are not the actions of a man who basically is trying to roll with the punches and deal with her. These are the actions of a man who is enraged at her and wants to kill her, that's the objective interpretation of the evidence. And even if he works it over in his mind in the light most favorable to him, still the most you could possibility give him in this case is he didn't care if she lived or she died. And he engaged in such a heinous, atrocious act, death was extremely likely from his conduct and he knew that. And he knows that now as he sits here. He knows that when he attacked her he was trying to kill her at that time. He was enraged. You don't hit somebody on the head 13 times with a crescent wrench and think that they're going to live. Now he needs to face that fact that he was trying to kill his wife. And until he faces that fact, if any circumstance repeats itself, if any circumstances come to light similar to this case, he may act out and be enraged again and this time they won't be as lucky as Alida. Alida survived not because of anything he did (inaudible) because

she managed to crawl out in the street and get immediate medical help while he's on the telephone concocting this story that she tried to attack him. And just two years ago when I was present he said that she came at him with a knife and with a wrench. And today he admits that's a boldface lie, but he covers up that lie by saying I have a hazy recollection of what happened. Well he has a hazy recollection of what happened because of the fact that Kenneth Ferguson is a con man and he's always been a con man. And he will weave things around and work them in and out to sound as best as they possibly can for himself. And I'm glad I'm here to point that out to the Board, that he is in no way suitable for parole, he's a time bomb waiting to go off again and he needs continued, further observation and therapy. And the last thing that I'll say is somehow he doesn't think he needs to have a job. He thinks it's okay if he just deals with that once he gets out. Working seems to be beneath him. He didn't work for the last five years of their marriage. Well, I think he needs to have some firm parole plans before he can ever be a serious candidate to get out. And with that, having said all of this, we're staunchly and strongly opposed to parole and we would defer, when it's her turn, the victim,

Alida, to make some remarks on how she feels about this. Thank you.

**PRESIDING COMMISSIONER ANGELE:** All right. Counsel, it's your turn now to close please.

**ATTORNEY STRINGER:** Thank you, Commissioner. The relevant law in the area is Penal Code section 3401 which indicates the Board will meet with the inmate, shall normally set a parole release date, that release date will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. I would argue that Mr. Ferguson's crime is no greater or no less than other crimes of its type that come before this Board and under the auspices of Section 3041 and relevant case law Mr. Ferguson is, by law, entitled to a date. Now under Title 15 the factors the Board can consider to show suitability are, one, no juvenile record. Mr. Ferguson does not have a juvenile record. A stable social history. He had that prior to this life crime. Signs of remorse. He has expressed those today. Motivation for the crime was the result of significant stress in his life, certainly no one would argue that. He has no criminal history. He has excellent plans for the future through this Methodist group and his institutional behavior has been exemplary. So

he's met the test for a parole date in every aspect. Now this is borne out by the record. Registered nurse Alayhe on April 30 says that she has contact with Mr. Ferguson on a regular basis. She knows him to be a sincere, truthful, kind and considerate gentleman. He's a peer health educator who provides vital health information to the inmate population. "It is my opinion that he is ready to rejoin society and should be considered for parole at the earliest possible time. Ferguson shows progress and continues to improve in all areas so that he can rejoin society as a productive citizen." She says: "This laudatory chrono is the latest of several laudatory chronos I've signed to benefit Mr. Ferguson." This is borne out by Reverend Spect in a chrono dated September 9, '04 that states Mr. Ferguson's an active member of the chapel of the Good Shepherd Church in Solano. He's been regularly counseled by the chaplain. He has a definite attitude of remorse for his crime and a desire to go forward in a positive way and he's a responsible member of not only the church but will be a responsible member of society. He is committed to Christ and has completely changed his attitude and personality. The reverend says he's taken positive steps towards reentering

society and should be given serious consideration towards that end. In a chrono dated January 12, '05 Correctional Officer Nears of CPS, Solano says:

"For over six years I have observed Ferguson, found him not to be a safety concern or have any degree of future dangerousness. In my duties as lead floor officer I have observed Ferguson as a peer health educator, Laubach Literacy teacher, porter and an inmate who is always helpful to staff and inmates alike. He's a positive programmer, continues to show that he is suitable for quote 'immediate parole.' He's a mature 62-year-old and trusted person who is not a threat to society."

And he says this comes from over 18 years of service as a correctional officer. Correctional officer Dominquez states in a chrono of January 11, '05: "I've observed Ferguson for over five years and found him not to be a safety concern or have any degree of future dangerousness. This is my fifth laudatory chrono written for Ferguson. My first, second, third and fourth laudatory chronos to benefit Ferguson were

written -- " and he gives the dates. Says he observed Ferguson over the years, he's been helpful to staff and inmates alike. He's a positive programmer, appears to show that he is suitable for quote 'immediate parole' and he says you can contact him with any questions. Now those are facts from individuals that have observed Mr. Ferguson over the years. That's borne out by Dr. Taylor, the psychologist who interviewed Mr. Ferguson in 2002. Dr. Taylor says: "There's little to suggest that he would be dangerous if released." Dr. Van Couvering states in her analysis of 2004 his dangerousness to the community at large is quote "low." It's clear that this was a onetime aberrant event. And the case law in Ramirez, Rosenkrantz, Smith and Powell is clear, it is whether or not the inmate poses a risk to society as he sits before the Board now. It is not the State's responsibility to go back and re-fight the commitment offense. That has been decided by the courts. What's to be decided now -- if he meets the suitability test for parole. Mr. Ferguson certainly does and we would ask and request that parole as a matter of law. Thank you.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you, Mr. Stringer. Mr. Ferguson, now it's

your turn to tell his Panel why you believe you are suitable for parole, and I'll need you to keep your comments directed to that particular statement, why you believe you're suitable.

**INMATE FERGUSON:** Yes. I've written out a short presentation here that actually speaks to that. It says, I wish to respectfully submit to the short statement explaining my current reasons for suitability for parole. Then I ask a question. I said, aside from the question of suitability for parole, I receive -- I believe that the Board is obligated to set a primary term at this time and I ask you to do so. I have the greatest and most bitter remorse for my crime. I have written a letter of remorse and apology to the victim. And it says, on August 28, 1995 I committed a violent crime against my wife of 23 years. I deserved to be arrested for my crime and to serve jail and prison time for this -- as a penalty. I'm currently in my tenth year of incarceration, rehabilitation in the California Department of Corrections. I am ashamed that I harmed my wife and mother of our children. I thank God she is fully recovered from her injuries. My remorse is most bitter and constant. My shame and feeling of remorse is my daily companion. I regret hurting my wife and shaming

my family, my community and all the people of San Diego County. I pray that I can be forgiven and be allowed my chance at parole so I may prove that I am a mature man of 62 years of age and again be a productive citizen and taxpayer. We've already the discussed the reason for my crime. It was because of the ever-changing conditions of a threatened, bitter divorce and what would happen to our son and what had happened to our recent assets. I'm sorry I lost it. I'm sorry I had the anger I did and the rage I did. I was out of control and I have no excuse for that. My attorney has read the two most recent laudatory chronos; therefore, I don't want to go into it any further, but I do want to give the copies of the chronos to the Board which have the original signatures on them. The only thing that I would draw from the most recent laudatory chrono from Officer Dominquez is that she addresses future dangerousness and says that in five years of observing me on a daily basis that she finds me not to have any degree of future dangerousness. She mentions my work habits, how I do my work inside the prison, that I am a 62-year-old mature and trusted man. And she draws these conclusions after being a correctional officer for the CDC for over 12 years. Then I have another most recent

laudatory chrono that's written by Lead Officer Nears who's in my building also. Officer Nears has observed me for over six years. His service with the CDC has been over 18 years. And he says the same things basically. He says I am not a safety concern and I do not have any degree of future dangerousness and I should be paroled immediately. The conclusion I think -- anybody who read a laudatory chrono would say that these are two officers that have spent 30 years in the system, have observed me in combination over 11 years and found me on my daily habits and basis to be cooperative, not to be a safety threat or have any dangerousness. Therefore, I think they are expert witnesses because they're professionals. Also, the latest laudatory chrono from my chaplain has been read by my attorney so there's no reason for me to go into this in great detail. All I would say is that I am a born again Christian. I am a re-baptized Christian. I'm a man that participates in all the Christian services every week. I believe in the teachings of Jesus Christ. And in so doing, I want to remind the Commissioners what is taken out of Mark 11:25 and 26 when the Lord says forgive anyone you have anything against then your father in heaven will forgive you for your sins. I believe this. And I

look for forgiveness. Today I look for forgiveness from my victim, who was my wife, and from the community at large and the Commissioners. It also says in the New Testament in Colossians 3:13, forgive the things you are holding against one another, forgive just as the Lord forgives you.

**PRESIDING COMMISSIONER ANGELE:** Why don't we get back on track, Mr. Ferguson, tell us why you believe you're suitable.

**INMATE FERGUSON:** These are my reasons, counsel, I mean, Commissioner. What I'm reviewing here is I've taken five laudatory comments or chronos from five different departments of the CDC, starting out with the correctional officers who find me suitable and I'm repeating their words and then I'm adding my words to it.

**PRESIDING COMMISSIONER ANGELE:** Okay. We've already read the chronos. Tell us why you're suitable please, why you believe you're suitable.

**INMATE FERGUSON:** Well I was put into the correctional atmosphere to see how I will be behave. I was convicted of torture, a crime that I readily admit to, and I'm most remorseful for, I should never have done and I don't really have an excuse. There is no excuse. I now agree with the prosecution's version of events. And yes, I did

review all the transcripts and I came up with a new admission of what I did. I can find nothing I've done in my time of incarceration that points to any dangerousness toward anybody. I believe that I am a suitable, 62-year-old, retired, disabled man, a good Christian, and a man that has proven in the last 10 years that he has no desire to have any violent actions against anyone. I think it's hard for people outside the prison environment to understand what goes on inside the walls. This is not a friendly place. It's a very violent place. There are gangs operating against each other, races operating against each other on a daily basis. People are getting stabbed, people are getting beaten. Yesterday we had the most unfortunate incident of a CDC officer being killed in Chino. Now the officers have more protection than the inmates do. So there is violence that is brought to me and other inmates on a daily basis and I have tried my hardest to show my suitability by making sure that all my behaviors, no matter what they be, be the very best by training myself to be a health educator and a teacher of literacy so when I leave prison and I go to the Methodist Free Home Ministry that I would have a viable job for them, a place to go, a place to parole which is an accepted good place that many people have

gone to prior to me and have a vocation when I get there that I can use that would be rather unique in that environment. And I found that. And you have the letters --

[Thereupon, the tape was turned over.]

**INMATE FERGUSON:** I even have letters that confirm that. I think my suitability has to be looked at. And no matter how heinous the crime was that I committed against my wife, it was a one-time event. The psychologist, Dr. Van Couvering, brought that out in her report. And I think that's significant. She clearly said, and I can read the report here, but she clearly said in this first paragraph: "To all appearances the crime was a once in a lifetime event. There is no record of comparable violence before or after the crime." That speaks very clearly to the suitability of any inmate, particularly myself. It was a once in a lifetime event. I admit to it. There is no comparable violence before or after my crime and I'm 62-years-old right now. I don't want to die in prison. As we get older our health slips and it doesn't get better, it gets worse. I know there's no recidivism in me. I know that I am suitable for parole and should be given that opportunity. Also I know that there are parole officers on the street. And it's their job to

watch over their clients. I would be a very low priority for any parole officer. I would obey all the rules. I have no addictions, whether it be alcohol or drugs. I have no dependencies whatsoever. I live by the word that is given basically in the New Testament and I have proved that since being here. I don't think there is anything, with the exception of the crime that happened that day against my wife, that points to me, no matter what words you use or how you try to stigmatize me, that says that I'm a bad person. I'm a bad person simply because I committed a most horrendous and uncalled for crime against my wife which I regret. And I do have the most bitter remorse. And I have tried my level best to rehabilitate myself and to have documentation that says that. Because if the laudatory chronos aren't in my file, nothing matters. Anything in CDC has to be written down. You can't have it on the spoken word. That's the reason for the laudatory chronos. That's the reason for the reports of what these people observe by seeing me on a daily basis. I regret my crime more than I can ever say. I don't know if there will ever be the words to (inaudible) and talk to my victim and explain to her why I did what I did. I don't think I completely understand it all myself even

though I've gone to Anger Management every week since I've been in prison. And I have some other things that I wanted to read about that.

**PRESIDING COMMISSIONER ANGELE:** Mr. Ferguson --

**INMATE FERGUSON:** Let me try to conclude this.

**PRESIDING COMMISSIONER ANGELE:** No, you conclude it by please telling me -- it's the last time I'm going to tell you, I want you to tell me why you believe you're suitable for parole.

**INMATE FERGUSON:** Because I'm not a violent person. There's no dangerousness in me. I regret and have the greatest remorse for the crime that I did commit. And I need a chance to prove myself on parole by going to the Home Free Ministry, being under their supervision and the supervision of my parole officer, and knowing that I could prove to be a useful citizen once again.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you for your comments. If you would, going to the victim of the crime, Alida Hedrick.

**MS. HEDRICK:** It's pronounced Alida. First of all thank you, thank the State of California for letting me speak. I imagine most of the time in these hearings you are forced to hear from the victim's family. I'm extremely grateful that I'm

able to be here and that my brother is here just as my support person and not the person that had to speak on my behalf. Just a couple of a things I wanted to clarify first from what the inmate had said in the beginning. There are four statements that he did make that are boldface lies that I would like to correct. During the timeframe that I was still in the home before I moved out, he said I was changing my mind, sometimes I wanted a divorce, sometimes I didn't. The only reason I was in that home was because I had consulted with an attorney and he said you can't move out without your son or you will lose all parental rights. And I was trying to negotiate a peaceable exit from our home and that's the only reason I was still there after all those days. As far as the tool caddy being in the laundry room, no, didn't exist. It was in the garage. There were no tool caddies in the laundry room. He said we had a highly charged and bitter argument that morning about missing money. There was never any discussion about any missing money. There was no missing money. He was simply talking about jewelry as he had said. And lastly, this fictitious F&G International, as Mr. Sachs pointed out, he had been unemployed for five and a half years, there was no firm, there was nothing. We

were headed toward bankruptcy. The house was going to foreclosure. Mr. G., who -- identifies as a Mr. Graff, was in fact his last employer of five years ago who he had probably not spoken with in five years. So those are just some of the things that I wanted to clarify that were clearly not true. My feelings on what I've heard going on here in the last hour and a half is I have heard over and over again the words of control and of anger management. And to my observation, I am seeing issues of control and anger management with this man right here today. I don't know if it's apparent to you. But he appears to be having difficulty controlling his emotions at this table. I've heard that there was -- according to this Dr. Van Couvering that Mr. Stringer said he was a low risk. Earlier someone was reading a portion of this report that I did in fact hear her say that he remains a moderate degree of threat to me. So I don't know how he can be a low risk and a moderate threat at the same time. She stated that he's externalizing his accountability. I think that's a very good statement for him. He externalizes everything. He doesn't want to admit that he can't control himself. He said what was your intent and his answer was I should have somehow better controlled myself, but he doesn't

explain what somehow is. I don't think he has a concept of what somehow better control himself is. I just -- All the laudos, I know there are numerous, numerous laudos and it was pointed out that -- over and over again I heard in most of them that they were for proficient behavior, for being cooperative, for being responsible, for participating. I would think that those would be normal expected behaviors in this type of environment. With the exception of one or two, they don't seem to point out that this man can function outside. Of course he's going to be good inside, he doesn't have many options. He has total lack of control of himself. I sincerely feel he has bitter remorse and regret because he's in prison. That's the reason he's bitterly remorseful is because he finds himself here. He has said today he doesn't want to die in prison. Those were his opening words when we sat at this table two and a half years ago. At that hearing I heard the words again. And back in August of '98 he decided I was going to die. He didn't ask me if I wanted to live that day. He made the choice to kill me. All the decisions were in his hands that day. At age 46, which I was at that time, I wasn't ready to die. Today at age 55 I'm not ready to die. And I'm a fighter because that's

the only reason I am here is because I would not succumb to his hideous attack. There was a lot of conversation today regarding whether or not this was an instant crime or had been preplanned. And I have shown before to the prosecution and other people, after he was convicted, after the trial was over, in our garage when we were cleaning out the home, I found in our garage this ammunition canister. And inside the ammunition canister there were two rolls of -- there were two containers of a rope and this very large thing of duct tape. And if you look at the enlarged receipt, it's dated 8-11 from the Home Depot at 4:06 p.m. At that very moment I was attending a counselor -- Because my ex had threatened suicide and I said you need help and he didn't want to come with me, so I was at a counselor -- and the counselor was telling me this man is a serious threat to you. So if anybody says that this was not premeditated, one of these rolls of rope that was found at the scene, hiding underneath a blanket, matched this skew number exactly. The police found under the blanket this rope, they found a claw -- a claw hammer, and I have no doubt that that wrench that he used on the attack that day came from underneath that same blanket. I know you've read the account of the attack and

you've seen some of the photos, but the absolute viciousness of it is really, really hard to portray to you. I was standing at the washing machine and within one or two blows I was -- I was on the floor. Within a few more there was just a sea of blood. I was -- I was desperately trying to do anything I could -- He never said a word during the attack. He was silent during the whole thing. Eventually I was prone on the floor, I couldn't get up, and that's when he came at me with the blanket, and that didn't work. And then he was strangling me. And I can only hope that none of you ever has to go through that sensation, that pain, that knowledge that you know you're taking your last breath, you know there's no way for you to -- there's no way. I knew I was a dead person. I was lying on the floor. My two little white dogs were standing in the doorway barking hysterically. They were covered in the splatter of blood. I lied there and I thought, God, this is it, I'm dying, I'm dying, I'm taking my last breaths. And I thought -- I thought to myself, this is just how Nicole -- I really thought this to myself. This is how Nicole Brown died at the hands of a madman husband and I'm going to die the same way and this is really a shitty way to go and I did not deserve to die that way. And

Mr. Ferguson has also said that -- I find it kind of curious that in this meeting he has said both of these statements, that he knows the crime better than anyone else because he committed it and then about 10 minutes later he says he has a hazy recollection of the events. I find it curious that he has the best knowledge and the least knowledge at the same time. I do remember it. I remember it very well. And the reason I bit his thumb was because it was around my neck and it was the last desperate, ditch effort to get free, and I managed to peel it off and put it in my mouth and I didn't release it until I lost consciousness. And that's when he left the room. He left the room I think to go bandage his thumb to tell you the truth. And only by the grace of God I awoke and I was able to struggle out into the street where neighbors found me. They life-flighted me. When I was in the helicopter, the paramedics were looking down at me. I was only wearing a bra and underwear and I was covered head to foot with blood. And the paramedic said to me, he said, are you wearing red underwear? And I said, no, it's beige. I mean that's how literally soaked I was. The surgeon who attended me in the trauma room had been a M.A.S.H. unit surgeon in Korea. And he told me later, he said,

in all my 40 some years of being a surgeon, he said, I've never cried while operating on someone until I operated on you. That's how bad I was. The doctors have no idea why I'm alive today. They say I should be a vegetable; I should be dead. The affects today, my nightmares will be with me forever. My son, 23, is now finally managing to take control of his life. He did visit his father once a year and a half ago. He doesn't want anything to do with him. He realizes him for the manipulator that he is. He's finally starting to merge from his own personal hell. He was suicidal because of severe depression. This man destroyed so many lives, all three of ours. He destroyed them. He writes to his son that the apple doesn't fall far from the tree, that's a cruel thing to say. To think that -- My son is petrified that he could turn into someone like his father. He writes to his father that he -- His father writes to him. He does not write to this father. But Kenneth writes to his son that, you know, you are my advocate, you are my only hope, you know, you are the person that can get me out of here. We're going to play ball again, we're going to play catch, we're going to go to football games. My son, he says, I don't have a father. I don't have a father. I haven't had a father for

10 years. There's no relationship to reestablish. And he's really anxious about the day that he's on the streets because my son is the only person that he has to call family. There is no other family for him and my son does not want to be part of his family anymore. I just want to get on with my life. I don't want to have to have this moderate threat around me. For 23 years my husband used to tell me to watch my backside, but he never told me I had to watch my backside because of him. He used to say I'm afraid of everything. He said, you're so afraid, you're afraid of your own shadow. I'm not afraid of my own shadow. The only shadow I'm afraid of is his, because if it crosses me I know I'll be dead the next time. I hope you can see it in his eyes. He's an angry man. He can't control himself. He can't control his passions. He's controlling himself in here because he has no choice. I hope you don't believe his version of reality. I'm firmly convinced this man's a psychopath. I don't think you can rehabilitate him. I don't think any amount of anything is ever going to help him. He's here where he belongs. He was given a life sentence. He needs to remain accountable. And I beg you to keep him here where he belongs. And I thank you very much.

**PRESIDING COMMISSIONER ANGELE:** All right. Thank you for your comments, Ms. Hedrick. We're going to recess for deliberations. The time is approximately 10:45.

**R E C E S S**

--oOo--

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**DEPUTY COMMISSIONER NIELSEN:** Back on record, Mr. Chairman.

**PRESIDING COMMISSIONER ANGELE:** This is the matter of Kenneth -- Back on Mr. Sachs.

**DEPUTY DISTRICT ATTORNEY SACHS:** Yeah, I'm back with you.

**PRESIDING COMMISSIONER ANGELE:** This is the matter of Kenneth Ferguson, CDC number KK-11229. The time is approximately 11:18 a.m. Mr. Ferguson, the Panel has reviewed all information received from the public and relied on the following circumstances in concluding that you're not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. First of all we have the offense carried out in an especially cruel, violent and callous manner. This victim was abused, struck 13 times with a wrench, was choked and suffocated. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human life and human suffering. These conclusions are drawn from the Statement of Facts wherein the inmate on or about the 20th day of August 1995, after a verbal

confrontation with his wife discussing divorce procedures and the dispensing of some property, did approach her from the rear with a wrench, struck her in the back of the head, struck her an additional 12 times and then tried to smother her and then tried to choke her. She survived the attack. The inmate has programmed fairly decently while he's been incarcerated. He has no 115's and no 128's. A recent psychological evaluation was not totally supportive of release, that report is by Dr. Nancy Van Couvering, August 20, 2004. She states:

> "To all appearances, the crime was a once in a lifetime event. There is no record of comparable violence before or after the crime. However, the victim has expressed concerns that he would seek revenge if released. In relation to the crime, he appeared to externalize accountability for his own behavior to some extent. For avoiding any repetition of violence toward his wife, it would not be enough to avoid similar situations, he would be a danger as long as he did not own --

and therefore did not control his own motivations. At this time the estimated risk to his wife is moderate and to the community at large is low."

I would also indicate that during the -- during the hearing one of the statements made by the inmate in the closing of the hearing was quote "sometimes I don't understand myself" which indicates a lack in insight. The inmate does apparently have plans to reside at a shelter that will provide nine months to 12 months of programming. However, the employment plans are a little sketchy. However, (inaudible) in their letter that employment is one of their goals. The hearing Panel notes responses to 3042 Notices indicating opposition to a finding of suitability, specifically the District Attorney of San Diego County present via videoconference -- excuse me -- audio-conference from San Diego and the victim of the crime present here today. The Panel makes the following findings. That the inmate needs additional time in order to fully understand and deal with the consequences of his acts. Nevertheless, he should be commended for not having any 115's during his total term of

incarceration, for participation in AA and NA, for participation as a peer health educator, literacy tutor, Anger Management, (indiscernible) program, Parenting, Life Skills and numerous positive chronos. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. In a separate decision the hearing Panel finds that it is not reasonable to expect that parole would be granted at a hearing during the following two years. The prisoner committed the offense in an exceptionally cruel, violent and brutal manner. Once again, on or about August 28, 1995 he did strike his wife with a crescent wrench a total of 13 times, attempted to smother and choke her. This was the culmination of a verbal discussion that got heated in regards to mutual property as there was the potential of a divorce. He attacked his wife after the conversation ended and when she left the room and went into another room. The victim was abused, struck 13 times with a crescent wrench, smothered and choked. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was very trivial in relation to the offense. The inmate does have a history of unstable

relationships, primarily with his spouse, the last five years of their relationship, having quite a few arguments. A recent psychological evaluation dated 8-20-04 by Dr. Nancy Van Couvering indicates a longer period of observation and evaluation of the prisoner is required. In addition, the prisoner has not completed the necessary programming which is essential to his adjustment. He needs additional time in order to gain such programming (inaudible) to adequately participate in therapy programming. Therefore, a longer period of observation and evaluation of the prisoner is required before the Board shall find that he's suitable for parole. The Panel makes the following recommendations. The inmate remain disciplinary-free; if available, participate in therapy programming and cooperate with the clinician in the completion of any future clinical evaluations. I'll be asking for a new evaluation to be completed prior to this next hearing. That does conclude the reading of the decision. Comments, Commissioner Nielsen?

**DEPUTY COMMISSIONER NIELSEN:** I just observed today, Mr. Ferguson, that I don't think you've changed a whole lot from the man that you were at the time. I see you today as very cold,

very controlled, very self-contained and very prone to intellectualizing all matters. When your victim was making a very emotional statement a while ago related to your son, it would seem to me that that might have provoked at least a twinge of emotion in you. I saw none whatsoever. I saw cold calculation, writing down things that I determine -- or speculated in my mind that you were going to be focusing on, to address those issues that she raised. I have a strong spirituality myself and do understand forgiveness, but there's another part of that equation and it's called justice. I would suggest -- And it is my opinion that you really have not even begun your rehabilitation yet. You are still intellectualizing, particularly reprehensible to me was your observation today that you had a better understanding of this than even the victim. Yet while consistently throughout the years, from right after the crime until today, you talk about vague recollections and forgetting things. I would suggest that you read Penal Code section 206 to begin your rehabilitation. It defines the crime, the elements of the crime that caused you to be here. Every person who, with the intent to cause cruel or extreme pain and suffering for the

purpose of revenge, extortion, persuasion or for any sadistic purpose, inflicts great bodily injury as defined in section 12022.7 upon another person is guilty of torture. I think that's something that you should ponder and internalize as they in treatment. Good luck.

**PRESIDING COMMISSIONER ANGELE:** Thank you. Also, once again, the clinical evaluation does talk about your externalizing your accountability and that I think is fortified extremely well by your statement that you say sometimes you don't even understand yourself (indiscernible) understanding and that talks about insight. I wish you the best of luck, sir. That does conclude this hearing. The time is approximately 11:26 a.m.

[Off the record]

**DEPUTY COMMISSIONER NIELSEN:** The Board is additionally ordering an investigation, an investigation coordinated with the Board's investigation unit and the Department of Corrections classification parole representatives, of the numerous laudatory chronos that appear in the file. At issue would be a request that the writers of those chronos, the authors, signify to what degree the inmate brought to their attention

and requested these chronos and/or produced the written verbiage of those chronos. There is an apparent pattern to the Panel today of some coercion and some attempts and even possible forgery of signatures on these chronos over a long period of time. The bottom line is we'd like to determine the veracity of the chronos that appear in the file, if they were voluntarily put in that file by the officers or by the counselors.

--oOo--

**PAROLE DENIED TWO YEARS**

**THIS DECISION WILL BE FINAL ON** MAY 12 2005

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 91, and which recording was duly recorded at CALIFORNIA STATE PRISON, SOLANO, at VACAVILLE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KENNETH FERGUSON, CDC No. K-11229 on JANUARY 12, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 4, 2005 at Sacramento County, California.

Marsha Mees
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT B

C. Bradley Patton, Esq. CA BAR: 67087
FLETCHER & PATTON
2777 Jefferson St., Ste. 200
Post Office Box 4598
Carlsbad, CA 92018-4598
(619) 434-4130

Attorneys for Defendant
KENNETH MICHAEL FERGUSON

2:55 PM

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
## NORTH COUNTY BRANCH

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>KENNETH MICHAEL FERGUSON,<br><br>Defendant. | CASE NO.: SCN 029511<br>D.A. NO.: ~~P068305~~ P6803501<br><br>**STATEMENT BY DEFENSE COUNSEL UNDER PENAL CODE §1203.01** |

The following information is submitted in rebuttal to the Statement By District Attorney Under Penal Code §1203.1 and is offered for the assistance of the Department of Corrections:

**REBUTTAL AND SUPPLEMENT TO PROSECUTOR'S "HISTORY OF THE CRIME AND WEAPONS USED":**

Mr. Ferguson did testify that on July 26, 1995, she told her husband she wished to have a divorce. When interviewed by the Carlsbad Police Department, Mrs. Ferguson admitted that there had been no previous threats or physical assaults between she and her husband. On July 25, 1995, Mr. Ferguson called the Carlsbad Police Department and advised that she was gong to tell her husband about the divorce. The following day she contacted the Carlsbad Police department and asked whether they could have a patrol vehicle in the area. She discussed with the police department if they had the ability to collect the variety of firearms and knives or hatchets kept at the house. Mrs.



C:\WPWIN\FERGUSON\APPEAL\attorney1203.1.wpd

Ferguson decided not to take the weapons to the police department. When Mrs. Ferguson told her husband she wanted a divorce, he was shocked and upset. Because of her husband and son's reaction to her request for a divorce, Mrs. Ferguson decided to delay moving out of the family home for one month. Mrs. Ferguson testified at trial that no threats were directed towards her after her announcement of intent to leave. On the day she announced she wished a divorce, no threats of any kind were made toward her. The reaction of Mr. FERGUSON was one of sadness.

Mrs. Ferguson's testimony during trial was severely impeached with gross and material inconsistencies rooted in the fact that each time she told the story the factual pattern changed. Her account of the incident to the police officers differed on the two occasions that she offered her recollection of events. A third independent version of events was testified to by her at the preliminary hearing. Indeed the jury reported her lack of believability after the trial. The conviction resulted primarily from a comparison of injuries between the two people.

In Mrs. Ferguson's version of events at the trial, she claims she was holding a bottle of Spray 'N Wash while standing at the washing machine when she was hit several times over the head from behind with a 12" crescent wrench. However, the police photographs of the washroom showed the bottle of Spray 'N Wash sitting in an upright position at the rear of the washing machine. The forensic evidence related to blood splatter confirmed that no attack occurred at the washing machine. Mrs. Ferguson claims that she had been smothered by a dog blanket were controverted by the testimony of a criminalist after viewing the dog blanket and Mrs. Ferguson's claims that she had been strangled were controverted by the testimony of a physician noting that no bruising consistent with strangulation was present on Mrs. Ferguson's throat. Indeed, once Mrs. Ferguson released Mr. FERGUSON's thumb from her jaws, having inflicted a bite wound down to the bone, Mr. FERGUSON got up and left the room. Mr. FERGUSON initiated a call to 9-1-1 asking for help immediately and pleading for the police to come because his wife had attempted to kill him. Mr. FERGUSON directed the officers to the wrench which he had hidden from his wife while calling the police.

Most of the wounds to Mrs. Ferguson's head were testified to as being superficial. The wounds were inflicted as a result of Mr. FERGUSON trying to extract his thumb from his wife's jaws

while they struggled on the washroom floor. The extent to which Mrs. Ferguson was willing to lie to convict her husband extended to planting evidence in the washroom two months after the assault and calling the Carlsbad Police Department to come photograph its location. Proof that the evidence was planted was established when original crime scene photographs showed the objects in question were in an entirely different location in the garage.

**VIEWS AND RECOMMENDATIONS REGARDING LENGTH OF TERM AND PAROLE**

The evidence at the trial was uncontroverted that this was a situational offense. Mr. FERGUSON is a middle-aged man with no prior criminal record or history of violent acts. Prior to moving to San Diego in 1993, he had maintained steady employment with several different companies. Mr. FERGUSON took over primary responsibility for raising his son once the family moved to San Diego. He and his son enjoy an extremely close relationship. In the hundreds of letters written by Mr. FERGUSON to his son since incarcerated, he has continued to encourage his son to respect his former wife and to follow her rules and guidance. Mr. FERGUSON has cooperated in the divorce proceedings which have finalized and given clear expressions that he wishes no further contact with his wife nor harbors any ill will towards her. He very much wishes to have the continuing close father-son relationship which he has enjoyed with Kyle in the past.

Mr. FERGUSON has and continues to actively pursue his appellate rights and a briefing as it relates to the appeal was just recently completed. The notion that a man who has lived a legally blameless life in excess of fifty (50) years, and who becomes involved in an explosive assault related to a highly charged divorce situation should never be allowed to walk the streets again is a notion which lacks insight and integrity. Mr. FERGUSON is a good candidate for early parole and should be considered as such.

Respectfully submitted,

FLETCHER & PATTON

Dated: June 6 1997

By: ______________________
C. Bradley Patton
Attorneys for Defendant



C:\WPWIN\FERGUSON\APPEAL\attorney1203.1.wpd

The foregoing instrument is a full, true and correct copy of the original on file in this office.

Attest: JUN 1 9 1997

KENNETH E. MARTONE

Clerk of the Superior Court of the State of California, in and for the County of San Diego.

By P. Murray Deputy

# EXHIBIT C

PAUL J. PFINGST
District Attorney
RICHARD J. SACHS, Bar# 113547
Deputy District Attorney
MARNIE M. MCGEE
Deputy District Attorney Pro Tem
San Diego Hall of Justice
330 West Broadway, Suite 920
San Diego, California 92101
(619) 531-4074

Attorneys for Plaintiff

FILED
VISTA
97 APR 30 AM 9:09
KENNETH E. MARTONE
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA.

James
Dave

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. KENNETH MICHAEL FERGUSON, Defendant. | No. SCN 29511 DA P068305<br><br>STATEMENT BY DISTRICT ATTORNEY UNDER PENAL CODE SECTION 1203.01 |

The following is furnished for the assistance of the Department of Corrections:

CRIMES FOR WHICH THE DEFENDANT WAS CONVICTED AND SENTENCED

On April 17, 1996, KENNETH MICHAEL FERGUSON was convicted by a jury of the following offenses:

Count One -- Penal Code section 242, battery on a person (LIO of attempted murder);

Count Two -- Penal Code section 206, torture; with a Penal Code section 12022(b) enhancement, personal use of a deadly weapon;

. . . . .

<u>Count Three</u> -- Penal Code section 273.5, corporal injury on spouse/cohabitant; with a Penal Code section 12022.7(d) enhancement, great bodily injury within domestic violence, and a Penal Code section 12022(b) enhancement, personal use of a deadly weapon;

<u>Count Four</u> -- Penal Code section 245(a)(1), assault with a deadly weapon other than firearm; with a Penal Code section 12022.7(d) enhancement, great bodily injury within domestic violence.

Additionally, the Penal Code section 1192.7(c)(23) allegation was found true, and FERGUSON was convicted of a serious felony.

On June 13, 1996, FERGUSON was sentenced to state prison for life.

<u>HISTORY OF THE CRIME AND WEAPONS USED</u>

Alida Hedrick (formerly Alida "Ferguson") and KENNETH FERGUSON were married 23 years and had one son together, Kyle Ferguson. Ms. Hedrick asked FERGUSON for a divorce on July 26, 1995. On that date Ms. Hedrick also called Carlsbad police to express her fears of FERGUSON as he had a volatile disposition and had numerous guns and sharp weapons in the family residence.

On August 28, 1995, Ms. Hedrick had been discussing the division of property with FERGUSON when she went into the laundry room to do laundry. Approximately three to four minutes after entering the laundry room, Ms. Hedrick felt a hard blow to the back of her head.

. . . . .

. . . . .

FERGUSON struck Ms. Hedrick several times on the back o her head with a 12-inch crescent wrench. Ms. Hedrick eventually collapsed to the floor. FERGUSON struck Ms. Hedrick with the wrench approximately 13 times. Ms. Hedrick was screaming for help during the attack.

FERGUSON eventually put the wrench down and then put his hands around Ms. Hedrick's throat and began choking her. FERGUSON took a blanket that was kept in the laundry room for the dogs to sleep on and put it over Ms. Hedrick's mouth and nose in an attempt to suffocate her. Ms. Hedrick was on the verge of losing consciousness during the attack.

At some point during the attack, FERGUSON's thumb was in Ms. Hedrick's mouth and she bit down on it. FERGUSON left the laundry room and Ms. Hedrick was able to escape through the outer garage door.

Ms. Hedrick sustained a compound fracture to her left third finger, laceration and severe contusion to her right forearm, multiple scalp lacerations, and an open, minimally depressed skull fracture. Upon arrival at the hospital, Ms. Hedrick was covered in her own blood.

At the crime scene, police officers found a bloody wrench thrown behind some shelves. Officers also found several drops of blood and bloody footprints leading from the laundry room floor which was completely smeared with blood.

. . . . .

. . . . .

. . . . .

. . . . .

DISPOSITION OF OTHER CHARGES

Count one was charged as Penal Code sections 664/187/189 attempted murder in the first degree. The jury convicted KENNETH FERGUSON of the lesser included offense of Penal Code section 242, battery.

VIEWS AND RECOMMENDATIONS REGARDING
LENGTH OF TERM AND GRANTING OF PAROLE

KENNETH FERGUSON struck Ms. Hedrick 13 times on the back of her head with a 12-inch crescent wrench, and then attempted to choke and suffocate her. FERGUSON's torture of Alida Hedrick was a heinous, unprovoked act of violence on his wife of 23 years and the mother of his child. Although FERGUSON does not have any prior criminal record, through his actions on August 28, 1995, he has clearly demonstrated he is a very violent, dangerous individual who needs to remain permanently removed from society.

FERGUSON has continually insisted that Ms. Hedrick instigated the attack on August 28, 1995. FERGUSON even went so far in his attempt to cover up his culpability as to call 9-1-1 twice to report that his wife had been beating him. At one point during his interview with Detective Trujillo, FERGUSON denied that the incident occurred: "I cannot, I just, I, this, this did not happen."

FERGUSON has not demonstrated any remorse or taken any responsibility for this brutal attack. In his letter to Judge Moon requesting a grant of probation, FERGUSON claimed that he was ashamed for his "part" in the August 28 "incident". FERGUSON then went on to state how angry Ms. Hedrick was with him and how she

bit his thumb to the bone. The only admission FERGUSON even made is that he injured Ms. Hedrick's head trying to regain his thumb from her jaw.

FERGUSON's claims that he is remorseful should not be believed, considering he is so unwilling to admit responsibility for the unprovoked brutality he inflicted on his own wife. In addition, FERGUSON has had a long history of deceitful, conniving behavior, ranging from falsifying his resume and lying to a long list of former employers, to staging a slip and fall accident and even being sued for fraud by an insurance company. FERGUSON is not a man who can be trusted or believed.

FERGUSON has permanently destroyed Ms. Hedrick's feelings of personal safety, as she is convinced if FERGUSON is ever released from prison he will kill her. During their marriage FERGUSON made several threats to Ms. Hedrick, such as: "You're lucky I let you live."; "If you ever cross me, you'll live to regret it."; "God help you if Kyle grows up and has any problems. There won't be a place on this earth you can hide."; and "If you ever touch me, they'll find pieces of you all over San Diego County."

The type of violent behavior FERGUSON exhibited on August 28, 1995, his deceitful nature, his past threats to Ms. Hedrick, and his refusal to take responsibility for his

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

vicious crime is powerful evidence that KENNETH FERGUSON should never be allowed to walk the streets of any community as a free man.

Dated: March 27, 1997

PAUL J. PFINGST, District Attorney

By
GREGORY THOMPSON
Assistant District Attorney

Prepared by: RICHARD J. SACHS, DDA
MARNIE M. MCGEE,
DDA Pro Tem

The within instrument is a correct copy of the original on file in this office.

ATTEST: MAY 12 1997

KENNETH E. MARTONE, Clerk of the Superior Court of the State of California, in and for the County of San Diego

By
Deputy Clerk P. MURRAY

Distribution:

Original.....Clerk of the Court
Copies.......Dept. of Corrections
District Attorney
Defendant
Defense Attorney

# EXHIBIT D

CALIFORNIA STATE PRISON – SOLANO
Vacaville, California

PSYCHOSOCIAL EVALUATION
FOR THE BOARD OF PRISON TERMS

## I Identifying Information

The inmate is a 61-year-old divorced white man who was born on December 3, 1942. He denied any prison nicknames. He identified his religion as "Devout Christian". He is serving a 7 year to Life term for Torture with the use of a Deadly Weapon. His sentence start date was June 18, 1996. The most recent Board decision asked for a current psychological report. Sources of information for this report were an interview with the inmate, a review of the Unit Health Record, and a review of the C-File.

## II Developmental History

The inmate was born in Kansas City, Missouri. His family at that time consisted of his mother, father, and himself. He said that his father was an executive for Southwest Bell and his mother was Personal Secretary to the President of Hallmark Cards. He denied any natal, perinatal, or early developmental issues. He said that he had many friends and engaged in many sports as a child. He denied being either a bully or the victim of abuse. He denied fire setting, enuresis, and taking unnecessary risks. He also denied animal torture and said that he had dogs as pets.

## III Education

The inmate reported that he graduated from high school and had all but his degree from college. He said he never required special education or Seriously Emotionally Disturbed Services. His current academic interests lie in art and art history.

## IV Family History

The inmate reported that his mother died from hepatic cancer. His father is still alive and in pretty good health. He is now retired. His parents stayed married until separated by death. The inmate has one brother who is eight years younger. He denied any criminal, addiction, or mental health history in his immediate family. He said that he is in touch with his father and brother "all the time".

## V Psychosexual History

INMATE COPY

The inmate identified himself as heterosexual. He denied being in any predator or victim relationships in prison. He said that he reached puberty at about the same age as his friends. The age of his first sexual experience

was somewhere around 16 or 17. He began dating at the age of 17 or 18. His first and only marriage was at age 28 or 29. He denied any history of high risk sex. He said at this point his ideal partner would be smart, good looking, feet on the ground, leading a faith based life, with high values and trustworthy.

## VI Marital / LTA History

He was married on June 18, 1976. The couple had two sons. One of these was premature and died in 1985. The surviving son is now 22 years old. He and the mother are now divorced. He said that he does have a relationship with his surviving son, but not his ex-wife.

## VII Military History

The inmate did not serve in the military.

## VIII Employment

The inmate reported no union affiliations. According to the inmate, he was a director of sales and marketing for nine years, and this employment was terminated by his arrest. At the time of the crime, he said he had just established a new company, F. G. International. According to his wife, he was unemployed for the five years prior to his arrest. In prison, he has worked as a health educator for almost his entire term and as a literacy tutor. He is currently a porter in Building Two. His physical activities are restricted because of medical problems. His career goals would be to return to sales and marketing if he were to be released.

## IX Substance Abuse History

The inmate said he did drink at dinner. In prison, he has received no 128s or 115s for controlled substances. He reported that he attended NA and AA for personal development the entire time of his incarceration.

## X Behavioral / Psychiatric / Medical History

The inmate was convicted of torture. He had no prior history of violence and no other criminal history. He denied any suicidal or homicidal ideation. On October 9, 1996, he was admitted to the CCCMS program and diagnosed with a Depressive Disorder, NOS. There is no history of psychiatric hospitalizations. There is no history of accidents or head injuries. He was initially medicated with low doses of Sinequan and 40 mg of Prozac with 25 mg of Trazodone. He is now on 10 mg of Prozac and 25 mg of Trazodone.

## XI Plans if Granted Release

The inmate would go to San Diego to live at A Christian Place. This is apparently an organization run by Home Free Ministries in Orange County. He would look for employment in sales and marketing. He believed he will be eligible for SSI this December, and also said his father would back him financially.

## MENTAL HEALTH EVALUATION

## I Mental Status / Treatment Needs

### Physical

The inmate is a 61-year-old white man who is 6 feet tall and weighs 186 pounds. Nutrition, aging, and hygiene were within normal limits. His hair was graying. He denied any tattoos or scars.

### Movement

He said that he had left knee arthritis and required a cane to walk. He was having some prostate problems as well as asthma, and diabetes which is under control, but which has left him with mild neuropathy in his feet.

### Conversation

The inmate's native language is English. Articulation, volume, and melody were within normal limits. His speech was fluent, but pressured. He observed appropriate turn-taking during conversation. Eye contact was within normal limits. His approach to the interviewer was alert, pleasant, cooperative, and a little controlling. He is a salesman.

### Thinking

The range of thought content was appropriate to his education. Logic was goal directed. Estimated IQ was in the above average range. Short term and long term memory were intact. He was oriented to person, day, date, time, and place.

### Affect / Mood

According to the inmate, his usual mood is "enthusiastic". There was a good match between underlying mood and emotional expression, and underlying mood and topic of conversation. Modes of expression were facial, gestural, and vocal. He was emotionally intense, but the range and regulation of emotion were within normal limits.

## Perception

The inmate denied hallucination and delusions.

## Insight

The inmate did recognize his symptoms as part of a depressive disorder. He has shown greater insight into his own behavior. In the past, he has both rationalized and denied aspects of his crime. However, he has recently written two letters of remorse in which he admits that he committed a violent crime against his wife and deserved to be arrested and to serve jail and prison time. He said that he was glad that his wife has recovered from her injuries, but he believed she would be angry with him for the rest of her life. This is a positive development, considering that at first he claimed that she initiated the crime by attacking him.

## Diagnosis (DSM IV-TR)

| | | |
|---|---|---|
| AXIS I | 301.9 | Depressive Disorder, NOS, in partial remission. |
| AXIS II | | No diagnosis. |
| AXIS III | | Mild peripheral neuropathy secondary to diabetes, asthma, prostate problems, arthritic left knee per inmate. |
| AXIS IV | | Incarcerated. |
| AXIS V | | GAF Past Year 90. |

The inmate's level of care is CCCMS. During the days, he said he rises early, does his devotional, works six to eight hours, has dinner with friends, writes and calls his family, reads and watches TV and goes to bed. He walks on the yard and says he socializes with people. His current medications are Trazodone and Prozac. Compliance is excellent.

## II Review of Life / Controlling Crime

According to the record and the wife's report, on August 28, 1995, the inmate and his wife were arguing about the division of property relating to their impending divorce. The argument began to escalate and she left the room and busied herself with laundry. He followed her and hit her from behind with a crescent wrench. She fell to the floor and he continued to strike her. She said he also attempted to suffocate her with the dog's blanket. He attempted to strangle her and she bit his thumb. She managed to escape through the garage and went to the street where she cried for help.

He called 911 claiming that his wife attacked him. Both the inmate and the victim were transported to hospitals. He had a laceration on his thumb. She had a fractured skull, a concussion, and numerous cuts to her head, a compound fracture of one finger and a large contusion on her right arm. He was subsequently placed under arrest based on her statements. At the time,

he told police that his wife "went crazy". He said that she came at him with a wrench and he thought that she was going to kill him. The inmate has recently revised his version of the crime, admitting that he attacked her and deserved the resulting jail and prison sentence.

According to the inmate, causative factors were the fact that his wife initiated the divorce, and that she kept "changing the game". He was angry about the divorce. He said the he would keep from repeating the crime by avoiding contentious marital relations. He expressed remorse at the time of the interview saying, "I feel terrible about it." He did not address the issue of whether he might need to make any changes within himself. Nevertheless, he seems to have come a long way from where he started.

## III Estimated Dangerousness

**Prior Crime History:**

The inmate had no prior crime history.

**Prison Performance This Term:**

He has received no 115s, no 128s and has over 150 laudatory chronos.

**Estimated Future Dangerousness in the Community / Significant Risk Factors:**

To all appearances, the crime was a once in a lifetime event. There is no record of comparable violence before or after the crime. However, his victim has expressed concerns that he would seek revenge, if released. In relation to the crime. he appeared to externalize accountability for his own behavior to some extent. For avoiding a repetition of violence toward his wife, it would not be enough to avoid similar situations. There would be a danger as long as he did not own, and therefore did not control, his own motivations. At this time, estimated risk to his wife is moderate and to the community at large is low.

Respectfully Submitted,

N Van Couvering, PhD

Nancy Van Couvering, Ph.D., License PSY 3998
Forensic Psychologist
MDO / Forensic Mental Health Unit
California Department of Corrections

# EXHIBIT E

STATE OF CALIFORNIA

**BOARD OF PRISON TERMS**

**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION: DENY PAROLE**

[x] **PAROLE DENIED FOR:** 1 (2) 3 4 5 **YEARS**

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will tell you the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, Section 2041.

## REASONS FOR DENIAL

- [x] The crime was very cruel or mean.
- [ ] More than one person was hurt or killed.
- [ ] The crime was done or planned without feeling bad about hurting others.
- [x] The victim was abused or treated very badly during / after the crime.
- [ ] The inmate did not care if people suffered.
- [x] The reason for the crime was small compared to the hurt it caused.
- [ ] Killing the victim did not stop the inmate from committing more crimes later on.
- [ ] The inmate has a record of hurting others and/or attempting to hurt others.
- [ ] The inmate's crimes got worse or more harmful.
- [ ] The inmate has a record of bad or harmful relationships.
- [ ] The inmate has sexually assaulted and frightened someone very much.
- [ ] Being in prison did not correct the inmate's behavior.
- [ ] The inmate cannot get along with people outside prison.
- [ ] The inmate committed crimes before this one.
- [ ] The inmate has not improved himself while in prison.
- [ ] The inmate has broken the rules while in prison.
- [x] Clinic reports say the inmate's thinking is dangerous. MODERATE DANGEROUSNESS TOWARDS WIFE
- [ ] The inmate has mental problems that may cause new crimes.
- [ ] The inmate has poor parole plans.

Other: NEW PSYCH REPORT REQUESTED

## HEARING PANEL

| | | | |
|---|---|---|---|
| Name | [signature] | Date | 01/12/05 |
| Name | [signature] | Date | |
| Name | [signature] | Date | |

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|
| FERGUSON, KENNETH | K-11229 | CSP-SOL | 01/12/05 |

BPT 1005(b) (REV. 01/02)

Distribution: White-C.File
Canary-BPT
Pink - Prisoner

# EXHIBIT F

CALIFORNIA STATE PRISON – SOLANO
Vacaville, California

# PSYCHOSOCIAL EVALUATION FOR THE BOARD OF PRISON TERMS

**NAME:** **Ferguson, Kenneth**
**CDC#:** K11229

The following is a psychological report solely conducted for the Board of Prison Terms.

Information for this was gathered from an interview with the inmate on 3-22-02 and a review of his central and medical file.

## IDENTIFYING INFORMATION:

Mr. Ferguson is a first termer currently 7-years-to-life for Torture when he was 52 years old. This is an initial report. He has been incarcerated for 6 1/2 years. He has no prior juvenile or adult arrests. He has no CDC-115's or disciplinary 128's. He will soon have a classification score of 5 points, he said.

## DEVELOPMENTAL/FAMILY HISTORY:

No developmental problems have been noted. He denied any head injuries or trouble learning to walk, talk, read, or write. He denied any history of physical or sexual abuse.

He has one brother, born and raised in Kansas City, Missouri. His father was an executive. His mother was an executive to Mr. Hall of Hallmark cards. His parents remained married up to his mother's death 2 years ago. His brother works in county government in Maryland as an elected Clerk of the County. He writes his father and brother weekly and talks to them each Sunday. His family lives in Maryland and so they do not visit. There are no other legal or psychiatric problems in the family.

## EDUCATION:

He had good grades and participated in sports. He graduated from high school on time and then entered college and obtained a degree in Business.

No learning disabilities have been noted. He was not in any special education classes. He has participated in VORG, MVP, Protestant chapel programs in 1998, and he also completed and inmate Peer Education program that year. In 2001, he completed a 6-week course in patient education, a 9-week course in anger management and he has completed various Plato programs.

INMATE COPY

He participates in the chapel here and is actively involved on Friday nights and Sundays for services as well as weekly discipleship meetings. He was re-baptized 6 months ago and has been a Christian all of his life.

He arises at 5 am, brushes his teeth, makes his bed, does his devotional (1 Psalm per day) goes to breakfast, and then to work. After work, he showers, reads, watches the news, converses, walks, exercises, and participates in some sports. He also enjoys watching humorous shows on TV.

**PSYCHOSEXUAL DEVELOPMENT/MARITAL HISTORY:**

No untoward sexual behavior has been noted. He married when he was about 29 for 23 years, divorcing after incarceration. He has had no girlfriends since then. He described himself as heterosexual and "a very strong Christian." He has one child with whom he communicates through letters -"he's busy in college." He communicates with 6 or so friends on the outside through letters.

**MILITARY HISTORY:**

None.

**EMPLOYMENT HISTORY:**

Prior to prison, he worked at Memorex for 5 years as a District and Regional Sales Manager. He the moved to ITT Qume as Western Regional Manager in sales for 8 years, and then to Smith Corona Marchant as National Sales Supervisor for 8 years. Finally, he worked at Mannesmann as Vice President of sales for 9 years. Each move was a step up. He did a lot of hiring and firing in his position and supervised people, being particular about whom he hired, he said.

He currently works as a health educator as he has for 4 years and he "loves the job." He makes presentations in classes through the educational department. He teaches one or two classes a day. He indicated that he gets great reviews for his teaching and is proud of the number of laudatory chronos.

**SUBSTANCE ABUSE HISTORY:**

He denied any use of drugs. He drank socially and did not abuse this.

**PSYCHIATRIC/MEDICAL HISTORY:**

It was noted that he has diabetic and cardiac problems. He denied any serious mental health problems but would describe himself as "a mild depressive." He finds the environment depressing. He currently takes Prozac as he has for a couple of years and is tapering off of it and he is thinking about ceasing all together. He finds the counseling

helpful. He has never felt suicidal. He denied any significant depression lasting for more than a couple of days. He sleeps fine and feels rested during the day.

He has had some mental health treatment while in prison. In 6-00, it was noted that he had symptoms of anxiety and depression in the dorm settings. In July, he exhibited no symptoms of an affective disorder. In September, he noted have some "bad days" which lasted "a few days (at a time)," and described himself as being withdrawn, irritable, and having thoughts of hopelessness and helplessness. He continued on Prozac. In October 2000 to May 2001, he appeared without symptoms. In May, he noted some increase in anxiety, irritability, and insomnia. It was felt that he may have been experiencing excessive stimulations secondary to Prozac. Few symptoms were noted in the ensuing months. Later in the year, he noted the beneficial effects of the anger management group. In December, he noted some "cyclic 5pm depression." No particular symptoms were noted after this.

**PLANNING ON RELEASE:**

He would write his resume and start interviewing immediately and believes that he would find "a pretty good job." He would live with friends, and he has a wealthy father who would help him.

**MENTAL STATUS:**

Mr. Ferguson appeared as a medium built 59-year-old man with good hygiene and grooming. He had a normal speech pattern and he exhibited a medium activity level with good eye contact. He was positive/serious in mood with somewhat a constricted affect and he related in a somewhat precise manner. He related in a somewhat intellectualized manner but was able to exhibit humor rather easily also, and he became more expressive as the interview progressed. He noted that he is in a "reasonable" mood most of the time. He was cooperative and with this examiner and was organized and logical in thought processing. He was oriented to date, city, government officials, and his concentration appeared at least adequate. No particular memory problems were observed or claimed. He denied psychotic thought processing or perceptions according to questions presented to him along these lines (ideas of thought insertion or mind reading/control, ideas of reference/over personalizing, feelings of being followed or others out to get him, and hallucinations).

**REVIEW OF "LIFE CRIME":**

> "My wife and I were having an argument and it got more heated and she bit me on the thumb. When she did, I grabbed a wrench and tried to get my thumb out of her mouth … I hit her in the head, I shouldn't have, but I did until she released my thumb. I called the police and asked for an ambulance and asked for the police to come because we had had a violent confrontation. My wife left the house and I followed her until I saw that she was going into the front yard. I went back into the house, called the police again and they told me to stay on the phone with

> them, which I did. They wanted me to come outside and I did. They took me to the hospital and sewed up my thumb and my wife went to the hospital also and they treated her. (He stated that she had no ongoing injuries or effects and went to the sports games they had tickets for 2 weeks later.) … When I hit her on the head her head bled, she had lacerations. (He hit her 5 or 6 times). We had never had any altercations ever – this was the first (physical altercation) - we had spats (previously – verbally) … We were having some disagreements, some difficulties – something blew up – I try to reconstruct it and work on it with the docs here and in anger management. I go to VORG also (on his 5th year there) and MVP … Severe anger – we were both angry – and it just got out of control. I would characterize it like having gas next to an open flame."

She bit him because she was angry. While it was going on, he

> "didn't think. If I'd have thought – I wouldn't have picked up the wrench and wishes that he hadn't. I would have just let her play out what she was going to do. If I could go back and let her have her thumb, if that's what it took, that's what I'd do."

They had disagreements about "money and she was having an affair (again)", which he found out and after "smoothing it over" the first time, he was not happy when it happened again. He expressed this displeasure by telling her that "it was not healthy, and could not and should not continue. He is nonetheless "ashamed of laying a hand on her and injuring her, however, as there is no excuse for that." There had never been any violence in prior relationships. "We were pushing on each other and her mouth came in contact with my thumb and she bit me." She did not get arrested. He believes that "there's enough blame to share some," but he

> "would take the major portion of blame – there's no making it right. It was quick and I wasn't really thinking – I was just reacting … We tried to plea but they had a woman on the women's domestic violence team – OJ Simpson had just committed double murder and they had a hard time finding a jury."

He has never been in any fights. He had been a youth sports coach, and had to take parent abuse, at times, he said, indicating that he managed these situations fine.

## ASSESSMENT OF DANGEROUSNESS/RECOMMENDATIONS:

He appears to be a motivated man and excited about his work and work prospects. He has a great discipline history, as well as an admirable work, education, and peer help history. He denied any ill feelings toward anyone or knowing of anyone out to get him. He appears reasonably socially connected, and likely has good job prospects. He seems to have realistic plans, not quite yet solidified. No particular mental health issues appear present, nor do adverse personality, attitude, impulse, or emotional dyscontrol factors appear to be at play. He is being successfully treated for mild depressive symptoms

which are not considered to bear on his risk of dangerousness. There is little to suggest that he would be dangerous if released.

Respectfully,

Charles Taylor, Ph.D.

# EXHIBIT G

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT B BEFORE HON. DAVID B. MOON, JR., JUDGE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br>PLAINTIFF,<br>VS.<br>KENNETH MICHAEL FERGUSON,<br>DEFENDANT. | CASE NO. SCN 029511<br><br><br><br>SENTENCE |

REPORTER'S TRANSCRIPT

JUNE 13, 1996

APPEARANCES:

FOR THE PLAINTIFF:

PAUL J. PFINGST
DISTRICT ATTORNEY
BY: BARBARA PETTINGELL, DEPUTY
325 SOUTH MELROSE DRIVE, SUITE 130
VISTA, CALIFORNIA 92083

FOR THE DEFENDANT:

FLETCHER AND PATTON
C. BRADLEY PATTON
2777 JEFFERSON STREET, SUITE 200
CARLSBAD, CALIFORNIA 92008

REPORTED BY:

JESSICA M. PERRY, CSR 3782
SUPERIOR COURT

MRS. FERGUSON: NO GOOD. OH, 12 INCHES.

THE COURT: 12, OKAY.

MS. PETTINGELL: WHEN DID YOU FIND THOSE ITEMS?

MRS. FERGUSON: THE MORNING OF THANKSGIVING DAY 1995.

THE COURT: I WILL ACCEPT THAT AS AN OFFER OF PROOF, NOT NECESSARILY CONCLUSIVE.

MR. PATTON: VERY GOOD.

THE COURT: IF THAT IS AN ACCURATE DESCRIPTION OF THOSE HAMMERS, WHAT RELEVANCE DOES THAT HAVE?

MR. PATTON: WELL, IT -- I WOULD LIKE TO INQUIRE WAS THAT SLEDGE THE ONLY SLEDGE HAMMER THAT YOU OWNED IN AUGUST OR SEPTEMBER OF 1995?

MRS. FERGUSON: ASSUMING THAT A SLEDGE HAMMER IS A BIG FAT MALLET KIND OF THING ON THE END, YES.

MR. PATTON: RELEVANCE THEN, YOUR HONOR. I WOULD OFFER AS EXHIBITS FOR PURPOSES OF THIS PORTION OF MY REQUEST FOUR PHOTOGRAPHS. ASK THEM TO BE MARKED AS COURT'S EXHIBIT NEXT -- EXHIBITS NEXT IN ORDER. AND MY OFFER OF PROOF IS THAT THOSE ARE PHOTOGRAPHS PROVIDED TO ME THROUGH DISCOVERY. THOSE ARE PHOTOGRAPHS THAT WERE TAKEN BY THE CARLSBAD POLICE DEPARTMENT ON THE DAY OF THE INCIDENT. THOSE PHOTOGRAPHS DEPICT TWO PARTICULAR OBJECTS IN THE GARAGE, ONE IS A SLEDGE, WOODEN HANDLE ABOUT 12 INCHES LONG, GREEN HEAD. THAT IS A PICTURE THAT WAS TAKEN ON THE MORNING OR THE MIDDAY OF THE INCIDENT. MR. FERGUSON WAS UNDER ARREST AT THAT POINT IN TIME, HAD BEEN TRANSPORTED TO THE HOSPITAL. MRS. FERGUSON HAD BEEN LIFE-LIGHTED AND WAS AT THE HOSPITAL.

THE OTHER TWO PHOTOGRAPHS SHOW A CLAW HAMMER

HANGING ON A PEG BOARD IN THE GARAGE RIGHT ABOVE REAL ESTATE SIGNS. AGAIN, THOSE SAME PHOTOGRAPHS TAKEN BY THE CARLSBAD POLICE DEPARTMENT ON THE MORNING IN QUESTION.

MR. FERGUSON, THE RECORD CAN SHOW AN OFFER OF PROOF, HE WAS IN CUSTODY CONTINUOUSLY SO HE HAD NO ACCESS TO THIS HOUSE. TO ME THIS RAISES A SUBSTANTIAL ISSUE OF CREDIBILITY. MRS. FERGUSON HAS JUST DESCRIBED TO THE COURT THE SAME ITEMS THAT ARE DEPICTED IN THE PICTURES. MRS. FERGUSON'S -- PLEASE, CREDIBILITY WAS DRAWN INTO QUESTION, WAS DRAWN INTO SUBSTANTIAL QUESTION DURING THE COURSE OF THE TRIAL BY REVEALING PRIOR INCONSISTENT STATEMENTS, ISSUES OF BIAS AND MOTIVE TO FABRICATE THIS INFORMATION BECAUSE, AS WE CONTENDED, SHE WAS THE ATTACKER IN THIS PARTICULAR MATTER.

WHAT THESE PHOTOGRAPHS SHOW I THINK IS EVIDENCE THAT THESE ITEMS WERE PLANTED BY HER, THAT SHE CONTACTED DETECTIVE TRUJILLO IN ORDER TO TRY TO AGGRAVATE OR ACCUMULATE FALSE EVIDENCE AGAINST HER HUSBAND. I THINK THAT THIS INFORMATION IS -- OBVIOUSLY TO ME THIS IS BRAND-NEW INFORMATION BECAUSE OF THE LETTER, THE NATURE AND THE DISCLOSURE, THE CIRCUMSTANCES OF THE DISCLOSURE AND THAT THIS WOULD HAVE BEEN POWERFUL EVIDENCE TO PRESENT TO THIS JURY OF HER BIAS, OF THE FACT THAT SHE IS FABRICATING AND WILLING TO FABRICATE EVIDENCE TO TRY AND CONVICT THIS MAN. AND THEREFORE IT'S NEWLY DISCOVERED EVIDENCE AND WOULD SUPPORT A MOTION FOR A NEW TRIAL AND I WOULD SO MAKE THAT REQUEST.

THE COURT: MS. PETTINGELL, ON THE GROUND OF NEWLY DISCOVERED EVIDENCE, WHAT IS YOUR POSITION WITH REGARD TO WHAT INFORMATION, PHOTOGRAPHS, EXHIBITS, AND SO FORTH WERE REVEALED

# EXHIBIT H

TRANSCRIPT OF JUNE 14, 2005 LETTER

"Graduated from UCSB w/a BA in Law and Society on the 12th. No longer at old address in Goleta, moving out of state and on with my life. [My pet dog] Petunia is buried in CA, she was born in '89. [My pet dog] Rufus was born in '94 - we plan to get another girl puppie "Daffodil" to keep him company and keep the legacy going.

I wrote several letters but never sent them. Will try to send a graduation picture. I never cashed any of your checks. You need the $ [i.e., money] more than me."

Sent [you a] graduation card. Doing good, am confident.

-- Kyle

U SAV[illegible] EM
tradepartment Envelope

OT SEAL THIS ENVELOPE

[redacted]

FERGUSON
1229 2-119L

atio[illegible]al Museum of the American Indian (NMAI)
ew of the east entrance on the National Mall
'ashington, D.C.
hotographer: Leonda Levchuk
atio[illegible]al Museum of the American Indian
[illegible] 2004 Smithsonian Institution

SUBURBAN MD 208
28 NOV 2006 PM 2 T

FIRST CLASS
00040

KENNETH FERGUSON
C.S.P. SOLANO
P.O. BOX 4000
VACAVILLE, CA 95696-4000
CDC #K11229

2-119-LOW

DAD -

SORRY I HAVEN'T WRITTEN IVA WHILE, I HAVE BEEN MEANING TO. THINGS ARE GOING WELL, I HAVE HAD AN ALRIGHT JOB FOR 10 MONTHS OR SO NOW FOR A FEDERAL CONTRACTOR IN THE D.C. METRO AREA, I AM DOING WELL, EVEN HAD A FEW DATES. WENT TO THE INDIAN MUSEUM TODAY W/ A FRIEND FROM OUT OF TOWN + TOOK THE DAY OFF WORK. I HOPE YOU GET THIS -Kyle

*Colonial Williamsburg*

11.6.05

Duke of Gloucester Street
Williamsburg, Virginia

Horse-drawn colonial carriages travel historic Duke of Gloucester Street amid the brilliant colors of fall.

*Colonial Williamsburg* is the corporate trade name and registered service mark of the Colonial Williamsburg Foundation

RICHMOND VA 232 PM NOV

Wilma Rudolph — Athlete — USA 23

0 45622

Hi, I've been doing well. I live in VA now and am starting a temp job at a court house on Monday, I visited Ken in MD. I miss the fun of college but am glad I am graduated. [illegible] -Kyle

[illegible]

#9979 © 2000 The Colonial Williamsburg Foundation
Designed, Distributed & Printed in the U.S.A.

KENNETH FERGUSON
P.O. BOX 4000
C.S.P. VACAVILLE
~~#K2H9~~ K-11229
VACAVILLE, CA
95696

2-119-L

THIS AREA FOR OFFICIAL POSTAL USE ONLY

[illegible]96/4000

STATE OF CALIFORNIA
CDC 805 (11/87)

DEPARTMENT OF CORRECTIONS

# U SAVE 'EM

Intradepartment Envelope

DO NOT SEAL THIS ENVELOPE

[redacted]

[redacted]

I/M FERGUSON
K11229 2-114L

---

Meteor Crater®

ARIZONA'S LEGACY FROM SPACE

With the force of a multi-megaton bomb, a speeding nickel-iron Meteorite crashed to Earth nearly 50,000 years ago. Splashing over 175 million tons of rock, the resulting Crater is 4150 feet in diameter, 550 feet deep and 2.4 miles in circumference. Meteor Crater is located 40 miles East of Flagstaff, Arizona.
Photo Courtesy: © Meteor Crater Enterprise

6.14.05

Graduated from UCSB w/ a BA in Law and Society on the 12th. No longer at old address in Goleta, moving out of state and on with my life. Petunia is living in CA, she was born in '89. Rufus was born in '94. We plan to get a westie girl puppie "Daffodil" to keep him company and keep the legacy going. I wrote several letters but never sent them. Will try to send a graduation picture. I never cashed any of your checks. You need the $ more than me. Got graduation card. Doing good, am confident. -Kyle

#19353 © Impact, 1-800-950-0110
Designed & Distributed in the U.S.A. Printed in China

...QUERQUE NM

CDC# K11229
2-119L

Altocumulus castellanus

KENNETH FERGUSON
C.S.P. SOLANO
P.O. BOX 4000
VACAVILLE, CA 95696

THIS AREA FOR OFFICIAL POSTAL USE ONLY

Meteor Crater®

ARIZONA'S LEGACY FROM SPACE

With the force of a multi-megaton bomb, a speeding nickel-iron Meteorite crashed to Earth nearly 50,000 years ago. Splashing over 175 million tons of rock, the resulting Crater is 4150 feet in diameter, 550 feet deep and 2.4 miles in circumference. Meteor Crater is located 40 miles East of Flagstaff, Arizona. Photo Courtesy: © Meteor Crater Enterprise

6.14.05

Graduated from UCSB w/ a BA in Law and Society on the 12th. No longer at old address in Goleta, moving out of state and on with my life. Petunia is lived in CA, she was born in '89. Rufus was born in '94, we plan to get a westie girl puppie "Daffodil" to keep him company and keep the legacy going. I wrote several letters but never sent them. Will try to send a graduation picture. I never cashed any of your checks. You need the $ more than me. Got graduation card. Doing good, am confident. – Kyle

#19353 © Impact, 1-800-950-0110
Designed & Distributed in the U.S.A. Printed in China

ALBUQUERQUE NM

CDC# K-11229
2-119L




KENNETH FERGUSON
C.S.P. SOLANO
P.O. BOX 4000
VACAVILLE, CA 95696

THIS AREA FOR OFFICIAL POSTAL USE ONLY

# EXHIBIT I

# Salinas Valley State Prison
## Memorandum

**DATE:** December 23, 1996

**TO:** TO WHOM IT MAY CONCERN

**FROM:** T. McCormick, Correction Officer, Badge # 53561

**SUBJ:** PERFORMANCE OBSERVATION OF INMATE FERGUSON
CDC# K11229

During my tenure as building A4 Floor Officer, I have occasion to observe inmate Ferguson CDC# K11229 on a daily basis. From his first day to the present he has been a model resident. His mature attitude and willingness to comply with all written and verbal instructions routinely demonstrate his responsible behavior. Inmate Ferguson clearly sets an example for other inmates with his positive approach to daily duties, his well-kept appearance, and his incisive approach to problem solving.

Inmate Ferguson's demonstrated cooperative spirit and positive approach to this institutional setting have earned him the respect and trust of other inmates as well as staff. As such, I strongly recommend he be granted a lower custody level at the earliest opportunity.

NAME and NUMBER FERGUSON K-11229 2-114-L CDC-128-B (Rev. 4/74

Inmate FERGUSON K-11229, 2-114-L, is a member in good standing and participant in the Victim Offender Reconciliation Group here at CSP-Solano. The Victim Offender Reconciliation Group helps inmates understand that any form of violence is unacceptable and can never be allowed. With his participation in the Victim Offender Reconciliation Group, FERGUSON is taking responsibility for his crime and showing that he wishes to be rehabilitated so that he can rejoin society as a peaceful and productive citizen. A year ago I wrote a Laudatory 128B Chrono for FERGUSON's C-File. Since that time I wish to document that he has continued to progress in behavior and attitude. This is FERGUSON's fourth year of laudatory service to V.O.R.G.

ORIGINAL: C-File
cc: Counselor
Writer
Inmate

R. AMBRIZ
Sponsor
Victim Offender Reconciliation Group
CSP-Solano

DATE 7-2-2001 LAUDATORY CHRONO GENERAL CHRONO

NAME and NUMBER FERGUSON K-11229 2-114-L

CDC-128-B Rev. 4/74

This Laudatory Chrono is written for **FERGUSON** K-11229 and for his **Board of Prison Terms Suitability Hearing** to be held on 6-18-02. I have written Laudatory 128's for FERGUSON before and I feel he is suitable for parole at this time. He appears not to be a threat to society. I have observed him as a **Peer Health Educator** and **Laubach Literacy** teacher in Complex B Education and Yard #1, building #2, where I am the first tier officer. **FERGUSON** is a positive programmer who is helpful to staff. This evaluation of **FERGUSON** comes from my over **18 years** of service as a C.O. in the C.D.C. Please feel free to contact me for further comment.

J. C. CARTER
Correctional Officer
Facility I, Bldg. 2, 2d Watch
CSP-Solano, Ext. 6112

cc: C-File
Counselor
Inmate

DATE 5-31-02

GENERAL CHRONO

NAME and NUMBER FERGUSON K-11229 2-114-L CDC-128-B Rev. 4/74

I am writing this Laudatory Chrono to the Board of Prison Terms for **FERGUSON** K-11229 and for his **Suitability Hearing** to be held on 6-18-02. I have written Laudatory 128's for FERGUSON before and I feel he is suitable for parole at this time. He appears not to be a threat to society. I have observed him as a **Peer Health Educator** and **Laubach Literacy** teacher on yard #1, building #2, where I am the second tier officer. **FERGUSON** is a positive programmer who is helpful to staff. This evaluation of **FERGUSON** comes from my over 15 **years** of service as a C.O. in the C.D.C. Please feel free to contact me for further comment.

c/o R. Galbraith

cc: C-File
Counselor
Inmate

**R.E. GALBRAITH**
Correctional Officer
Facility I, Building #2,
CSP-Solano

DATE 6-7-02

GENERAL CHRONO

alifornia Medical Facility | GENERAL MENTAL HEALTH CHRONO | Department of Corrections

Number K11229 Last Ferguson First Kenneth House J-242L Date 3/26/03 CMF

This chrono states that Mr. Ferguson has been an active member of Dr. Weingarten's CCCMS Impulse Control Group for over six months and has only missed regularly scheduled meetings when institutional constraints necessitated such. His diligence to this group and participation in discussions has been an inspiration to other group members and has resulted in measurable personal growth for Mr. Ferguson. He is willing to risk vulnerability and disclose personally sensitive issues which often result in others giving advice, suggestions, and criticisms that Mr. Ferguson receives in a constructive and mature fashion. He is ever eager for more information and challenges members to consider alternative plans for managing inappropriate impulses within the institution and more globally to every facet of life. He is a joy to work with and an energetic, honest, and insightful member of this group and will likely utilize the skills he has acquired in a responsible fashion.

Dr. [signature]

Clinician Kotila

CDC Psychiatric 128C

CDC-128-B Rev. 4/74

NAME and NUMBER FERGUSON K-11229 2-119-L

I commend FERGUSON K-11229 with a Laudatory Chrono. I have contact with FERGUSON on a regular basis in performing my duties. I have come to know him to be a sincere, peaceful, kind, and considerate gentleman. He is a Peer Health Educator who provides vital health information to the inmate population. It is my opinion that he is ready to rejoin society and should be considered for parole at the earliest possible time. FERGUSON shows progress and continues to improve in all areas so that he can rejoin society as a productive citizen. This Laudatory Chrono is the latest of several Laudatory Chronos I have signed to benefit Ferguson K-11229 over the past several years.

P. Lahey
Registered Nurse
Primary Clinic, CSP-Solano

ORIGINAL: C-File
cc: Counselor
Writer
Inmate

DATE 4-30-04 LAUDATORY CHRONO GENERAL CHRONO

NAME and NUMBER KENNETH FERGUSON K-11229 (2-119-L) CDC-128-B Rev. 4/74

INMATE FERGUSON HAS BEEN AN ACTIVE MEMBER OF THE CHAPEL OF THE GOOD SHEPHERD CHURCH AT C.S.P.-SOLANO. INMATE FERGUSON ALSO HAS BEEN REGULARLY COUNSELED BY THIS CHAPLAIN DURING THE COURSE OF HIS INCARCERATION HERE. MR. FERGUSON HAS DEMONSTRATED A DEFINITE ATTITUDE OF REMORSE FOR HIS CRIME AND A DESIRE TO GO FORWARD IN A POSITIVE WAY AS A RESPONSIBLE MEMBER OF SOCIETY. MR. FERGUSON ALSO CLEARLY DECLARED HIS RECOMMITMENT TO JESUS CHRIST AND A DESIRE TO EXEMPLIFY CHRIST IN HIS LIFE IN THE FUTURE. IT IS MY BELIEF AND CONVICTION THAT MR. FERGUSON IS TAKING POSITIVE STEPS TOWARDS RE-ENTRY INTO SOCIETY AND SHOULD BE GIVEN SERIOUS CONSIDERATION TOWARDS THAT END. THIS LAUDATORY CHRONO IS THE LATEST OF SEVERAL LAUDATORY CHRONOS I HAVE SIGNED TO BENEFIT FERGUSON, K-11229, OVER THE PAST SEVERAL YEARS.

LAUDATORY

DATE 7/9/04 REV. CARL F. SPECHT, M.DIV./PROTESTANT CHAPLAIN

GENERAL CHRONO

CDC-128-B Rev. 4/74

NAME and NUMBER **FERGUSON** K-11229 2-119-L

This Laudatory Chrono is to confirm and congratulate Ferguson K11229, on his dedication to the Alcoholics Anonymous and Narcotics Anonymous Programs at C.S.P. Solano. Ferguson has attended and participated in all Alcoholics Anonymous and Narcotics Anonymous Programs available to him. The only times Ferguson was unable to attend meetings was when he was on institutional lock-downs or when State budget cuts suspended the program.

Ferguson is a mature and trusted inmate who is helpful to staff and inmates alike. Pleae feel free to contact me for further comment.

J. GAST, Sponsor
Alcoholics Anonymous Program
and Narcotics Anonymous Program
Facility I, II, III, IV
California State Prion - Solano

cc: C-File
Counselor
Writer
Inmate

DATE September 17, 2004

LAUDATORY CHRONO

GENERAL CHRONO

For B.P.T Suitability Hearing

CDC-128-B Rev. 4/74

NAME and NUMBER FERGUSON K-11229 2-119L

I have observed Ferguson, K11229, for over 5 years and found him **Not** to be a **safety concern** or have any degree of **future dangerousness**. This is my Fifth Laudatory Chrono written for Ferguson. My first, second, third, and fourth Laudatory Chronos written to benefit Ferguson were written on August 5, 2002, October 15, 2003, June 7, 2004, and September 14, 2004. In my duties as Control Officer Bldg. #2 I have observed Ferguson as a **Peer Health Educator**, **Laubach Literacy Teacher**, and an inmate who is always helpful to staff and inmates alike. **Ferguson** is a positive programmer who continues to show that he is suitable for immediate parole. **Ferguson** is a mature **62** year old, trusted person who is **Not** a threat to society. This Laudatory Evaluation of Ferguson comes from my over 12 years of service as a Correctional Officer in the C.D.C. Please feel free to contact me for further comment at Ext. 6111.

cc: C-File
Counselor
Writer
Inmate

**C. Dominguez** c/o C. Dominguez
Control Officer
Facility I Bldg. #2
CSP-Solano, Ext. 6111

DATE January 11, 2005 LAUDATORY CHRONO GENERAL CHRONO

For B.P.T Suitability Hearing

NAME and NUMBER FERGUSON K-11229 2-119L CDC-128-B Rev. 4/74

For over 6 years I have observed Ferguson, K11229 and found him Not to be a safety concern or have any degree of future dangerousness. In my duties as Lead Floor Officer Bldg. #2, I have observed Ferguson as a Peer Health Educator, Laubach Literacy Teacher, Porter, and an inmate who is always helpful to staff and inmates alike. Ferguson is a positive programmer who continues to show that he is suitable for immediate parole. Ferguson is a mature 62 year old and trusted person who is not a threat to society. This Laudatory Evaluation of Ferguson comes from my over 18 years of service as a Correctional Officer in the C.D.C. Please feel free to contact me for further comment at Ext. 6111.

cc: C-File
Counselor
Writer
Inmate

C/O Nears
Floor Officer
Facility I Bldg. #2
CSP Solano Ext. 6111

DATE January 12, 2005 LAUDATORY CHRONO GENERAL CHRONO

NAME and NUMBER FERGUSON K-11229 2-119-L CDC-128-B Rev. 4/74

I have observed inmate Ferguson K-11229 and conclude that he is **not a safety concern** nor does he present any **future danger** towards anyone in society. In my duties as Bldg. 2 floor officer I have observed, first hand, Mr. Ferguson's mature behavior, cooperative attitude, and his ability to teach other inmates in his assigned position as a **Peer Health Educator** and **Laubach Literacy Teacher**. Mr. Ferguson makes **amends to society** by teaching other inmates how to prevent disease and how to read and write. Mr. Ferguson can use these teaching skills, upon parole, to gain employment that will benefit society. Mr. Ferguson is a mature **64 year old** positive programmer who continues to show that he is suitable for **immediate parole**. I do not believe he would create any problems for his parole officer. Please feel free to contact me for any further comment at **Ext. 6111**.

cc: C-File
Counselor
Writer
Inmate

E. Gonzalez, C/O
Facility I. Bldg. 2
Ext. 6111

DATE Jan. 26, 2007 LAUDATORY CHRONO GENERAL CHRONO

NAME and NUMBER FERGUSON K-11229 2-119-L CDC-128-B Rev. 4/74

As a member of the CSP Solano medical staff I have observed Mr. **Ferguson, K-11229** as a mature **64** year old inmate who constantly exhibits peaceful calm behavior that shows **no safety concerns** or **any degree** of **future danger** towards anyone in society. Mr. Ferguson has worked as a **Peer Health Educator** for approximately **10 years** and actively communicates health knowledge and disease prevention to the inmate population. In his assignment as a Health Educator, Mr. Ferguson helps inmates to practice safe behaviors and thus creates better health practices that lower the need for medical appointments. It is my opinion that Mr. Ferguson is ready to rejoin society and **gain immediate parole**. Mr. Ferguson should be very employable in the health care industry and his parole will give him the opportunity to continue to make amends to society. Feel free to contact me for any further comments.

cc: C-File
Counselor
Writer
Inmate

W. Alegado
M.T.A.
Medical Staff, CSP Solano

DATE Feb. 1, 2007 LAUDATORY CHRONO GENERAL CHRONO

NAME and NUMBER FERGUSON K-11229 2-119-L CDC-128-B Rev. 4/74

Teaching is a vocational skill. Inmate **Ferguson K-11229** is assigned as a **Peer Health Educator** and teaches the inmate population on subjects of disease prevention and healthy behaviors. Mr. Ferguson has actively been a teacher/ facilitator/ educator for approximately **10 years**. Mr. Ferguson presents health information that allows other inmates to prevent highly contagious diseases from being transmitted. He also explains behaviors that lead to dangerous addictions. In doing so, it is hoped that drug usage can be slowed or prevented in the institutional setting. Mr. Ferguson is a vocal and enthusiastic **64** year old Health Educator who has prepared himself for future employment, upon parole, in the health care industry. Mr. Ferguson has proven over his **12 years** in prison not to be a safety concern and exhibits no degree of future danger. If you wish any further comments, I can be reached at **Ext. 5477**.

cc: C-File
Counselor
Writer
Inmate

S. Gebrezghi, RN
Supervisor Inmate Health
Education

DATE Feb. 5, 2007 LAUDATORY CHRONO GENERAL CHRONO

# EXHIBIT J

Petitioner now asserts that the Board of Prison Terms (BPT) has improperly failed to grant him a release date after his most recent parole eligibility hearing. Petitioner contends the BPT improperly failed to consider any current or recent evidence regarding his present dangerousness and based its decision almost entirely on his commitment offense. Petitioner asserts that the BPT characterizes all life offense including torture as involving a callous disregard for human suffering. He asserts that the offense must be particularly egregious compared to other torture cases before the Board can deny parole based on this. Petitioner further claims that the BPT improperly characterized his psychological evaluation which Petitioner asserts found him suitable for parole. Petitioner also alleged that the BPT considered improper statements regarding the incident which were made by the victim and that they improperly failed to consider laudatory reports by prison staff.

"Courts must not second-guess the Board's evidentiary findings. (Powell, supra, 45 Cal.3d at p. 904.) However, it is the proper function of judicial review to ensure that the Board has honored in a "practical sense" the applicant's right to "due consideration." (Sturm, supra, 11 Cal.3d at p. 268.) This function is best served by examining the Board's parole suitability rulings under a deferential abuse of discretion standard. The Board's decision should not be disturbed unless it has acted arbitrarily or capriciously. Particular deference must be accorded to the Board's factual determinations, which need only be supported by some evidence." In re Ramirez (2001) 94 Cal.App.4th 549, 564.

Petitioner relies on In re Rosenkrantz (2002) 29 Cal4th 616 for his contentions that the Board did not apply the criteria properly when it denied him a parole date. Petitioner cites In re Rosenkrantz for the proposition that reliance solely on the finding that the offense was committed in a callous manner and a manner which exhibits an exceptional disregard for human suffering was improper. In Rosenkrantz there were no reasons for finding unsuitability except for allegations regarding the commitment offence. Indeed, there were no negative factors against him aside from the commitment offense of second degree murder after a jury had acquitted him of first degree murder.

//

//

//

//

In In re Ramirez (2001) 94 Cal.App.4th 549 the Petitioner was denied a parole release date after numerous hearings. The appellate Court found that the denial was arbitrary and capricious because the BPT considered only Petitioner's commitment offense and failed to consider Petitioner's performance in custody or his progress as noted in a psychological report. However, the appellate Court also found the trial Court erred by reconsidering the evidence instead of remanding the matter to the BPT to hold another hearing where it would consider the factors it had previously failed to consider.

Here Petitioner is unlike the Petitioners in Rosenkrantz and Ramirez. The BPT considered many factors and did not focus solely on his life crime. The BPT relied on a psychological report by Dr. Nancy Van Couvering. The report states that Petitioner "appeared to externalize accountability for his own behavior to some extent. For avoiding repetition of violence toward his wife, it would not be enough to avoid similar situations. There would be a danger as long as he did not own, and therefore did not control, his own motivations. At this time, estimate risk to his wife is moderate and to the community at large is low."

The BPT was also concerned that Petitioner had not fully explored his culpability in the life crime. Petitioner no longer claims self-defense as he did previously. However, he still attempts to minimize the offense and make claims about it which are at odds with the testimony of the victim here both at trial and at Petitioner's hearing before the BPT. Deputy Commissioner Nielsen observed during the hearing that Petitioner was cold, unemotional and intellectualizing the offense. He found it disturbing that Petitioner testified that he had a better understanding of the offense than the victim, though he also stated his recollection of the incident was vague. The BPT was certainly more than justified in finding testimony by the victim more credible than Petitioner's testimony.

Further, Petitioner's plans upon release on parole are not concrete. Though he has a placement with an organization that would attempt to find him employment, no such employment was guaranteed. He indicated that he had no doubt that he would be able to find an acceptable job in sales, marketing or teaching based on his resume.

//

//

//

The BPT clearly considered many legitimate factors other than Petitioner's commitment offense when he was denied parole. There was nothing arbitrary or capricious about their denial of parole. Petitioner has failed to make a prima facie showing of specific facts which would entitle him to habeas corpus relief under existing law. In re Hochberg (1970) 2 Cal.3d 870, 875 fn 4. As such, the Petition for Writ of Habeas Corpus is hereby denied.

IT IS SO ORDERED.

DATED: NOV 0 9 2005

HARRY M. ELIAS, JUDGE

HARRY M. ELIAS
JUDGE OF THE SUPERIOR COURT

# EXHIBIT K

State of California

# Memorandum

**Date:** February 23, 2007

**To:** Board of Parole Hearings Panel

**From:** **California State Prison - Solano, Vacaville 95696-4000**

**Subject:** **K-11229 FERGUSON, KENNETH**

It was recently brought to my attention that Deputy Commissioner Nielsen at Inmate Ferguson's last appearance before the Board on January 12, 2005 requested an investigation coordinated with the Board's Investigation Unit and the Department of Corrections Classification Parole Representative's Office. The issue was a request that the writers of the laudatory chronos (dating from August 4, 1998 to September 13, 2004) on file signify to what degree the inmate brought to their attention and requested these chronos and/or produced the written verbiage of those chronos. The Panel felt that there might have been some coercion and some attempts and even possible forgery of signatures on these chronos over a long period of time.

My predecessor, Velda Dobson-Davis, Classification and Parole Representative, sent 38 Memorandums dated May 17, 2005 to the various writers of the laudatory chronos. This office did receive some responses to the memorandum that indicated that they did in fact authored or signed a prepared chrono after reviewing it. Some of the staff no longer worked at our institution. The returned responses were placed in the BPT Section of File #3.

I telephoned the BPH Investigation Unit to check their database for the results of the investigation. Their database does not indicate that the case was ever opened.

Since I picked up this investigation approximately two years after the request and some of the laudatory chronos in question are as old as eight years, this memorandum is documentation that the investigation has been concluded. It is noted that the chronos in Inmate Ferguson's Central File for this Board appearance are quarterly reports for participation in Alcoholics Anonymous or completion of Anger Management. There are no other laudatory chronos noted.

S.A. Miller

S.A. Miller
Classification and Parole Representative

BOARD OF PRISON TERMS

CONTINUATION SHEET

CONTINUATION FOR: Ferguson Kenneth SECTION K-11929

BPT FORM NO. SUBSECTION

CSP Solano Hearing [illegible]

Panel requests an investigation by BPT Investigations unit and (1) Clarification and Parole Requested @ CSP Solano (?)

Numerous laudatory chronos appear in C-File. The validity of [illegible] are in question. Panel would like the record to reflect if inmate drafted any of these chronos for those who purportedly authored them, whether chronos were solicited or voluntary, whether signatures were forged and generally any [illegible] information officers or others have about how and why the chronos were given.

[illegible signature]
Deputy Commr [illegible]

NAME NUMBER INST./REGION CALENDAR HEARING DATE



WHITE — C-FILE
CANARY — BPT
PINK — PRISONER / PAROLEE
GOLDENROD — OTHER

PERMANENT ADDENDA

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region
1. ____
2. ____

Log No.
1. ____
2. ____

Category
AU
Records

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| KENNETH FERGUSON | K-11229 | PEER HEALTH EDUCATOR | 2-119L |

A. Describe Problem: 1/12/05 - In my presence, the Parole Board orders the Solano prison "Classification and Parole" staff to investigate and verify the Laudatory Chronos in my C-File, for their review at my next Board hearing - which is scheduled for this January.

5/16/05 - CCl Franklin confirms that C&PR staff received my CDC-602 requesting notice of the outcome of that investigation.

8/24/06 - BPT prep/Olsen review with CCl Franklin reveals my C-File contains nothing about the outcome, or even progress, of the investigation - which would exonerate me.

My next scheduled Board hearing is now about three months away.

If you need more space, attach one additional sheet.

B. Action Requested: No attempt to informally resolve the issue is necessary because the problem concerns Classification and Parole Staff action - within the meaning of 15 CCR 3084 etc. As my CDC-602 of 5/11/05 requested, notify me in writing that the investigation in question was completed and exonerated me, as I know it must have, or as to its current status.

Inmate/Parolee Signature: Ferguson K11229 Date Submitted: 10-12-06

C. INFORMAL LEVEL (Date Received: ____ )

Staff Response: ____

Staff Signature: ____ Date Returned to Inmate: ____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Signature: ____ Date Submitted: ____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

RECEIVED
OCT 19 2006
CSP/SOLANO
APPEALS OFFICE

#6 10-30-06
#6 11-1-06

State of California
CDC FORM 695
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the INFORMAL Level

*October 19, 2006*

***FERGUSON, K11229***
*S102T1000000119L*

Log Number: CSP-S-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

***Your appeal is incomplete. You must include supporting documentation. All documents must be legible. (If necessary, you may obtain copy(ies) of requested documents by sending your request with a signed trust withdrawal form to your assigned counselor.) Your appeal is missing:***

***Please provide a log# for the appeal referenced in this action, or a copy of said appeal.***

M.D. Carrasco CCII
Appeals Coordinator
CSP-SOLANO

**NOTE:** Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

State of California
CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the INFORMAL Level

*October 30, 2006*

***FERGUSON, K11229***
*S102T1000000119L*

Log Number: CSP-S-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

***There has been too great a TIME LAPSE between when the action or decision occurred and when you filed your appeal with no explanation of why you did not or could not file in a timely fashion. Time limits expired per CCR 3084.6(c). Therefore, if you would like to pursue this matter further, you must submit an explanation and supporting documentation explaining why you did not or could not file your appeal timely.***

***Appeal rejected due to untimely filing.***

M.D. Cofioso, CCII
Appeals Coordinator
CSP-SOLANO

NOTE: Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE

**State of California**
**CDC FORM 695**
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the INFORMAL Level

*November 7, 2006*

***FERGUSON, K11229***
*S102T1000000119L*

Log Number: CSP-S-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

***There has been too great a TIME LAPSE between when the action or decision occurred and when you filed your appeal with no explanation of why you did not or could not file in a timely fashion. Time limits expired per CCR 3084.6(c). Therefore, if you would like to pursue this matter further, you must submit an explanation and supporting documentation explaining why you did not or could not file your appeal timely.***

***This issue was discussed with the C&PR's office and, while the issue remains an untimely filing, efforts will be made to bring closure to your concerns.***

J. Gonzales s/y
Appeals Coordinator

**NOTE:** Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

STATE OF CALIFORNIA
GA-22 (9/92)

# INMATE REQUEST FOR INTERVIEW

DEPARTMENT OF CORRECTIONS

| DATE | TO | FROM (LAST NAME) | CDC NUMBER |
|---|---|---|---|
| Nov. 17 2006 | Appeals Coordinator | Ferguson | K11229 |

| HOUSING | BED NUMBER | WORK ASSIGNMENT | JOB NUMBER |
|---|---|---|---|
| Z-119L | | Health Educator | FROM TO |

| OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ASSIGNMENT HOURS |
|---|---|
| V.O.R.G. | FROM TO |

**Clearly state your reason for requesting this interview.**
You will be called in for interview in the near future if the matter cannot be handled by correspondence.

Dear Appeals Coordinator, I thank you for your help as I must prepare for my January 2007 BPT Hearing. I have not received anything from the C and PR but I have sent a detailed request and copies of my OVER Please

Do NOT write below this line. If more space is required, write on back.

INTERVIEWED BY: Mr. Ferguson

DATE: 11/29/06

DISPOSITION: I have made multiple inquiries about this issue to the C+PR's office. There is not much else I can do. Please direct any further concerns to the C+PR's office as, unless your problem is addressed in appeal form, I am not the proper authority to address the concern.

M.D. Corioso, CCII

# EXHIBIT L

**S157726**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re KENNETH MICHAEL FERGUSON on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

SUPREME COURT
**FILED**

APR 23 2008

Frederick K. Ohlrich Clerk

Deputy

WERDEGAR
Acting Chief Justice

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED
Stephen M. Kelly, Clerk
MAY 24 2007
Court of Appeal Fourth District

| | |
|---|---|
| In re KENNETH FERGUSON<br><br>on<br><br>Habeas Corpus. | D050253<br><br>(San Diego County<br>Super. Ct. No. SCN029511) |

THE COURT:

The petition for writ of habeas corpus has been read and considered by Presiding Justice McConnell and Associate Justices McIntyre and O'Rourke. We take judicial notice of our decision in *People v. Ferguson* (Dec. 18, 1997, D026454) [nonpub. opn.].)

In 1996, a jury convicted petitioner Kenneth Ferguson of torture with the use of a deadly weapon, corporal injury to a spouse, and assault with a deadly weapon. The trial court sentenced him to a term of life plus one year. He became eligible for parole in 2003.

The circumstances of the commitment offense are as follows: Ferguson and his wife, Alida, were in the process of divorcing after approximately 23 years of marriage. After the two had an intense argument over divorce-related personal property issues, Alida went into the laundry room to do some laundry. Ferguson came up behind her and struck her in the head with a crescent wrench at least 10 and as many as 13 times. He then tried to suffocate her with a blanket and strangle her with his hands.

Alida managed to pry one of Ferguson's thumbs from her neck and bite down on it. At some point, Ferguson let go of Alida and she got up and exited the house through the garage. Ferguson followed her with the wrench, but once she was outside of the garage, he turned and went back into the house. He eventually dialed 911 and told the dispatcher that Alida had attacked him with a wrench, was trying to kill him, and had a knife. In the meantime, a housecleaner working in the house next door heard the commotion and also dialed 911.

for his own behavior," the evaluation indicates that his future danger risk to Alida is moderate.

In July 2005, after considering the above information and objections to parole from the San Diego District Attorney's Office and Alida, the Board of Parole Hearings (Board) found Ferguson unsuitable for parole. The Board based its decision on the circumstances of the commitment offense, Ferguson's most recent mental health evaluation, statements made by Ferguson during the hearing that indicated a lack of insight, and his lack of specific employment plans upon parole.

Ferguson filed this petition challenging the Board's decision and asserting 12 convoluted and overlapping grounds for relief. Essentially, Ferguson argues that the Board's decision denies him equal protection of the law because he is being treated worse than inmates with more egregious crimes. In addition, Ferguson argues that the Board's decision violates his right to due process of law because: (1) the Board was biased, (2) the Board failed to properly apply the regulatory suitability criteria, and (3) the Board gave too much emphasis to the victim's statement and the circumstances of the commitment offense, which Ferguson characterizes as being nothing more than an aggravated assault with great bodily injury. Ferguson also argues that the "some evidence" standard of review violates the federal constitution and he questions the validity of California Supreme Court authority to the contrary. Finally, Ferguson disagrees with the Board's recommendation that he participate in further therapy, if available, and the Board's requirement that he undergo another mental health evaluation before his next parole hearing.

We conclude Ferguson has failed to state a prima facie case for relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.) In reviewing a decision of the Board to deny parole, this court's inquiry is limited to determining whether there is some evidence in the record to support the Board's decision, based on factors specified by statute and regulation. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658.) We are bound by this limitation notwithstanding Ferguson's view of its validity. (*Auto Equity Sales, Inc. v. Superior Court of Santa* (1962) 57 Cal.2d 450, 455.)

In this case, the record, as described above, indicates that the Board considered appropriate suitability factors and that there is some evidence to support the Board's decision to deny parole. There is also some evidence to support the Board's recommendation for further therapy and requirement for further evaluation. It is clear from the record, and from Ferguson's characterization of his crime in this petition, that he does not sufficiently appreciate the magnitude or causes of the commitment offense. In addition, while Ferguson views the most recent mental health evaluation as being favorable to him, it is not since it expressly indicates that he continues to pose a threat to Alida. Without another mental health evaluation, the Board would not know whether this threat has changed.

# EXHIBIT M

**VIII. Employment, continued:**

Within the CDCR, he worked as a porter, in the Prison Industry Authority (PIA) Optical Lab, as a clerk, and currently he works as a health educator. He said he earns twos on his CDCR-101s.

**IX. Substance Abuse History:**

He said he started to drink alcohol in college and stopped in 1995 upon his coming into prison. He denied an illegal drug or alcohol addiction or abuse history. He denied that he consumed any alcohol or illegal drugs prior to or during the instant offense. He denied ever being arrested for substance-related crimes and denied ever receiving a disciplinary chrono in prison for substance-related rules violations. He also denied abuse of prescription drugs and inhaling glue or paint.

He said he has not participated in Alcoholics Anonymous (AA) or Narcotics Anonymous (NA). He did say he has taught aspects of AA and NA in his role as a peer health educator. This was from 1996 through the present.

**X. Behavioral / Psychological / Medical History:**

Mr. Ferguson denied a history of and current suicidal ideation, intent, or plan. He denied current assaultive or homicidal ideation, intent, or plan also.

He denied a mental health history outside of prison. He denied ever being an inpatient in a mental hospital. He is part of the Mental Health Services Delivery System (MHSDS) at the Correctional Clinical Case Management Services (CCCMS) level of care (LOC). He is prescribed Trazodone for mild depression. He said this is to help him sleep.

He received a normal cognitive functioning (NCF) designation in the Developmental Disability Program (DDP) Clark testing evaluation on April 30, 2003. This indicated that he did not meet the requirements for inclusion in the DDP.

He has a significant medical history. He said he has diabetes, asthma, benign prostatic hypertrophy, and he is post left knee surgery. He receives medications for his medical problems. Defer to Health Services Department (HSD).

**XI. Plans if Granted Parole:**

Mr. Ferguson said he would like to live in San Diego County. He would live by himself. He said he has retirement funds, Supplemental Security Income and bank account funds to live on upon parole. He said he also would like to teach health education. As noted in the Education section, he has certificates in this field.

## MENTAL HEALTH PSYCHOLOGICAL EVALUATION

### I. Mental Status / Treatment Needs:

**Physical:**

He said he is a 64-year-old male who appeared height/weight proportionate. He says he is 6' tall and weighs 190 pounds. He eats well and exercises. His hygiene and grooming were good.

**Movement:**

His gestures were fluid. Gait was slow but within normal limits (WNL). As mentioned above, he is post surgery on his left knee. He has Americans with Disabilities Act limitations and walks with a cane when needed.

**Conversation:**

His native language is English. Articulation, volume, and melody were within normal limits (WNL). Speech was fluid and not pressured. He observed appropriate turn taking during the interview and evaluation. He maintained good eye contact throughout the evaluation. His approach to this clinical and forensic psychologist was cooperative, helpful, and pleasant.

**Thinking:**

Breadth of thought was broad and commensurate with his life experience. Logic was goal-directed and linear. He appeared to be of average intelligence during this evaluation. He was oriented to person, place, time, date, day, and CDCR number. His short- and long-term memories appeared intact.

**Affect / Mood:**

His mood was described as "fine." He denied being depressed or tearful lately. His affect was full range and appropriate to his expressed thoughts and to his situation. His modes of expression were facial, vocal, and gestural; and his intensity, range, and emotional regulation were all WNL.

**Perception:**

He denied experiencing auditory hallucinations (voices in his head that only he can hear), visual hallucinations (visions in his head that only he can see), and delusions (e.g. bizarre, grandiose, and/or paranoid thoughts – ideations and/or beliefs).

MENTAL HEALTH PSYCHOLOGICAL EVALUATION, continued:

I. **Mental Status / Treatment Needs, continued:**

**Insight:**

His insight into his crime involvement, lack of mental symptoms, and his overall situation appears intact. He does not appear to utilize the psychological defense mechanisms of denial or rationalization concerning his crime commitment or situation. He takes blame for his role and sees his prior judgment as poor. Current judgment seems adequate.

**Diagnosis (DSM IV-TR)**

| | | |
|---|---|---|
| AXIS I | V71.09 | No diagnosis on Axis I. |
| AXIS II | V71.09 | No diagnosis on Axis II. |
| AXIS III | | Diabetes, asthma, benign prostatic hypertrophy, and post left knee surgery. Defer to HSD. |
| AXIS IV | | Incarceration, medical problems, estrangement from his family, "lifer" status. |
| AXIS V | | GAF = 70. |

He is part of the MHSDS. His usual activities include walking the yard, exercising, socializing, listening to music CDs, watching TV, reading, writing letters, his work assignment, and teaching illiterate inmates how to read and write through the Lawbach Tutoring Program where he volunteers and makes his amends to society.

II. **Review of Life / Controlling Crime:**

Mr. Ferguson's instant offense is well-documented. On August 28, 1995, he and his wife had a verbal argument that turned into a physical altercation and ended up with both being taken to the hospital.

Mr. Ferguson stated that he feels terrible about his behavior during the instant offense. He had felt frustrated and had some difficulties in communicating with his wife. They were going through a divorce. Pent-up frustrations and angry feelings had bubbled over to the instant offense. He said he feels very bad that he hurt his wife and that she is having ongoing mental difficulties (i.e. PTSD). He said he fully regrets what he put his wife and two children through as far as committing the instant offense and then his being estranged from his family of procreation.

III. **Estimated Dangerousness:**

**Prior Crime History:**

As a juvenile: None.

As an adult: None.

**MENTAL HEALTH PSYCHOLOGICAL EVALUATION, continued:**

**III. Estimated Dangerousness, continued:**

**Prior Crime History, continued:**

Within the CDCR, his disciplinary history includes: None.

**Prison Performance This Term:**

Mr. Ferguson recently completed a six-month Anger Management Course on August 31, 2006. In addition, as a teacher/facilitator/educator, he has attended AA and NA. He has participated in the CCCMS LOC since 1995. Prior to his last appearance before the BPH in 2005, he said he completed a multitude of self-help and therapy programs. This information is located in his C-File.

He has a place to live and the funds to afford to live by himself. He has remained disciplinary free throughout his entire incarceration. He has also remained substance abuse free. In addition, he has received approximately 200 laudatory chronos, according to him. This information is all in his C-File. Of note, he gets along well with other inmates and staff and is a sociable and polite individual.

**Estimated Future Dangerousness in the Community / Significant Risk Factors:**

Mr. Ferguson's instant offense is his only offense on record. It also does not appear that he has any sort of substance abuse/dependence problems. He has the funds, according to him, to live on his own upon parole. He has the intelligence and coping skills to successfully live and interact with members of society without committing dangerous or violent acts upon other people.

The previous psychological evaluation by Dr. Van Couvering was discussed with Mr. Ferguson. He articulated what he had learned about himself. He felt that his feelings and communication styles (from the previous psychological and self-help therapies he had completed and the six-month Anger Management course that he recently completed) helped remind him to reinforce those healthy coping skills that he uses in his everyday life. In addition, and possibly more importantly at this point, his completion of the six-month Anger Management course in August 2006 helped him to articulate better to professionals in a way that he might not have been able to do at the time of the interview with Dr. Van Couvering.

It appears, from what he stated during this evaluation, that he has taken ownership of his thoughts and his feelings and responsibility for his actions during the instant offense. It was noted that communicating was an important factor and it was noted that his completion of his self-help and therapy rehabilitative course within the CDCR in 2006 helped him to be able to articulate the lifestyle that he has chosen to live, which is a healthy and law-abiding one.

**MENTAL HEALTH PSYCHOLOGICAL EVALUATION, continued:**

**III. Estimated Dangerousness, continued:**

**Estimated Future Dangerousness in the Community / Significant Risk Factors:**

Given his recorded history in the files reviewed and from interview and psychological evaluation of the inmate on December 26, 2006, he appears to show a low risk of dangerousness and violence when compared to other life-term inmates. This would be whether compared to life-term inmates within the CDCR or in the free society.

Respectfully Submitted,

P. Davis, Psy.D.
PSY - 17804
Clinical and Forensic Psychologist
MDO / Forensic Mental Health Unit
California Department of Corrections

with the psychological evaluation process, remain disciplinary free, participate in self-help and earn positive chronos. Subject has complied with BPH recommendations. Subject continues to involve himself in a full-time work assignment, receiving satisfactory work reports. He is currently assigned as a Peer Health Educator.

## IV. FUTURE PLANS:

### A. Residence:

Upon release from prison, Ferguson plans to live at the Salvation Army, located at 525 7th Avenue, San Diego, CA. 92112; telephone number: (619) 239-8027.

Alternate Residence:

Placentia Free Methodist Church Home Free Ministries, located at 925 South Melrose Street, Placentia, California, 92870; telephone number: (714) 630-3481.

### B. Employment:

Subject claims he is eligible to receive Social Security Insurance benefits. A review of the Central File verified subject's claim.

### C. Assessment:

Future plans appear feasible. However, no recent letters have been received documenting offers of employment or support.

## V. USINS STATUS:

N/A

State of California Department of Corrections California State Prison, Solano Prior Page Number:___ ___

CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES: All Staff, Clinicians, Treatment Teams.

| Date: | Time: | Staff: | Reason for Visit | Scheduled Length: |
|---|---|---|---|---|
| 11/3/2006 | 14:30 | Dusay | Meds Expiring | 0.25 |

**Housing:** S102T1000000119L **Release Date:** **Current Diagnosis:** 296.35

CONTACT: [ ] Case Manager [ ] IDTT [✓] Psychiatrist [ ] Individual [ ] Other

Completed? Yes / No [✓] Out of Cell [ ] Cell Front Reason not Completed ______

REFERRED BY [ ] MH [ ] Custody [ ] Medical [ ] Emergency [ ] I/M Request [ ] Other

**Subjective:** ∅ new MH complaint — ∅ SI / HI, or ∅ aggressive thoughts — going to Board in Jan. One crime sentence, — progressing well

**Objective:** MS: WNL

**Assessment:** 296.33 — well controlled, + remitting on trazodone —

**Plan:** Renew trazodone —
Should do well in Board. ∅ Hx of incidents ∅ altercations in prison, ∅ write-ups. —

**Education:**
I consider him ∅ safety risk

J. DUSAY, M.D
STAFF PSYCHIATRIST
CALIFORNIA STATE PRISON SOLANO

Followup:

| MENTAL HEALTH INTERDISCIPLINARY PROGRESS NOTES | LEVEL OF CARE: | Last Name: | First Name: |
|---|---|---|---|
| MH 3 [3/21/96] | CCCMS | FERGUSON | KENNETH |
| Confidential Client/Patient Information See W I Code, Section 5328 | | CDC # K11229 | DOB 12/23/1942 |

# EXHIBIT N

BOARD OF PRISON TERMS
LIFE PRISONER HEARING DECISION FACE SHEET

STATE OF CALIFORNIA

[ ] PAROLE GRANTED – (YES)
CDC: Do not release prisoner before Governor's review.

[X] PAROLE DENIED – (NO) 2 (two) years

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR: ____YEAR(S)
[ ] HEARING POSTPONED/REASON:________________

**Records Use Only**

Parole Release Date________
YR MO DA

Attach Prison Calculation Sheet

**PANEL RECOMMENDATIONS AND REQUESTS**

**The Board Recommends:**

[ ] No more 115's or 128'A
[ ] Work to reduce custody level
[X] Get self-help* As available
[X] Stay discipline free
[ ] Learn a trade*
[X] Get therapy* as avail.
[X] Earn positive chronos
[ ] Get a GED*

[ ] Recommend transfer to
[X] Other needs new psych for next hrg.
*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

Penal Code 3042 Notice ☒ Sent Date: **1/19/2007**

| Commitment Offense(s) | Code(s) | Crime(s) |
|---|---|---|
| | **P206/P12022(b)** | **TORTURE W/ USE DEADLY WEAPON** |
| | **Case(s)** | **Count(s)** |
| | **SCN029511** | **02** |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| **6/18/1996** | **6/18/1996** | **7/5/2003** |

☐ Initial Hearing ☒ Subsequent (Hearing No.) ___2___ Date of Last Hearing **1/12/2005**

CDC Representative

Attorney for Prisoner ~~BEN RAMOS~~, CHRISTENSEN Address

D. A. Representative SACHS County **SAN DIEGO**

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair [signature] Date 2/27/07

Panel Member [signature] Date

INMATE COPY

Panel Member Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| **FERGUSON, KENNETH** | **K11229** | **CSP-SOLANO** | **2/2007** | **2/27/2007** |

TENTATIVE

BPT 1001(REV. 08/03)

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER SMITH:** -- is back in the hearing room. Once again, everyone previously identified is back in the hearing room.

**PRESIDING COMMISSIONER SHELTON:** I'm going to move closer so that Mr. Sachs, maybe you can hear me better.

**DEPUTY DISTRICT ATTORNEY SACHS:** Okay. Thanks.

**PRESIDING COMMISSIONER SHELTON:** All right. Okay. With that being said, we're back here in the matter of Kenneth Ferguson, FERGUSON, CDC number K-11229. Mr. Ferguson, the Panel's reviewed all information received and we've relied on the following circumstances in concluding that you are not suitable for parole and would pose an unreasonable risk of danger to society, or a threat to public safety if released from prison. You know? To be honest with you, sir, it didn't take us a whole lot of time to come to this decision. Unfortunately, when we've taken a look at everything and in general, your presentation puts people off. You know? You speak a good game and you talk about yourself

handle it. We're giving you a two year denial, sir. And that involves a couple of reasons. First of all, we'll deal with the commitment offense. It was a horrendous offense and you may tell us how you feel but I don't feel how you feel. It's not coming across. The offense was carried out in an especially cruel and callous manner. There were more victims than the lady sitting here. The offense was carried out dispassionately and in a calculated manner. You beat her potentially, the intent was, to death. With over 13 blows from a wrench 12 inches long and I would say that she was abused and defiled during and after that offense. The motive for the crime goes back to your controlling issues. She wanted to leave. You wanted to be in control. You said something about abandonment. I think Commissioner Smith brought up an issue about that as well. If you came from a loving, nurturing family, issues aren't abandonment. The issue here is that you didn't get what you wanted. These conclusions are drawn from a statement of facts that came from the appellate court ruling that was filed on December 18th 1997, pages two through six. I think we've discussed it enough. I don't want to put the

victim through it again. All we do know is that she was beaten severely and it was a monstrous attack on her that's not only her damaged also her son. You had no prior record. That serves to your advantage. With regards to your institutional behavior, you had a classification score of 28. I will cover the positive aspects of your incarceration momentarily. While you were in custody, you did not pursue a vocation. Granted you were 52 when you went in and you're currently 64, which I might add, Mr. Ferguson, is not geriatric and that caused a symptoms in your (inaudible) because you attempted to paint yourself a picture of an old man not capable of doing much. 64, you're very capable of doing much. With that our indifference. Anyway, with regards to vocation, you did not complete one. You put yourself into the role of a peer health education teacher, as you say, and hopefully someday may be get something that you can use but you didn't pursue any other vocation while you were in here. I think educationally, you did most of your education outside the institution and we would definitely like to see you participate more in the arena of self help and I'll go into that shortly. With regards to the

psychiatric evaluation, it has some concerns. In '02, your psychiatric evaluation indicated that you were still describing this event as self defense. You were defending yourself. That was in '02. Doctor Vancouvering had concerns about victim safety in her psychological. Doctor Davis did one in December '06, indicated you suffered from a mild depression. His scoring leaves a lot to be desired when it comes to comparing inmates to inmates but he indicated you had a low risk as compared to life term with other inmates. Then, as Ms. Christensen pointed out and we noticed, sir, your GAF score which stands for Global Assessment Functioning was 70 which is like a C minus if we were going to give you a grade. Because of the contrast in opinions in those three psychological evaluations, we're going to have you have another psychological evaluation. Hopefully, it will be completed under the new standard and that would be happening prior to your next hearing. Your parole plans are shaky at best, sir. I couldn't find a letter anywhere in the record that indicates Salvation Army had a program or offered it to you or accepted you into it. I have no letters. With regards to your ability to take care of yourself economically,

you have a social security letter. I guess, I have a concern that the fact that you tell us that you have maybe $50,000 tucked away in a trust fund somewhere and I don't know if there's been any efforts made to pay restitution to the victims in your offense or considering the fact that it's a great deal of expense all across the board with regards to your son, your ex wife and other people involved. You're sitting on a nest egg that you say you have no control over but I bet if you really wanted to find a way, you could. So, prior to your next hearing, you really have to deal with more secure and stable parole plans. We need to know you have a place to live and a letter supporting that and if you can give enough dated social security statement and I would heartily recommend you look into your resources and when there is a trust fund. With regards to the 3042 notices that I told you we sent out, obviously, you had opposition from the San Diego District Attorney's Office as well as probably an excess of 75 letters by people who oppose your parole at this time. There are several things, Mr. Ferguson, that I would like to commend you for. You have made some improvements in your world. Again, your

classification score is 28. That's as low as it can go. Commissioner Smith indicated that we are both extremely impressed when we run across an inmate that has not received any disciplinary action in the institution. No 115s and no 128s. You received a laudatory chrono in January of '07 for being a peer health educator and teacher through the lawback literacy program. You also received some general chronos with regards to your participation in the 26 week anger management program and also a short period of time in '05 as in AA and NA. You also indicated to us that you participated in Board for the last ten years although I don't think we found any verification of that in your file so I would recommend you to bring verification of that to your next hearing. So, with that being said, sir, in a separate decision, the hearing Panel finds that it is not reasonable to expect that parole would be granted at a hearing during the next two years. We've gone over the reasons. In summary, I'll put some of the facts of your commitment offense and you've been there and it was taken from the appellate court ruling. It was, as you indicated in one of your opening statements, a heinous crime but you haven't

convinced me you wouldn't do it again. You need to work on you. The real you. Part of what we recommend is for your psychological evaluation was an appraisal of the varying opinions from your previous psychologicals. So, you need to work on your parole plans, update your letters, make sure you have a place to stay. You need to do as much as possible in the way of self help and that would include reading books and writing book reports. You need to (inaudible), sir of a whole lot more. You need to feel it. You need to know it yourself. You need to believe it. You need to work it just not pass the word along. Commissioner?

**DEPUTY COMMISSIONER SMITH:** Mr. Ferguson, you, you may have very well turned a corner certainly in terms of your adjustment that, that would indicate that you have. As Commissioner Shelton indicated that turn may be very recent. It's a little difficult to tell. In the '02 psychological evaluation, you were still talking about self defense as the mechanism. It certainly tells us, I believe it's in '02, you hadn't come to terms with the commitment offense and in '04, although you were no longer talking about self defense, the doctor at that time still

considered your victim as being in a dangerous position should you be granted parole. The current evaluation doesn't indicate either of those things and I don't know whether or not that's because you've turned that corner or whether that's simply the opinion of the current evaluator. And the other thing in it that caused me great concern was that throughout the course of the hearing and understandably so, to an extent, you talked about the effect of the commitment offense and what it's had on you and being in prison and the type of adjustment you've made. To an extent, you discussed the impact that it's had on your victim. But there was another victim here and that other victim was your son. Although your son was not attacked by you physically, certainly, your son was attacked by you psychologically. I was disturbed as I still am that that wasn't expressed by you and I don't know if that's because the pain is such that it needs to be pushed back or you didn't express that because you didn't feel that. I suggest that you explore that. That when you get the transcript from this hearing, that you take a look specifically at my comments as well as Commissioner Shelton's but particularly my

comments with regard to the impact that this commitment offense has had on your son as well as the victim. I wish you well. Counsel, thank you.

**ATTORNEY CHRISTENSEN:** Thank you.

**DEPUTY COMMISSIONER SMITH:** Mr. Sachs, thank you.

**PRESIDING COMMISSIONER SHELTON:** Good luck, Mr. Ferguson.

**DEPUTY DISTRICT ATTORNEY SACHS:** Thank you very much and I wish along (inaudible). Good evening.

**PRESIDING COMMISSIONER SHELTON:** That concludes this hearing at 5:30 p.m.

**A D J O U R N M E N T**

--oOo--

**PAROLE DENIED TWO YEARS**

**THIS DECISION WILL BE FINAL ON:** JUN 27 2007

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS
CDC128G

| CDC NUMBER | NAME: | CS | COMMITTEE ACTION: |
|---|---|---|---|
| K11229 | FERGUSON, KENNETH | 28/LIF | POST BOARD- CPP ( Peer Health) BPH Panel recommendations explained. |
| CUSTODY: | ASSIGNMENT | WG/PG | |
| MED A | PEER HEALTH | A1-A 10-6-97 | |
| | NEXT CLASS | TYPE-RELEASE DATE | |
| | 7/2007 | MEPD 7-5-2003 | |

FERGUSON, KENNETH, K11229, appeared before Facility I UCC for POST BOARD Classification. Complied with CCR 3375(f)(1). Inmate participated and agreed with Committee actions. Inmate was advised of his rights to appeal the Committee actions.

Appeared before the Board of Prison Hearings on February 27, 2007, for Subsequent Hearing #2. Parole was denied for a period of two years. The Panel recommended Ferguson remain disciplinary free, earn positive chrono's, and participate in self-help and therapy programs as available. Ferguson had questions regarding his CII report. The process for obtaining this document was explained to Ferguson.

INMATE COPY

COMMITTEE ACTION: CPP( Peer Health) BPH Panel recommendations explained.

K. BROADWATER
CC-I/Recorder

M. BROWN
CC-II (A)

C. ARTHUR
FACILITY CAPT(A)/CHAIRMAN

| Institution: | Facility/House: | Action Date: | Signature: |
|---|---|---|---|
| CSP-SOLANO | I/2-119L | 3-8-07 | |

PROG.DOC

kb